BEFORE THE UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Doc. No.: |
| | ) | |
| BELMONT UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT

---

Plaintiff John Doe, for his complaint against defendant Belmont University, alleges as follows:

### JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has subject matter jurisdiction over Plaintiff's state claims under 28 U.S.C §§ 1367 and 1651. The amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, an actual controversy exists between Plaintiff and Belmont University, justiciable in character, in respect to which John Doe seeks a declaration of his rights and appropriate further relief under the provisions of 28 U.S.C. §§§ 2201, 2202 and 1651.

2.  This Court has personal jurisdiction over defendant Belmont University because it regularly does business and engages in other persistent courses of conduct in this district.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendant
Belmont University is located in this district and a substantial part of the events
giving rise to this claim occurred in this district.

## PARTIES

4.     Plaintiff John Doe is a citizen and resident of Tennessee.

5.     Defendant Belmont University ("Hereinafter "Belmont") is a private university,
located in Nashville, Davidson County, Tennessee, which accepts federal funding,
and can be served through its Registered Agent, Robert C. Fisher, 1900 Belmont
Blvd., Nashville, TN 37212.

## FACTS

6.     In October of 2016, John Doe received a letter from Belmont informing him that a
complaint of sexual misconduct was filed against him by S, a student at Belmont.

7.     The allegations of sexual misconduct were made through Belmont University's
Title IX department.

8.     John Doe had just completed his freshman year at Belmont at the time the
complaint arose.

9.     Student S., who accused Doe of sexual misconduct, was a rising junior at the time
the accusations were made.

10.    Doe was an A student, active in sports and Belmont leadership activities; Doe was
often called on by the administration and professors to assist in campus matters
relating to new students.

Case 3:17-cv-01245   Document 1   Filed 09/11/17   Page 2 of 28 PageID #: 2

11.     Doe chose Belmont because of its Christian principles and its academic excellence. Doe was very happy and successful at Belmont and fully intended to graduate from the university.

12.     John Doe met Student S. on or about May of 2016.

13.     Doe and S. were both on summer staff for Belmont and lived in the same dorm over the summer. The cost of living in the dorm was provided as part of the payment Doe received for being on summer staff.

14.     Doe did not live on Belmont campus, with the exception of the 2016 summer.

15.     Doe had three roommates, with whom he shared campus housing, for the time period of May 2016 through August 2016.

16.     Doe and Student S. became close friends over the summer of 2016 and S. went on outings with Doe and his roommates or other mutual friends.

17.     Doe is a photographer and he would often seek out interesting places to photograph. On their outings, Doe and his friends went to such places as the rock quarry in Gallatin, TN and the Natchez Trace Parkway bridge.

18.     During the summer of 2016, S. was a bartender at Bar Taco in Nashville.

19.     At the beginning of their friendship, S. informed Doe she did not have a car and would often walk home from work late at night. Doe offered to give S. a ride home if she ever felt unsafe walking.

20.     S. frequently called or otherwise communicated with Doe to request a ride home; Doe gave S. a ride 12-15 times.

21.    As the summer progressed, S. began coming to Doe's room to hangout and talk; their relationship developed into one of closer friends. Often S. would stay in Doe's room late into the night and sometimes fall asleep there.

22.    Doe and S. did not have sexual intercourse; they kissed and talked but did not have intercourse or oral sex.

23.    One night during the summer of 2016, S. requested Doe perform oral sex on her and he refused, stating his moral and Christian beliefs as a reason for refusing.

24.    In June of 2016, Doe quit spending time with S., outside of work at Belmont, because he believed they were incompatible spiritually. Doe informed S. of this decision and the reason for his decision.

25.    On or about the beginning of October, 2016, Student S. filed a Title IX complaint against Doe.

26.    S. filed the Title IX complaint against Doe several months after their last date or interaction.

27.    On October 6, 2016, the Deputy Title IX Coordinator found "reasonable cause to exist" and recommended the matter proceed under the university's formal sexual misconduct accountability process.

28.    On October 11, 2016 John Doe received a "No Contact Order" from Belmont University regarding Student S. The letter and order were issued by Molly Zlock, Assistant Dean of Students and University Title IX Coordinator. Doe was given no specific information regarding the reason for the order.

