**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:17-cv-01245** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| | ) | |
| **BELMONT UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**MOTION FOR JUDGMENT ON THE PLEADINGS**</u>

## I.     Introduction

Plaintiff is a former undergraduate student of Defendant Belmont University ("Belmont" or "the University") who was accused by a female student of sexual misconduct in violation of Belmont policies. Plaintiff alleges that Belmont violated his rights under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*, ("Title IX"), breached a purported contract, and committed a variety of torts against him during the course of the University's investigation of the Title IX complaint.  As set forth herein, Plaintiff has failed, as a matter of law, to state a claim upon which relief can be granted for breach of contract, promissory estoppel, intentional infliction of emotional distress, intentional interference with a business relationship, and unjust enrichment.

## A.    Standard of Review

A motion for judgment on the pleadings may be filed "after the pleadings are closed but within such time as not to delay the trial." *See* Fed.R.Civ.P. 12(c). In deciding motions for judgment on the pleadings, courts apply the same analysis that they would apply to motions to dismiss under Fed.R.Civ.P. 12(b)(6). *See E.E.O.C. v. J.H. Routh Packing Co*., 246 F.3d 850, 851 (6th Cir. 2001). Judgment may be granted if the court determines that the moving party is entitled to judgment as a matter of law. *See Astor v. International Bus. Machs. Corp*., 7 F.3d 533, 538 (6th Cir. 1993).

In deciding a motion for judgment on the pleadings, the Court considers the "pleadings," which consist of the complaint, the answer, any counterclaims, and any written instruments attached as exhibits to those pleadings. *See Commercial Money Center, Inc. v. Illinois Union Ins. Co*., 508 F.3d 327, 335 (6th Cir. 2007); *Felix v. Dow Chemical Co*., 2008 WL 207857, *1 (S.D. Ohio 2008) (citing Fed.R.Civ.P. 12(c); Fed.R.Civ.P. 7(a) (defining "pleadings" to include both the complaint and the answer); *see also Housing Authority Risk Retention Group, Inc. v. Chicago Housing Auth*., 378 F.3d 596, 600 (7th Cir. 2004)). A pleading is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint. *Id*. (citing Fed.R.Civ.P. 10(c), and *Sira v.*

*Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). Documents attached to the answer may be considered in a Rule 12(c) motion if they are referred to in plaintiff's complaint and are central to plaintiff's claims. *Id*. (citing *Horsley v. Feldt*, 304 F.3d 1125, 1133-35 (11th Cir. 2002)); *see also Weiner v. Klais and Co., Inc*., 108 F.3d 86, 88 (6th Cir. 1997) (applying rule to motion to dismiss under Fed.R.Civ.P. 12(b)(6)); *see also* WRIGHT AND MILLER, FEDERAL PRACTICE & PROCEDURE § 1367 ("a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice").

Defendant references two exhibits in support of its motion, both of which are attached as exhibits to Defendant's Amended Answer (Doc. 20) and referred to extensively in the complaint and answer. Exhibit A is a true and correct copy of Defendant's initial Title IX determination letter dated December 13, 2016 sent to Doe by Belmont's Title IX coordinator (Doc. 21-1). Exhibit B is a true and correct copy of the Bruin Guide student handbook as it was in effect in the fall of 2016 (Doc. 21-2).

### B.   Statement of Relevant Facts

This case arises from Belmont's investigation of a complaint of sexual misconduct filed against Plaintiff, John Doe, by Belmont student S.S. ("Student

S") beginning in October of 2016. (Doc. 1, ¶6). Belmont addressed this complaint pursuant to its policies under Title IX of the Education Amendments of 1972. The investigation was conducted by Belmont's Title IX department. (Doc. 1, ¶¶9, 27).

### (i) Doe and Student S become friends.

John Doe and Student S met on or about May of 2016. (Doc. 1, ¶12). Doe and Student S were on summer staff for Belmont and lived in the same residence hall over the summer of 2016 in housing provided by Belmont for summer staff. (Doc. 1, ¶13; Doc. 9, ¶13). Doe and Student S became friends over the summer and went on various outings together or with additional friends. (Doc. 1, ¶16).