29.    Molly Zlock was, at all times, acting as an agent of Belmont.

4

30.   An investigation into the alleged Title IX violation took place between October 11, 2016 and October 28, 2016; this investigation was conducted solely by the Belmont Title IX Department.

31.   Student S. provided a written statement to the Title IX office at some point during the investigation. Doe was not permitted to view this statement until October 28, 2016 and thus did not know with specificity the acts of which he was accused until October 28, 2016.

32.   On October 28, 2016, the parties were given the investigatory file and were instructed to submit final statements on the matter within a two or three day time period.

33.    It was on this date, October 28, 2016, that Doe first received information regarding the substance of the accusation. Doe thus received the actual accusation against him after the investigation was finalized.

34.   As the sole basis of her Title IX complaint, Student S. listed three incidents that occurred between and John Doe and herself: (1) S. alleged Doe kissed her and attempted to take her shorts off on an unspecified date; (2) S. alleged that on June 3, 2016, Doe asked her to take her shorts off, which she did, and then attempted to have sexual intercourse with S., in the missionary position, with S. on top; (3) June 8, 2016, S. and Doe were at Percy Warner park in a hammock together and were kissing. While kissing, S. alleged Doe attempted to undress her and she stopped him. S. does not allege anything else of a sexual nature occurred between the two on this date.

35.   S. voluntarily spent time with John Doe after these alleged incidents occurred.

36.     On June 23, 2016, S. posted a statement on a public social media forum commending Doe for his upstanding character; this post was made after the alleged Title IX violation.

37.     When reviewing the investigatory file provided by Zlock on October 28, 2016, Doe noticed that one of his witnesses, student T., was not interviewed and, through counsel, brought this to the attention of the Title IX Coordinator, Zlock.

38.     On November 3, 2016, the witness, Student T., was interviewed and the information pertaining to his statement was provided to S. and Doe as a late addition to the investigatory file.

39.     On December 13, 2016 Doe received the initial determination statement from Belmont, signed by Zlock.

40.     Zlock made the following findings in her December 13, 2016 letter to Doe:

"I find Respondent not responsible for non-consensual sexual intercourse and non-consensual sexual contact. However, I do hold Respondent accountable for being purposefully untruthful in this investigation. Additionally, I find the evidence establishes that Respondent repeatedly violated the university's visitation policy…"

41.     John Doe appealed the initial determination, within the allotted two day time period, on December 15, 2016.

42.     On December 28, 2016, Doe received the final determination letter stating no procedural errors were found and the determination of Zlock would stand.

43.     During the time frame of the Title IX investigation, Respondent was suddenly accused of cheating in an online class during the fall of 2015. However, the issue

6

was not sent to the Honor Council, as as prescribed by the student handbook, the Bruin Guide.

44. Doe was given no viable explanation for why he was not afforded the opportunity to appear before the Honor council for the cheating accusation.

45. During the Title IX investigation, John Doe was **_also_** accused of violating the visitation policy (also called Community Commitment) and given a much stricter punishment than those students *with him* who also violated the policy.

46. The alleged Community Commitment violation (visitation violation) should have been investigated separately from the Title IX accusations, according to Bruin Guide, but was not.

47. Doe was **assured** the visitation violation would not be considered or intermingled with the Title IX charge by Zlock and yet Zlock specifically mentions visitation violations in her determination letter and bases her discipline on alleged visitation infractions.

48. The visitation violations were for being in a dorm after curfew and included times when Doe was with S. but S. received no discipline.

49. The dates of the visitation violations for which Doe was disciplined are as follows:

(1) 6/5/2016- Doe was found responsible for a violation and issued a written reprimand;

(2) 10/1/2016- Doe was found responsible for a violation and lost all dorm visitation privileges until the end of the Fall 2016 semester;

7

(3) 10/26/2016- Doe was found responsible for a violation and lost all dorm visitation privileges until the end of the Spring 2017 semester.

50.     Finally, Doe was also accused and found guilty of violating the no contact order during the Title IX investigation as a result of actions by Doe's sister-in-law.