Student S worked for Bar Taco during the summer of 2016 near Belmont's campus. (Doc. 1, ¶18). Doe occasionally offered to give Student S a ride back to campus after her work finished, and Student S sometimes asked Doe for a ride back to campus after her shift. (Doc. 1, ¶¶19-20). Doe and Student S's relationship progressed through the summer. They began to kiss and hangout more together. (Doc. 1, ¶22).

### (ii) Student S's Title IX complaint is thoroughly and fairly investigated by Belmont.

In October of 2016, Student S filed a formal Title IX complaint of sexual misconduct against Doe. (Doc. 1, ¶25). Student S alleged that Doe kissed her and attempted to take her shorts off. Student S alleged that on a separate occasion Doe

4

asked her to take her shorts off, which she did, and then Doe attempted to have sexual intercourse with her. Student S also alleged that while kissing in a hammock at Percy Warner Park Doe attempted to undress her and she stopped him. (Doc. 1, ¶34).

On October 6, 2016, Belmont's Title IX Coordinator found reasonable cause to exist sufficient for Student S's complaint to proceed under Belmont's Sexual Misconduct Policy, which is set forth in the university's student handbook, the Bruin Guide. (Doc. 1, ¶27, 76; Ex. B, p. 20). At all times relevant to the allegations in this case, Belmont's Bruin Guide specifically provided that "Occasionally policies will change during the academic year. The policies and processes found in the Bruin Guide are the most current and supersede any other version found outside this web publication. * * * *The language used in this handbook is not intended to create nor is it to be construed to constitute a contract between Belmont University and any one or all of its students*." (Ex. B, p. 5, p. 11; Doc. 20, Defense 4, p. 18)(Emphasis added).

On October 11, 2016, Doe was given a No Contact Order from Belmont prohibiting any further contact between Student S and Doe. (Doc. 1, ¶28). Belmont's formal Title IX investigators investigated the complaint between October, 11 and October 28, 2016. (Doc. 1, ¶30). On October 28, 2016 both Student S and John Doe were given the investigatory file complied by Belmont's

Title IX department and asked to submit their final statements in response within three days. (Doc. 1, ¶32). Doe requested and received an extension of time to review the materials and provide his statement in response. (Doc. 20, ¶ 32). Doe also requested that an additional witness of his be interviewed. (Doc. 1, ¶37). This witness was interviewed on November 3, 2016 and the information pertaining to his interview was provided to Doe and Student S as a late addition to the investigatory file. (Doc. 1, ¶38; Ex. A, pp. 9-10).

### *(iii) The Title IX complaint is resolved in Doe's favor.*

On December 13, 2016, Belmont issued its initial determination letter to Doe. (Ex. A). This letter reviewed the investigation and witness statements in depth. *Id*. The Title IX Coordinator found important statements made by Doe during the investigation to be lacking in credibility. (Ex. A, p. 11). Particularly, Doe had questioned the authenticity of a number of text messages submitted by Student S, which established that Doe and Student S had a more physical relationship than Doe had acknowledged. (*Id*.) Doe claimed the text messages were clearly doctored, glaring forgeries, and total lies. (Ex. A, p. 12). Due to these claims, Belmont had the university's Director of Information Security and its Chief Information Officer examine and analyze Student S's phone. (Ex. A, p. 10). Based on this inspection, the text messages were found to be authentic. (Ex. A, pp. 10-11).

Belmont's Title IX Coordinator determined that "despite Respondent's [Doe's] attempts to deny the relationship and his untruthfulness throughout this process, I cannot find it more likely than not that Respondent violated the university's sexual misconduct policy . . . Therefore, I find Respondent not responsible for non-consensual sexual intercourse and non-consensual sexual contact." (Doc. 1, ¶ 40; Doc. 20, ¶ 40). Student S's evidence established that she and Doe had a physical relationship with one another, but fell short in showing it was more likely than not that Doe had violated the sexual misconduct policy by engaging in non-consensual sexual contact. (Ex. A, p. 12).