51.     Doe's sister-in-law contacted a mutual friend of she and S. and vaguely inquired of the friend what they knew about S. Doe's sister-in-law did not mention the Title IX accusations or any details of the accusations.

52.     The action taken by Doe's sister-in-law was done without Doe's knowledge. Doe had no idea his sister-in-law had spoken to anyone about S. and certainly did not ask her to do so. Doe's sister-in-law provided Zlock an affidavit to this affect.

53.     Zlock disciplined Doe for his sister-in-law's actions despite clear evidence that Doe was unaware of and uninvolved in her actions.

54.     Despite Zlock's determination that Doe did *not* violate the sexual misconduct policy, Zlock determined Doe violated another policy, one for which he received no notice that he was being investigated or charged.

55.     In her December 13, 2016 letter Zlock determined Doe attempted to "deny the relationship" with S. and determined he was "untruthful throughout the investigative process"; no specific details were given in regard to what Zlock believed Doe was untruthful about.

56.     In fact, Doe admitted in his statement that he had a relationship with S.; Doe did not deny a relationship with S.

57.     Doe denied there was any non-consensual sexual activity with S. and, by way of her determination, Zlock agreed.

8

58. Zlock determined Doe was "purposefully untruthful in the investigation" and that Doe "repeatedly violated the university's visitation policy". Per the Bruin Guide, the investigation of the alleged visitation violations should have been conducted by a department other than the Title IX department and should have had no bearing on Zlock's investigation or decision making regarding Title IX allegations.

59. Zlock gave no evidence to support her finding that Doe was untruthful and in fact agreed with his version of events in that she found him not responsible for the sexual misconduct of which S. accused him.

60. As Doe was found not responsible for the acts S. accused him of, S. was the untruthful party.

61. S. received no discipline for anything related to the false accusations against Doe or for the visitation violations.

62. For NOT committing non-consensual sexual intercourse or non-consensual sexual contact John Doe received the following sanctions:

    1) Immediate suspension through the end of Spring 2017 semester, after which Doe must *re-enroll; Doe was expelled;*

    2) Institutional probation for Doe's entire career at Belmont;

    3) Doe is banned from holding any leadership positions in *any* organization at Belmont;

    4) A permanent no-contact order against the woman he DID NOT rape or sexually assault.

9

63.     Doe was punished for retaining counsel and defending himself against all charges. It was not until after Doe retained counsel and vigorously defended himself before Belmont, that he began receiving notifications of other violations, including the allegations of honor code and visitation violations.

64.     The University's promise of fundamental fairness and implied covenant of good faith and fair dealing placed an obligation on Molly Zlock, the Title IX Coordinator to dismiss charges in their entirety if evidence of guilt or "responsibility" was not present.

65.     On June 23, 2016, S made a written statement on a public forum commending Doe for his upstanding character. Zlock was aware of this statement prior to interviewing Doe.

66.     According to the Bruin Guide, Doe had the right during the Title IX investigation to provide the University with the names of and contact information of any witnesses with information regarding the accusations against him.

67.     Pursuant to Belmont's Title IX Process, the University is required to meet with witnesses to collect information relevant to the accusations.

68.     The University breached its promise when it completely failed to interview T., the individual listed as the primary factual witnesses for Doe. The University only interviewed T. when Counsel for Doe intervened.

69.     When T. was finally interviewed, he was still not interviewed in a meaningful manner. Zlock and the University deemed T.'s testimony to be deemed "scripted" and not credible.

70. No explanation or evidence was provided to support the determination that T.'s testimony was not credible.

71. As a result of the determination against Doe, and the continued retaliation he was subjected to, Doe was forced to withdraw from Belmont.

72. Doe has been unable to gain customary acceptance to another school due to the findings associated with the Title IX accusations.

73. Doe is currently not attending any educational institution.

## COUNT I
## BREACH OF CONTRACT

74. All of the foregoing paragraphs are incorporated by reference.

75. John Doe applied to and enrolled in the University and paid tuition and other fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the University would provide education and instruction to Doe as well as abstain from arbitrarily imposing punishment that would prevent Doe from securing his degree, or that interfered with his education, in an unfounded manner or arbitrary basis.