*(iv) Doe is sanctioned for being untruthful in the investigation.*

Although Doe was not found in violation of the policy, Doe was held accountable for being untruthful in the Title IX investigation. (Ex. B, p. 12). Belmont assigned the following sanctions: (1) Suspension through the end of the upcoming Spring 2017 semester with eligibility to return in Summer of 2017 upon reapplication; (2) Institutional probation throughout Does' Belmont Career during which any further violation of the Code of Conduct would put Doe's status with the university in jeopardy; (3) Loss of the ability to hold a leadership position in any co-curricular organization; and (4) A permanent do not contact order with Student S. (Ex. A, p. 13).

On December 15, 2016 Doe timely appealed the initial determination letter. (Doc. 1, ¶41). On December 28, 2016, Doe received Belmont's response to his appeal noting that no procedural errors were found and the prior determination would stand. (Doc. 1, ¶42).

Doe withdrew from Belmont and did not return after his suspension for the Spring 2017 Semester. (Doc. 1, ¶¶71, 73). Accordingly Doe lost his employment as a student worker for Belmont University. (Doc. 1, ¶¶170-171; Doc. 9, ¶170).

## II. Legal Analysis and Argument

### A. Plaintiff fails to state a claim for Breach of Contract

In Count I of the Complaint, Plaintiff asserts that Belmont breached a contract consisting of the student handbook, the Bruin Guide (Doc. 1, ¶¶76, 77, 78). To establish a breach of contract claim, Plaintiff must demonstrate that an enforceable contract existed. *See Kindred v. National College of Business & Tech., Inc.*, *Slip Copy*, 2015 WL 1296076, *4 (Tenn.Ct.App. 2015); *see also Ku v. State of Tenn.*, 104 S.W.3d 870, 875 (Tenn.Ct.App. 2002) *citing Johnson v. Central Nat'l Ins. Co.*, 356 S.W.2d 277, 281 (Tenn. 1962). While a contract may either be express or implied, written or oral, it "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and

sufficiently definite to be enforced." *Staubach Retail Services-Southeast, LLC v. H.G. Hill Realty Co*., 160 S.W.3d 521, 524 (Tenn. 2005); *see also Ku*, at 875-876.

The Bruin Guide expressly disclaims that it is a contract, and states, in pertinent part: "The language used in this handbook is not intended to create nor is it to be construed to constitute a contract between Belmont University and any one or all of its students." (Ex. B, Section III, p. 11). The Bruin Guide further provides that, "Occasionally, policies will change during the academic year," (Ex. B, Section I, p. 5), putting students on notice that Belmont may unilaterally change its policies as it deems appropriate. The disclaimers reflect the University's clear intention not to be contractually bound to the contents of the student handbook.

Tennessee courts have held that similar disclaimers in university handbooks "preclude the finding of a contract," particularly when, as here, there is no other offer or assertion of Belmont's intent to be bound by the contents of the Bruin Guide. *See Gardner v. Univ. of Memphis College of Business*, *Not Reported*, 2003 WL 1872640, *3 (Tenn.Ct.App. Apr. 8, 2003); *see also Petty v. State of Tenn*., *Not Reported*, 2002 WL 415650, *2 (Tenn.Ct.App. 2002) (rejecting contract formed by virtue of catalog when catalog explicitly set forth a disclaimer); *Cf King v. TFE, Inc*., 15 S.W.3d 457, 461 (Tenn.Ct.App. 1999)(employee handbook expressly disclaimed formation of contract, reflecting company's intent not to be bound); *see also Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn.Ct.App. 1988)("the specific

language of the handbook must show contractual intent."); *see also MacDougal v. Sears, Roebuck & Co.*, 624 F.Supp. 756, 758 (N.D. Tenn. 1985)(finding that the employee manual was a "unilateral expression of company policy and does not amount to a contract between Sears and the plaintiff."). Without mutual assent, there is no contract. *See Ku*, at 876. Unequivocally, the Bruin Guide is not intended to be a contract, and as a matter of law the mutual assent prerequisite to Plaintiff's breach of contract claims is lacking. *See Petty*, at *2; *King*, at __.