76. Doe also had the reasonable expectation that Defendant Belmont would implement and enforce the promises and policies made in its official publications, including the Bruin Guide and all other official publications of the university.

77. A contract was formed between the University and Doe; either an express contract or a contract implied in law or fact.

78. The contract contained an implied covenant of good faith and fair dealing and other specific written provisions from the Bruin Guide and other unwritten rights guaranteed by law. Certain rights were and are guaranteed to every student at

11

Belmont involved in the disciplinary process, including those accused of sexual misconduct or assault.

79. Specifically, Defendant Belmont University is accused of the following breaches:

**A.** **Breach of the obligation to provide timely and meaningful notice to John Doe of the accusations against him;**

80. Pursuant to Belmont University's sexual misconduct policy, Doe was entitled receive notice of the commencement of the formal sexual misconduct accountability process and a written copy of S's statement.

81. Although Belmont University may have provided Doe with timely notice of S's allegations of sexual assault and/or misconduct, Doe was never given timely notice of the actual actions or incidents of which he was accused.

82. Doe was not given any notice of the alleged violations for which he was actually found guilty of and punished for, namely untruthfulness.

83. Belmont University did not just provide Doe with late or inadequate notice; it simply provided no notice of the alleged violations for which Doe was punished.

84. Belmont University's complete failure to provide Doe with any notice prevented Doe from gathering evidence to refute the charges against him, preparing his defense, and conducting any meaningful consultation with his support advisor concerning the actual allegations for which he was punished.

85. Belmont did not conduct any investigation into the allegations for which Doe was disciplined.

86. Belmont's complete lack of any notice and complete absence of any investigation into the allegations for which Doe was disciplined, violated the student handbook and constitutes a breach of contract .

12

**B.    Breach of the obligation to conduct an appropriate and unbiased investigation;**

87.    Pursuant to Belmont's sexual misconduct policy, the Title IX coordinator will assign at least one neutral investigator to the investigation.  Aside from this statement Belmont's sexual misconduct policy does not discuss or establish the responsibility of any employees, including the Title IX coordinator, to act impartially or without bias.

88.    Despite the lack of any language regarding impartiality in Belmont's sexual misconduct policy, the promise of fundamental fairness and the implied covenant of good faith require Belmont University to conduct appropriate and unbiased investigations into all sexual misconduct allegations.

89.    Belmont University, and specifically Zlock, failed to conduct an appropriate and unbiased investigation regarding the allegations against Doe.

90.    Zlock's communications with Doe make it clear that she was biased against him from the very start of the investigation.  Despite the fact that Zlock had absolutely no grounds to find Doe liable of any sexual assault (and thus found him not guilty), she still found a way to indefinitely suspend him from Belmont for allegedly being untruthful throughout the investigation, although Doe was never charged with any policy violations regarding veracity or truthfulness.

91.    Although S. accused Doe of sexual misconduct and he was found not guilty of such allegations, Belmont never disciplined S. for false statements she provided throughout the course of the investigation.

92.    S. alleged Doe had nonconsensual sexual intercourse with her, this either occurred or it did not. Zlock found it did not occur and therefore, S. was untruthful.

13

**C.** **Breach of the obligation to refrain from proceeding if the charges lacked sufficient evidence against Doe;**

93.     Belmont's promise of fundamental fairness and the implied covenant good faith and fair dealing placed an obligation to Belmont and Zlock to refrain from proceeding with S.'s allegations against Doe if the investigation demonstrated that there was insufficient evidence to find Doe guilty of sexual misconduct.

94.     On June 23, 2016, S. posted a statement on a public social media forum, which commended Doe for his upstanding character  S. posted this after the date(s) on which S alleged that sexual misconduct occurred.

95.     Before Doe was even interviewed regarding the allegations against him, Belmont and Zlock were aware of S.'s statement commending Doe and contradicting her accusations against him.

96.     In the face of S.'s statement and the fact that Belmont was aware of such statement, the decision of Belmont and Zlock to proceed with the charges against Doe constituted a breach of Belmont's promise of fundamental fairness and the implied covenant of good faith and fair dealing.