Plaintiff next asserts that the Bruin Guide "contract contained an implied covenant of good faith and fair dealing." (Doc. 1, ¶78). It is well-settled that a claim for violation of the covenant of good faith and fair dealing is not a stand-alone claim, but is instead part of a breach of contract claim. *See Jones v. Lemoyne-Owen College*, 2009 WL 1941515, *10 (Tenn.Ct.App. 2009), *citing Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn.Ct.App. 2000). Without a contract, there can be no breach of contract claim, and without a breach of contract claim, there can be no claim for breach of covenant of good faith and fair dealing. Thus, it is axiomatic that a contract between the parties must exist in order to state a claim for violation of the covenant of good faith and fair dealing.

Even assuming a contract exists, the allegations of the complaint belie its breach. Doe contends that Belmont breached the purported contract by denying him due process and fundamental fairness (Doc. 1, ¶86). However, the Complaint

is replete with demonstrations of Belmont's due process and fundamental fairness to Plaintiff, including notice (Doc. 1, ¶¶31, 81, 102), investigation of charges (*id.*, at ¶¶30, 91, 107, 108, 114), opportunity to be heard (*id.*, ¶99), option to select an advisor (*id.*, ¶¶97, 99), presentation of witnesses (*id.*, ¶¶38, 107, 109), opportunity to review evidence and rebut it (*id.*, ¶¶32, 116), and an appeal (*id.*, ¶¶41, 121). Indeed, Belmont found Plaintiff *not responsible* for the sexual misconduct charges that prompted the Title IX investigation (*id.*, ¶120; Ex. A).

The thrust of Plaintiff's claim appears foisted on the notion that Belmont dared to punish him for lying during the Title IX investigation without first providing him notice of his lies and launching an entirely separate investigation into his bountiful untruths. (Doc. 1, ¶¶83-86). Nothing in the Bruin Guide or in law (or common sense) requires a student to be investigated separately for lying to a university official during an investigation. The Bruin Guide establishes the expectation among students that "actions will be taken" in response to "behaviors that compromise" the university community's commitment to "personal integrity." Ex. B, p. 13. "Such behaviors include, but are not limited to: cheating; plagiarism; forgery; *deliberate deception*; *furnishing false information*;" among a list of other behaviors. *Id.* (emphasis added). Plaintiff thus was on perennial notice that he would be punished if he lied during the Title IX investigation, which the Title IX Coordinator found he did. (Ex. A).

Finally, to prevail on his breach of contract claim, in addition to showing an enforceable contract and the breach of it (both of which Doe has failed to do), Plaintiff must also demonstrate "damages caused by the breach of the contract." *Kindred*, at *4. "An injured party is only entitled to be put in the same position he would have been in had the contract been performed." *Kindred v. National College of Bus. & Tech.*, *Slip Copy*, 2015 WL 1296076, *6 (Tenn.Ct.App. 2015). "Damages in breach of contract cases are nothing more than payment in money for actual losses caused by the breach of contract." *Id*. The Complaint is wholly bereft of any particular financial loss. Instead, Plaintiff vaguely asserts "substantial injury, including … past and future economic loss, …, and loss of future career prospects." (Doc. 1, ¶126; p. 28, ¶6).

"[P]arties are not entitled to recover *uncertain, contingent, or speculative* damages." *Kindred*, at *6 (original emphasis). "Damages will be considered uncertain or speculative when their existence is uncertain..." *Id*. To the extent Plaintiff rests his claim on past economic damages, he fails to articulate what they are, and he must do more than merely *conclude* that he was damaged. Courts "need not accept as true legal conclusions couched as factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). The remainder of his supposed damages consist of patently

speculative *future* losses, which are not recoverable. *See Kindred*, at *6. Doe was suspended at the end of the fall 2016 semester for the upcoming spring 2017 semester. He lost no tuition on account of the suspension and was free to apply and re-enroll beginning in summer of 2017. Any alleged damages are speculative.

### B. Plaintiff fails to state a claim for Promissory Estoppel

Tennessee courts have defined promissory estoppel as "a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance [such that . . .] injustice can be avoided only by enforcement of the promise." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn.Ct.App. 2007); *see also Barnes & Robinson v. OneSource Facility Servs.*, 195 S.W.3d 637, 645 (Tenn.Ct.App. 2006). To succeed on his claim, Plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [he] reasonably relied upon the promise to [his] detriment." *Chavez*, at 404. Critically, inherent in a claim for promissory estoppel is a finding of a clear and precise promise. *See id*, at 405.