**D.** **Denial of meaningful right to counsel;**

97.     Belmont's sexual misconduct policy states that Doe was entitled to a support advisor of his choosing, and had the right to select an attorney or legal counsel as his support advisor.

98.     Belmont violated both its own sexual misconduct policy, the promise of fundamental fairness, and the implied covenant of good faith and fair dealing by denying Doe a meaningful right to effective counsel at critical times throughout the  investigation and disciplinary process.

14

99.  Doe selected an attorney as his support advisor, but had legal counsel in name only, as Belmont tied Doe's attorney's hands. Doe's legal counsel was not acknowledged by Belmont and could not speak or give advice while Doe was interviewed or communicating with Belmont.

100.  The notion of a student being able to defend himself competently in the immensely emotional situation Doe found himself is absurd. Doe was intimidated, as any innocent student accused of sexual assault would have been, and could not have been expected to prepare and deliver his version of the facts in a coherent and logical manner. Doe should not have been forced to go through the investigation process without counsel, and an attorney who cannot speak or give advice during interviews and is not at all acknowledged by Belmont University as Doe's counsel is no substitute for effective legal counsel.

101.  Doe was penalized for retaining counsel as Zlock determined some witness' statements to have been "scripted".

**E.  Breach of the obligation to provide Doe with the specific charges against him;**

102.  Belmont University's sexual misconduct policy requires that notice be provided to students accused of sexual assault via email.

103.  The notice provided to Doe contained only information regarding S.'s allegations of sexual misconduct; the notice contained no mention of any charges relating to a lack of truthfulness or any issues regarding Doe's veracity.

104.  The notice provided by Belmont University was defective in that it did not fairly apprise Doe of the range of charges which he was facing, one of which he was eventually suspended for allegedly violating.

15

105.     Complete and meaningful notice of the charges faced by an accused individual is among the most basic procedural protections, and the notice must state and define the charged offenses with sufficient particularity to enable the accused party to adequately defend against such charges.

106.     Belmont University's inadequate notice of charges against Doe was a breach of Doe's right to provided with notice of the charges against him, as well as a breach of the University's promise of fundamental fairness and the implied covenant of good faith and fair dealing.

**F.     Breach of promise that all persons with relevant information would be interviewed in a meaningful manner**

107.     Pursuant to Belmont's sexual misconduct policy, the investigators will meet with witnesses that have relevant information as many times as needed to collect such information.  Additionally, Doe was supposed to receive statements, prepared by the University, based on the interviews of "the parties and their witnesses".  The University's sexual misconduct policy provides that Doe would also be permitted to respond to and approve the statements and inform Belmont University of any necessary amendments to the statements.

108.     Belmont breached its promises because investigators failed to interview T., a primary factual witness provided by Doe to Belmont. Belmont did not interview T. during its initial investigation into the allegations against Doe, and only interviewed T. when Counsel for Doe intervened.

109.     When Belmont University finally interviewed T., it failed to do so in a meaningful matter.  Belmont, and specifically Zlock, deemed T.'s testimony to be

16

"scripted" and not credible. Zlock provided no explanation or basis for her decision that T.'s testimony was not credible.

**G.    Breach of obligation to provide competent, trained, unbiased investigators, and decision makers;**

110.    Although Belmont University's sexual misconduct policy inexplicably seems to be devoid of an obligation that decision makers act without bias (aside from requiring that the investigators be "neutral"), the implied covenant of good faith and fair dealing and Belmont University's promise of fundamental fairness obligated Belmont University to provide Doe with unbiased, competent and trained investigators and decision makers and to ensure that the outcome of the investigation was not predetermined.

111.    Ms. Zlock oversaw all aspects of the investigation into the allegations against Doe and made the final decision regarding his sanction, and her bias and conduct tainted the investigation from the beginning.  This conduct includes but is not limited to Zlock's refusal to timely interview Doe's primary witness (T.), her dismissal of T.'s testimony as scripted, and her decision to proceed with the charges against Doe despite evidence that Doe was not guilty of any sexual misconduct against S.