In Count II, Plaintiff generally asserts that the University's policies and procedures in the Bruin Guide, and other unidentified publications contain unspecified "guarantees of due process and fundamental fairness," which allegedly

constitute both "express and implied promises" to Plaintiff that he claims to have relied on to his detriment. (Doc. 1, ¶128). Doe fails to specify the particular promise(s) on which he claims to have detrimentally relied, which is fatal to his claim. *See Chavez*, at 404.

The Bruin Guide limits students' reliance upon the policy statements contained in it by preserving the University's ability to change policies unilaterally at its discretion. *See* Ex. B, p. 5; *see also Shaughnessy v. Interpublic Group of Companies, Inc.*, 506 Fed.Appx. 369, 378 (E.D. Mich. 2012) (dismissing plaintiff's motion to amend the complaint to add a claim for promissory estoppel because disclaimers contained in the Code of Conduct precluded formation of a promise not to retaliate against plaintiff). "Where, as here, a [university] 'retains the choice' to either follow or to abandon its specified policy, the policy is, in reality, 'not a promise at all.'" *Shaughnessy*, at 378. "In other words, where a [university] makes known to its [students] that '[student] policies are subject to unilateral changes by the [university],' the [student] cannot legitimately expect 'that any particular policy will remain in force.'" *Id*. The Bruin Guide explicitly warns students that policies will occasionally change during the academic year, (Ex. B, p. 5), and therefore cannot, as a matter of law, constitute the kind of promise contemplated in claims for promissory estoppel. *See, e.g., Shaughnessy*, at 378.

Moreover, Plaintiff fails to identify a clear promise upon which he supposedly detrimentally relied, as he must do to prevail. *See Chavez*, at 405. In *Chavez*, *supra*, plaintiffs claimed that defendant made promises regarding the available work in the area. *See Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 405 (Tenn.Ct.App. 2007). Plaintiffs asserted that defendant's agents represented that the "construction market was strong and solid, there was years of work to be done, overtime would be plentiful, and anyone with a security clearance would have no difficulty finding work…", and that plaintiffs detrimentally relied on those promises. *Id*. The court found that the "promises" defendant made "were too ambiguous, vague, and nonspecific" to support a claim for promissory estoppel. *Id.*

Here, Doe's purported "promises" are even more "ambiguous, vague and nonspecific" than those relied upon by the *Chavez* plaintiffs, as Doe pleads only a general reference to nebulous notions of "promises and policies made in its official publications, including the Bruin Guide," (Doc. 1, ¶76); and an unspecified "promise of fundamental fairness," (Doc. 1, ¶¶64, 88, 93, 98, 110.)

Further, Tennessee courts place limits on promissory estoppel claims, including: "(1) the detriment suffered in reliance must be *substantial* in an *economic* sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted

15

*reasonably* in justifiable reliance on the promise as made." *Calabro v. Calabro*, 15 S.2.3d 873, 879 (Tenn.Ct.App. 1999) (emphasis added). Absent a clear, specific promise to plaintiff and in the context of the Bruin Guide's warning that "policies will change during the academic year," Doe's alleged reliance cannot be said to be reasonable as a matter of law. *See Chavez*, at 405; *see also* Ex. B, p. 5. Nor can Plaintiff's conclusory allegation that he reasonably relied on these purported promises to his detriment carry the day as such assertions "…are distinct from the factual allegations that [courts] are required to accept under Rule 12." *Barnes & Robinson*, at 644; *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

Plaintiff also fails to factually allege the sort of substantial economic loss necessary to support a claim for promissory estoppel. Plaintiff claims he paid tuition in reliance on Belmont's unspecified promises. (Doc. 1, ¶128). As noted above, Plaintiff's suspension covered the upcoming spring 2017 semester (*Id*., ¶62; Ex. A). He does not assert that he was required to pay tuition to Belmont during the period of his suspension, and he was not. Thus, the purported economic detriment of tuition is entirely mitigated by the benefits conferred upon him in the form of his education during the period of his enrollment for the fall semester of 2016. Indeed, he (or his parents) paid tuition so that he would be educated, and he received formal instruction in exchange for that payment as there are no allegations indicating he did not receive an education during his enrollment. "No injustice

arises in the refusal to enforce a promise where either the loss induced is negligible or the promisee's reliance is not reasonable." *Barnes & Robinson*, at 645.