112.    Zlock's bias against Doe was so pervasive throughout the investigation that Doe was somehow disciplined very harshly despite being found not guilty of any sexual misconduct. Zlock found a way to suspend Doe for being "purposefully untruthful" throughout the investigation, a violation that he was never even charged with and had no opportunity to defend against.  This finding was plainly

17

a product of the presumption of some sort of wrongdoing on the part of Doe, as well as the atmosphere of bias that permeated the entire disciplinary process.

113. Upon information and belief, none of the investigators or decision makers involved in Doe's case had any training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting. Thus, Belmont University breached its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

**H. Breach of obligation to afford Doe an opportunity for confrontation and cross examination;**

114. Belmont University's sexual misconduct policy does not provide for any sort of hearing for students accused of sexual misconduct. After an investigation takes place, the decision of guilt or innocence and the appropriate sanction(s) is left entirely up to the Title IX coordinator, rather than a panel of decisionmakers.

115. Doe's right to confront Belmont University's evidence against him is a key component of fundamental fairness.

116. Doe's right to confront Belmont University's evidence was extremely limited, as he was only permitted to review the statements of S. and other parties involved in the investigation after the investigation had concluded. He had no right to cross-examine S. or any other relevant parties.

117. Doe was also completely deprived of the opportunity to confront Belmont University's evidence regarding his alleged untruthfulness during the investigation, which is the actual alleged violation for which he was found guilty and sanctioned. Not only was Doe not informed of the charge of untruthfulness at

18

the outset of the investigation, but also Belmont University provided Doe with absolutely no opportunity for confrontation or cross-examination regarding this issue. This lack of opportunity was a violation of the implied covenant of good faith and fair dealing and Belmont University's promise of fundamental fairness.

I.   **Breach of obligation that there be sufficient evidence (or any evidence) to support the Title IX Coordinator's finding.**

118.   Pursuant to Belmont University's sexual misconduct policy, Ms. Zlock could only find Doe responsible for the alleged violation based on the information in the investigatory file and utilizing the preponderance of the evidence standard.

119.   Belmont University's promise of fundamental fairness and the implied covenant of good faith and fair dealing require that Doe have been presumed innocent and Belmont University have the burden of proof. The records pertaining to Belmont University's investigation and ultimate decision demonstrate that Belmont University breached these obligations.

120.   Although Belmont University found Doe not guilty of any sexual misconduct, he was suspended for being "purposefully untruthful" during the course of the investigation. Belmont University put forward no evidence to support this completely new allegation and determination, and there is no evidence of such untruthfulness from Doe in the record. Further, the discipline is listed on his transcript and in his student record as a Title IX violation, when it clearly is not.

J.   **Breach of the obligation to provide a meaningful right of appeal.**

121.   Pursuant to Belmont University's sexual misconduct policy, Doe had the right to submit an appeal of the determination of responsibility and any sanctions because of the presence of procedural errors, new information, or information

19

demonstrating the fact that no reasonable person could have arrived at a similar determination absent bias.

122. Mr. Anthony Donovan, the assistant dean of student-residence life, was the Belmont University employee responsible for reviewing Doe's grounds for appeal and making a determination.

123. Upon information and belief, Mr. Donovan did not have training in adjudication; in the law; in the weighing of evidence; or in the relevance of irrelevance of types of evidence in the alleged sexual misconduct investigation setting.

124. Despite the absence of any relevant training, Mr. Donovan was somehow able to conclude that no procedural errors, evidence of bias, or relevant new information had impacted or would impact the ultimate outcome and sanctions in Doe's case.

125. This "appeal" was illusory and a sham, and breached the promise of fundamental fairness and the implied covenant of good faith and fair dealing.

**K. Summary**

126. All of the foregoing breaches of contract were wrongful, without justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in Doe's case. Doe was disciplined and constructively expelled from Belmont University despite being found not guilty of any sexual misconduct. As a direct and forseeable result of these breaches of contract, Doe has sustained, and will continue to sustain, substantial injury, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

20

## COUNT II
## PROMISSORY ESTOPPEL

127.   All of the foregoing paragraphs are incorporated by reference.

128.   As described above, the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of John Doe. In reasonable reliance on these promises and representations, Doe accepted the University's offer of admission and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

129.   To his detriment, Doe reasonably relied on the express and implied promises and representations made by the University.