Finally, "…the doctrine of promissory estoppel is not to be liberally applied, and its application is limited to exceptional cases where the circumstances border on actual fraud." *Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 406 (Tenn.Ct.App. 2007); *Barnes & Robinson Co. Inc. v. OneSource Facility Services, Inc.*, 195 S.W.3d 637, 645. Here, Plaintiff fails to assert any specific written or oral promise made by Belmont or to allege any conduct that "verges on actual fraud." *See Chavez*, at 407, *citing Shedd v. Gaylord Entertainment Co.*, 118 S.W.3d 695, 700 (Tenn.Ct.App. 2003) (declining to find such an "exceptional case" where there were no allegations of fraudulent conduct by the defendant). Plaintiff's vague contention that general notions of due process and fundamental fairness were breached are particularly feeble given the allegations in the complaint demonstrating he was afforded due process: Doe was found not responsible for the alleged sexual misconduct because the claimant did not meet her burden of proof. (Ex. A). His claim appears rooted in the fact that Belmont disciplined him for numerous occasions of his dishonesty during the Title IX investigation, and he now seeks relief from this Court to escape any consequence of his own misconduct. Promissory estoppel does not provide a vehicle for his specious venture.

## C.    Plaintiff fails to state a claim for intentional infliction of emotional distress (IIED)

Plaintiff contends in Count IV that Belmont's Title IX investigation and the discipline imposed upon him for lying during the course of it were intentional and reckless actions "so outrageous that they are not tolerated in a civilized society." (Doc. 1, ¶¶145, 146). Plaintiff's allegation of Belmont's outrageous conduct is belied by the fact that Belmont issued a determination *in his favor* regarding the Title IX allegation of sexual misconduct. Nevertheless, to state a claim for IIED, Doe must show that "(1) the conduct about which plaintiff complains must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society, and (3) the conduct about which the plaintiff complains must result in serious mental injury." *Kindred v. Nat'l College of Bus. & Tech.*, *Slip Copy*, 2015 WL 1296076, *8 (Tenn.Ct.App. 2015). It is "not an easy burden to meet the essential elements of outrageous conduct." The Tennessee Supreme Court "has adopted and applied the high threshold standard described in the Restatement (Second) of Torts," which states in pertinent part:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all

> bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community."

*Kindred*, at \*8, *citing Bain v. Wells*, 936 S.W.2d 618, 622 (quoting Restatement (Second) of Torts §46, comment d (1965)).

Belmont admits it purposefully investigated the Title IX complaint and the myriad policy violations that Plaintiff committed at different times unrelated to the Title IX matter. (Doc. 20). Belmont's actions in enforcing its policies and meting out appropriate and measured sanctions for violations were not "so outrageous in character and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable" in civilized society. *Kindred*, at \*8. While a defendant's actions can be so atrocious that they provide evidence of mental injury (because a civilized society will not tolerate it), Plaintiff's allegations of misconduct here fall woefully short of that threshold. *See Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999). "[O]utrageous conduct does not include 'mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" *Kindred*, at \*9, *quoting Levy v. Franks*, 159 S.W.3d 66, 83 (Tenn.Ct.App. 2004). As factual support for his alleged "mental anguish" and "severe emotional distress," Plaintiff offers only that he was "forced to withdraw from Belmont," and "has been unable to gain customary acceptance to another school." (Doc. 1, ¶¶71, 72). In 175 paragraphs, he fails to offer any facts demonstrating "atrocious, utterly intolerable" conduct on the part of Belmont.

A review of relevant decisions by Tennessee courts on this point is telling. The standard is not whether *Doe* considers Belmont's conduct outrageous; it is whether civilized *society* would consider it intolerable to suspend a student for lying to a university official during an investigation. Tennessee courts have historically rejected this kind of assumption. *See Goldfarb v. Baker*, 547 S.W.3d 568 (Tenn. 1977); *see also Kindred v. Nat'l College of Bus. & Tech.*, *Slip Copy*, 2015 WL 1296076 (Tenn.Ct.App. 2015); *Runions v. Tenn. State Univ.*, 2009 WL 1939816 (Tenn.Ct.App. 2009).