130.   As a direct and foreseeable result of the University's failure to honor its promises and representations, Doe has sustained and will continue to sustain substantial injury, damages, and losses. Doe's damages, injuries and losses include, but are not limited to: injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of future career opportunities, loss of educational and extracurricular opportunities, and deprivation of due process.

131.   John Doe reasonably believed that if he was found not guilty of the charges levied against him, he would not be sanctioned. However, Zlock sanctioned John Doe for alleged actions he was not charged with.

132. No evidence was presented to Doe to support the allegation that he was purposefully untruthful.

133. Doe was never put on notice of any charges of untruthfulness. Doe was afforded no opportunity to defend himself against allegations of untruthfulness for which he was disciplined.

134. Throughout the "investigation" John Doe was not treated fairly; he was not given the same assistance S. received. John Doe requested assistance and accommodations from Zlock regarding an examination and was ignored, as were his parents.

135. Zlock's decision finds that S. was untruthful, but S. received no sanctions. The determination that S. is credible is completely at odds with the finding that Doe was not responsible for non-consensual sexual intercourse and non-consensual sexual touching. S. clearly stated that John Doe engaged in these activities. The sanctions against John doe are for being untruthful, clearly S. was untruthful as well.

136. S.'s narrative was inconsistent. S. stated in the interview with investigators that she was "triggered" on August, 21, 2016, but also states multiple times that she was scared or horrified during events that allegedly took place before August. She also stated that she wants to "salvage the relationship", while also stating that she was sexually assaulted.

137. On June 23, 2016, S. commented on Doe's upstanding moral character on a public social media platform.

22

## COUNT III
## RETALIATION FOR ASSERTING HIS RIGHTS UNDER TITLE IX

138.  All of the foregoing paragraphs are incorporated by reference.

139.  After being found "not responsible" for the Title IX charges against him, Plaintiff Doe was punished for his actions in defending himself against said action and was suspended from the university and required to re-enroll in order to return to Belmont.

140.  After being found "not responsible" for the Title IX charges, Doe was accused of an honor code violation from several months prior and forced to undergo an investigation into that alleged violation.

141.  After being found "not responsible" for the Title IX charges, Doe was accused of two housing violations, also from several months prior and forced to undergo two additional separate investigations.

142.  Doe was punished significantly more than those who were also present during the housing violations, including S.

143.  Doe suffered actual harm as a direct and proximate result of Defendant's actions.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

144.  All of the foregoing paragraphs are incorporated by reference.

145.  Defendant Belmont's actions in its investigation, including later retaliatory actions, findings and discipline of Doe, and all actions stated in this Complaint, were done intentionally or recklessly.

146.  Defendant Belmont's actions stated in this Complain, including the retaliatory actions, are so outrageous that they are not tolerated in a civilized society.

147. Defendant Belmont's actions regarding Doe resulted in serious mental injury.

## COUNT V
## NEGLIGENCE

148. All of the foregoing paragraphs are incorporated by reference.

149. Having put in place a student disciplinary process, including its sexual misconduct policy, Defendant Belmont University owed a duty of care to John Doe to conduct that process in a non-negligent way.

150. The applicable standard of care is informed by the laws of Tennessee and by the requirements of Title IX and the Clery act.

151. Belmont University failed to perform the duty of care owed to Doe.

152. As a direct and proximate result of Defendant's actions, Plaintiff Doe suffered actual harm, including monetary and emotional damages.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153. All of the foregoing paragraphs are incorporated by reference.

154. Defendant Belmont University owed a duty of care to John Doe.

155. Belmont University failed to perform the duty of care owed to Doe.

156. As a direct and proximate result of Defendant's actions, Plaintiff Doe suffered actual harm.

157. Plaintiff suffered emotional harm, in addition to other damages.

## COUNT VII
## GROSS NEGLIGENCE

158. All of the foregoing paragraphs are incorporated by reference.

159. As set forth above, Belmont University has engaged in conduct that amounts to ordinary negligence.

160. Belmont University's actions in regard to Doe were taken with such disregard for his rights that a conscious indifference to consequences is implied in law.