In *Kindred*, the National College of Business and Technology canceled plaintiff's enrollment after plaintiff attended a week of classes because her student file did not contain an official copy of her high school transcript or equivalent. *Kindred v. Nat'l College of Bus. & Tech.*, *Slip Copy*, 2015 WL 1296076, *1 (Tenn.Ct.App. 2015). The plaintiff alleged that National College caused her to suffer "great emotional pain and mental distress" resulting from a college director's "arbitrary termination" of her education, and as a result, she felt she could "no longer pursue her educational goals because she could not continue at National College and could not start over somewhere else at her age." *Id.*, at *2, *9. The court found that although plaintiff was "understandably unhappy that her enrollment in Term 107 was cancelled," the school's actions did not "rise to the sufficiently outrageous standard required for recovery under IIED." *Id.*, at *10.

In its decision, the *Kindred* court cited to its earlier opinion in *Runions v. Tennessee State University*, 2009 WL 1939816 (Tenn.Ct.App. 2009), where the plaintiff had been expelled from TSU's nursing program because of her grades, which thwarted her goal of obtaining a nursing degree. *See Kindred*, at *10; *see also Runions v. Tennessee State University*, 2009 WL 1939816, *1-*2 (Tenn.Ct.App. 2009). The *Runions* plaintiff was forcibly, physically removed from a classroom by a professor when she showed for class after having been expelled from the program. *Runions*, at *1-*2. There, plaintiff alleged the incident "caused her to suffer great mental anguish, embarrassment and emotional distress, and that she has had to undergo professional counseling as a result." *Runions*, at *2. The court held that "neither the administrators' decision to expel her from the program because of her grades nor the instructor's action in physically removing her from the classroom meets the exacting standard for recovery on a claim of outrageous conduct or intentional infliction of emotional distress." *Runions*, at *6.

In its support of its holding, the *Runions* court cited to the Tennessee Supreme Court's decision in *Goldfarb v. Baker*, 547 S.W.2d 568 (Tenn. 1977). *See Runions*, at *6. In *Goldfarb*, "an unidentified prankster entered the classroom, [and] threw a pie, which struck the defendant professor, and ran away." *Goldfarb v. Baker*, 547 S.W.2d 567, 568 (Tenn. 1977). The professor accused the plaintiff of assault; forbade him from attending class; had plaintiff ejected from the building

when he tried to take his seat; and accused him, in the presence of others, of attempting to blackmail the professor. *See Goldfarb*, at 568. Plaintiff, a former state prisoner, complained that the episode falsely portrayed him as lawless, "that he lost the confidence of his associates, and was frustrated in his effort to reform his life." *Id*. He alleged that the professor's actions caused him "extreme mental anguish, humiliation, depression, and distress." *Goldfarb*, at 568. In finding that the professor's actions did not extend "beyond the pale of decency," the court quoted *Magruder, Mental and Emotional Disturbance in the Law of Torts*, 1936: "Against a large part of the frictions and irritations and clashing of temperaments incident to participating in community life, a certain toughening of the mental hide is a better protection than the law could ever be." *Goldfarb*, 547 S.W.2d at 569 (Tenn. 1977). Plaintiff's emotional distress alleged in the present case is comparable to the "frictions and irritations" suffered by the plaintiffs in *Kindred*, *Runions*, and *Goldfarb*. Plaintiff's allegations likewise fail to meet the "exacting standard" necessary to establish a claim for relief and should be dismissed. *Goldfarb*, at 569; *Kindred*, at *9; *Runions*, at *6.

> **D. Plaintiff fails to state a claim for intentional interference with business relationship**

In Count IX, Plaintiff asserts that Belmont tortiously interfered with his employment with Belmont (Doc. 1, ¶¶170-172). Plaintiff's claim fails as a matter of law because there is no assertion of interference with a third party, which is

necessary to state a claim for relief. *See Trau-Med v. Allstate Ins. Co.*, 72 S.W.3d 691, 701 (Tenn. 2002).