161. Belmont University's gross negligence has caused Doe, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT VIII
## NEGLIGENT TRAINING AND SUPERVISION OF EMPLOYEES

162. All of the foregoing paragraphs are incorporated by reference.

163. Zlock, the Title IX Coordinator, was an employee of Belmont University at all relevant times.

164. Zlock, an employee of Belmont University, lacked the proper training to carry out her responsibilities pursuant to Title IX, the Clery Act, and Belmont University's sexual misconduct policy.

165. As alleged above and below, Zlock committed negligent, grossly negligent, and intentional tortious acts that caused injury to Plaintiff.

166. Belmont University knew, or in the exercise of due, should have known of Zlock's lack of training and inability to carry out her responsibilities under Title IX, the Clery Act, and Belmont's own sexual misconduct policy and process.

167. Belmont University's negligent failure to train and supervise Zlock directly and foreseeably caused injury to Doe. Had Belmont University taken appropriate steps to train and supervise Zlock, such steps would, more probably than not have prevented the injuries.

25

168. Belmont University's breach of its duty to ensure proper training and adequate supervision for Zlock proximately caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects.

## COUNT IX
## INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP

169. All of the foregoing paragraphs are incorporated by reference.

170. Doe was employed or received funds from Defendant Belmont in return for specified work on campus.

171. Plaintiff was terminated from his employment and lost his monetary compensation as a direct and proximate result of the unfair and illegal actions of Belmont when Belmont disciplined Doe despite a finding of "not responsible" in regard to the Title IX charges against him.

172. Doe was terminated from his employment through no fault of his own; Doe merely asserting his rights under Title IX and defended himself against the Title IX charges.

## COUNT X
## UNJUST ENRICHMENT

173. All the foregoing paragraphs are incorporated by reference.

174. A benefit was conferred on the Defendant by Plaintiff in the form of Plaintiff's photograph, which was used for University advertising and promotional purposes;

26

Plaintiff received no compensation, monetary or otherwise, for the use of his photograph.

175. Defendant Belmont appreciated the benefit conferred by Plaintiff.

176. Retention of the benefit, without any payment to Plaintiff is unjust under all the circumstances of this matter, especially in light of the fact that Doe was suspended with a requirement to re-enroll in the University and therefore was not a student at the time photographs were used.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for this judgment against Defendant Belmont University and asks this Court to:

1. Issue a judgment that that (a) declares Belmont University's investigation and prosecution of the charges against Doe to contrary to Belmont University's contractual and other obligations, its own rules and regulations and arbitrary and capricious;

2. Declare Belmont University's student disciplinary process, including the sexual misconduct policy, as written and implemented and as applied to Doe, to be contrary to Title IX and the Clery Act;

3. Set aside the decision of Belmont University as contrary to Belmont University's own rules and regulations, contrary to law, arbitrary and capricious, and unsubstantiated by evidence;

4. Require Belmont University to expunge the entire incident at issue from its records;

5.  Require Belmont University's records to reflect that Doe left Belmont University in good standing with no disciplinary record whatsoever and to so represent in the event of any , third party inquiry;

6.  Award Doe compensatory damages in an amount to be determined at trial for mental anguish, severe emotional distress, injury to reputation, serious mental injury, past and future economic loss, deprivation of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by Defendant Belmont University;

7.  Award Doe compensatory damages in the amount that Belmont University has been unjustly enriched by its unlawful conduct;

8.  Award Doe his attorneys fees, disbursements and costs pursuant to the provisions of 42 U.S.C. § 1988(b) relating to Title IX, or pursuant to any other statute or common law doctrine providing for the award of attorneys fees, disbursements, and/or costs;

9.  Award prejudgment interest;

10. Grant such further relief that this Court may deem just and proper.

Dated September 11, 2017.

Respectfully Submitted,

*s/Michelle Owens*
Michelle Owens #26512
Agee Owens Cooper, LLC
2911 Elm Hill Pike, Suite 2
Nashville, TN 37214
(615) 300-8546
mowens@ageeowenslaw.com