For the court to impose liability on Belmont for the tort of intentional interference with business relationships, plaintiff must show "(1) an existing business relationship with specific *third* parties or a prospective relationship with an identifiable class of *third* persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and finally (5) damages resulting from the tortious interference." *Trau-Med*, at 701 (internal citations and original emphasis omitted) (emphasis added); *see also Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 789 (Tenn. 2006).

It is a "basic principle under Tennessee law that a party to a contract cannot be liable for tortious interference with that contract." *Cambio*, at 789, *citing Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977). To the extent Plaintiff's claim rests on the premise that he lost his student employment with Belmont as a consequence of the suspension of his enrollment, his claim fails as a matter of law because Belmont is a party to that employment relationship. *Cambio*, at 789. "This principle correctly reflects the purpose of the tort of intentional interference, which is to deter *third* parties from interfering with the contractual

relations of parties to a contract." *Id*. (original emphasis). There are no allegations in the complaint that Belmont interfered with Plaintiff's contractual relationship with a *third* party. Plaintiff lost his student employment with the university when he lost his status as a student. Belmont cannot be held liable for tortious interference in relation to its own employee. *Cambio*, at 789.

### E. Plaintiff fails to state a claim for unjust enrichment

In Count X, Plaintiff claims that Belmont used a photograph for University advertising and promotional purposes without compensating him. (Doc. 1, ¶¶ 174, 176). Plaintiff does not offer any particular facts regarding what photo, when, where or how it was used. He simply asserts the conclusion that Belmont "appreciated the benefit" from the use of the unidentified photograph. (*Id*., ¶ 175).

"Unjust enrichment is an equitable remedy employed by courts when there is no contract in fact. The court will imply one at law when no contract between the parties exists, but reason and justice require their creation." *Freeman Indus v. Eastman Chem*., 172 S.W.3d 512 (Tenn. 2005). To prevail on an unjust enrichment claim, plaintiff must demonstrate "(1) [a] benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Id*., *quoting Paschall's*

*Inc. v.* Dozier, 407 S.W.2d 150, 155 (Tenn. 1966). Here, plaintiff simply concludes an appreciable benefit, as there are no particular factual allegations to support it.

"The most significant requirement of an unjust enrichment claim is that the benefit to the defendant would be unjust." *Freeman*, at 525. Belmont's retention of any supposed benefit is not unjust because the Bruin Guide authorizes such use:

> From time to time, University personnel will photograph or videotape campus events for the instructional, documentary, promotional, public relations and/or advertising purposes of Belmont University. Belmont students included in such photographs or video agree that the photographs or video may be used for these purposes by Belmont University. If a student objects to this provision, he or she should provide written notice of this objection to the Office of Communications…"

Ex. B, p. 80. Plaintiff has not alleged that he provided written notice of his objection to Belmont regarding the use of the photograph, and therefore is considered to have agreed to its use. "The plaintiff must further demonstrate that he or she has exhausted all remedies against the person" who is alleged to be unjustly enriched. *Id*. Plaintiff makes no such allegation, and his unjust enrichment claim fails as a matter of law.

## III.    Conclusion

Plaintiff's complaint, based on the facts presented on its face, fails to state claims upon which relief can be granted by the Court with respect to Counts I, II, IV, IX, and X for those reasons set forth herein. As a matter of law, those counts are due to be dismissed.

Respectfully submitted on January 12, 2018.

*s/ Timothy A. Palmer*
Timothy A. Palmer, TN Bar # 008993
Samantha K. Smith, PHV
OGLETREE, DEAKINS, NASH, SMOAK
      & STEWART, P.C.
SunTrust Plaza
401 Commerce Street, Suite 1200
Nashville, TN 37219
(615) 687-2230 – telephone
(615) 254-1908 – facsimile
Timothy.Palmer@ogletree.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January 2018, I e-filed the foregoing

via the Court's CM/ECF service, which will serve the following counsel of record:

Michelle Owens
Lynn Agee
Agee Owens Cooper, LLC
2911 Elm Hill Pike, Suite 2
Nashville, TN 37214
mowens@ageeowenslaw.com

*s/ Timothy A. Palmer*
