# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN DOE, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 3:17-cv-01245 |
| vs. | ) Judge Waverly D. Crenshaw, Jr. |
| | ) Mag. Judge Jeffrey S. Frensley |
| BELMONT UNIVERSITY, | ) |
| | ) Jury Demanded |
| Defendant. | ) |

## PLAINTIFF'S RESPONSE TO BELMONT UNIVERSITY'S MOTION FOR JUDGEMENT ON THE PLEADINGS

Plaintiff, John Doe, by and through counsel, offers the following in opposition to Defendant's Motion for Judgment on the Pleadings, pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure, and Local Rule 7.01.

## SUMMARY OF FACTS

In October of 2016, when Plaintiff had just completed his freshman year at Belmont University (Hereinafter "Belmont"), he received a letter from Belmont informing him that a complaint of sexual misconduct was filed against him by S[1], a student at Belmont. The complaint was filed against Doe several months after their last date or interaction The allegations of sexual misconduct were made through Belmont University's Title IX department, under Coordinator, Molly Zlock (Hereinafter "Zlock"). On October 6, 2016, Zlock found "reasonable cause to exist" and recommended the matter proceed under the university's formal sexual misconduct accountability process. On October 11, 2016 Plaintiff received a "No Contact Order" from Belmont regarding Student S.

As the sole basis of her Title IX complaint, Student S listed three incidents that occurred between and Plaintiff and herself: (1) S. alleged Plaintiff kissed her and attempted

---
[1] Student names are redacted due to FERPA regulations.

to take her shorts off on an unspecified date; (2) S. alleged that on June 3, 2016, Plaintiff asked her to take her shorts off, which she did, and then attempted to have sexual intercourse with S., in the missionary position, with S. on top; (3) June 8, 2016, S. and Plaintiff were at Percy Warner park in a hammock together and were kissing. While kissing, S. alleged Plaintiff attempted to undress her and she stopped him. S. does not allege anything else of a sexual nature occurred between the two on this date. On June 23, 2016, S. posted a statement on a public social media forum commending Doe for his upstanding character; this post was made *after* the alleged Title IX violation. When reviewing the investigatory file provided by Zlock on October 28, 2016, Plaintiff noticed that one of his witnesses, student T, was not interviewed. Zlock eventually interviewed T. On December 13, 2016 Plaintiff received a letter from Belmont and Zlock stating:

> "I find Respondent not responsible for non-consensual sexual intercourse and non-consensual sexual contact. However, I do hold Respondent accountable for being purposefully untruthful in this investigation. Additionally, I find the evidence establishes that Respondent repeatedly violated the university's visitation policy..."

Plaintiff appealed the initial determination, within the allotted two day time period, on December 15, 2016.

On December 28, 2016, Plaintiff received the final determination letter stating no procedural errors were found and the determination of Zlock would stand. During the time frame of the Title IX investigation, Plaintiff was suddenly accused of cheating in an online class during the fall of 2015. However, the issue was not sent to the Honor Council, as prescribed by the Bruin Guide. Doe was given no viable explanation for why he was not afforded the opportunity to appear before the Honor council for the cheating accusation. During the Title IX investigation, Plaintiff was also accused of repeatedly violating the

2

visitation policy (also called Community Commitment) and given a much stricter punishment than those students with him who also violated the policy, including student S.

The alleged Community Commitment violation (visitation violation) should have been investigated separately from the Title IX accusations, according to Bruin Guide, but was not. The visitation violations were received for being in a dorm after curfew and included times when Plaintiff was with S. but S. received no discipline. The dates of the visitation violations for which Plaintiff was disciplined are as follows: (1) 6/5/2016- Plaintiff was found responsible for a violation and issued a written reprimand; (2) 10/1/2016- Plaintiff was found responsible for a violation and lost all dorm visitation privileges until the end of the Fall 2016 semester. These accusations occurred after Plaintiff was under investigation for the Title IX matter, but the actions occurred prior to that.

Finally, Plaintiff was also accused and found guilty of violating the no contact order during the Title IX investigation as a result of actions by Plaintiff's sister-in-law. The action was taken without Plaintiff's knowledge or approval. Plaintiff's sister-in-law provided Zlock an affidavit to this affect.

S. received no discipline for anything related to the false accusations against Plaintiff or for the visitation violations. For NOT committing non-consensual sexual intercourse or non-consensual sexual contact Plaintiff received the following sanctions:

1) Immediate suspension through the end of Spring 2017 semester, after which Plaintiff must re-enroll; Plaintiff was expelled;
2) Institutional probation for Plaintiff's entire career at Belmont;
3) Plaintiff is banned from holding any leadership positions in any organization at Belmont;
4) A permanent no-contact order against the woman he DID NOT rape or sexually assault.

Plaintiff was essentially punished for retaining counsel and defending himself

3

against all charges. It was not until after Plaintiff retained counsel and vigorously defended himself before Belmont, that he began receiving notifications of other violations, including the notices of honor code and visitation violations.

## LEGAL STANDARD OF REVIEW

When considering a Fed.R.Civ.P. 12(b)(6) motion to dismiss made by a defendant, the court must "construe the complaint in a light most favorable to plaintiffs, accept all plausible well-pled factual allegations as true, and draw all reasonable inferences in plaintiff's favor." *Lutz v. Chesapeake Appalachia L.L.C.,* 717 F.3d 459, 464 (6th Cir. 2013). The standard question the court must ask is whether the pleading "contain[s]…a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a); *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976). A complaint should survive a motion to dismiss if it contains "Sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625 (6th Cir. 2009), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Twombly*, 550 U.S. at 557. Here, Plaintiff has sufficiently pled factual allegations that satisfy these standards.

## LEGAL ARGUMENT

### I. There existed an enforceable contract between Plaintiff and Belmont University

Defendant's argument focuses solely on the absence of a written contract and contends the Bruin Guide, Belmont's student handbook, does not constitute an enforceable contract. However, Plaintiff does not claimed there was solely a written contract between

4

himself and Belmont, rather, he claims there was either an express contract or a contract implied in law or fact. (Doc. 1, ¶ 72).

### A. <u>Contract Implied in Law or Fact</u>

Plaintiff enrolled in Belmont University and paid tuition and other fees and expenses with the reasonable expectation that the university would provide him an education and instruction. (Doc. 1, ¶ 70). Plaintiff does not claim the Bruin Guide is the sole source of the contract between the parties, but rather the Bruin Guide explains the expectations of Belmont and the rights of Plaintiff while Plaintiff attends the university. (Doc. 21-2, p. 11). The Bruin Guide serves to provide information to both parties regarding the details of their relationship, which is based on a contractual interaction. Plaintiff had the reasonable expectation that Belmont would implement, adhere to and enforce promises and guarantees made in the Bruin Guide. (Doc. 1, ¶ 76). In Tennessee, contracts are not required to be in writing; they can be "express, implied, written, or oral." *ICG Link, Inc. vs. Steen*, 363 S.W.3d 533, 543 (Tn. Ct. App. 2011). Both contracts implied in law and contracts implied in fact are recognized as enforceable contracts. *See Power Equipment Co. v. England,* 307 S.W.3d 756, 759 (Tn. Ct. App. 2009).

The mutual assent prerequisite to Plaintiff's breach of contract claim is not lacking as Belmont contends. The actions of Plaintiff and Belmont constitute the existence of an implied contract in fact. Implied in fact contracts are created when "the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract." *River Park Hosp., Inc. vs. Bluecross Blueshield of Tennessee, Inc.,* 173 S.W.3d 43, 57 (Tn. Ct. App. 2002). In order for an implied in fact contract to be enforceable, it must be supported by consideration, lawful purpose, and mutual assent. *Thompson v. Hensley,* 136 S.W.3d 925, 930 (Tn. Ct. App. 2003). Plaintiff entered into a contract with Belmont when

5

he enrolled in the program, was accepted, and paid tuition. The mutual understanding between the parties was that, in exchange for Plaintiff paying tuition and successfully completing program requirements, Belmont would provide Plaintiff with the requisite education and skills to earn a degree from their institution. (Doc. 21-2, pp. 5,9,11). Plaintiff's conduct clearly established that he assented to the terms of the contract. Plaintiff attended and completed classes and extracurricular activities for a full year before he was charged for misconduct under Title IX. Likewise, Belmont accepted Plaintiff's tuition money and allowed him to attend classes and extracurricular activities, and awarded him credit hours towards his degree, for a full year before he was charged with misconduct under Title IX. The existence of an implied in fact contract is clear from the actions of both parties

In the absence of an implied in *fact* contract, an enforceable implied in *law* contract existed between Plaintiff and Belmont University. Implied in law contracts arise when there is an absence of a formal contract, but reason and justice dictate that a contract should exist. *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 906 (Tn. Ct. App. 2009). The essential elements of a contract implied in law are as follows: (1) there is no existing, enforceable contract, (2) the moving party provided valuable goods or services, (3) the party charged received the goods or services, (4) the parties should have reasonably understood that the moving party expected to be compensated, and (5) it would be unjust for the party charged to retain the goods or services without payment. *Id.*

Here, Plaintiff provided valuable goods to Belmont over the course of his time as a student, in the form of tuition money. Plaintiff paid a substantial amount of money to Belmont University in in furtherance of his goal to receive an education and degree. The reasonable understanding between the parties was that if Plaintiff paid tuition and

6

completed all program requirements, he would receive a degree in return. It would be unjust for Belmont to retain Plaintiff's tuition payments with no expectation of conferring a degree, if all degree requirements were met.

B. **Express Contract**

Despite Belmont's assertion that the Bruin Guide is not a contract, there exists many indices of a contract. Belmont's Bruin Guide states the following on page 11:

> "The Code of Conduct is a portion of The Bruin Guide, which outlines our community expectations, policies and disciplinary process. Students, faculty and staff voluntarily enter into membership in the University community and, in so doing, assume obligations of performance and behavior reasonably expected by that community for the purpose of furthering its mission, vision, processes and functions.
>
> **Students accept the expectations and policies set forth in this code and other university rules, regulations and policies when they are admitted to the university (see "Scope" under "Adjudication Process"). Students are also subject to the laws of the state of Tennessee."** (Doc. 21-2)

The statements in the handbook sound suspiciously like an offer with the terms of acceptance set forth clearly. When you look closely at those words above you see an offer, terms of acceptance, consideration and mutuality of obligation; you see the elements of a contract. Wording contained in the Bruin guide stating it is not a contract does not automatically prevent it from being just that. In the *Davis v. Connecticut General Life Ins. Co.,* case, the court determined that a "provision of employee handbook stating that handbook was for information only and was not employment contract did not automatically prevent handbook from becoming part of employment contract…" *Davis v. Connecticut General Life Ins. Co.*, 743 F.Supp. 1273 (M.D.Tenn.,1990). Further, Tennessee courts have recognized that an employee handbook may, under certain

7

circumstances, become a part of the contract of employment between the employee and the employer. *Davis v. Conn. Gen. Life Ins. Co.,* 743 F.Supp. 1273, 1278–1279 (M.D.Tenn.1990). While, in the case at bar we are discussing a handbook of a different nature, that of a student and a college, the analogy holds because these two types of relationships are often dealt with similarly. The determination of whether an employee handbook is deemed to be part of the employment contract depends upon the specific language of the handbook. *Shelby v. Delta Air Lines, Inc.,* 842 F.Supp. 999, 1006 (M.D.Tenn.,1993); *MacDougal v. Sears, Roebuck & Co.,* 624 F.Supp. 756, 759 (E.D.Tenn.1985). Plaintiff argues the same hold true for student handbooks at universities and colleges, they may be a contract, despite wording to the contrary.

      C.      **Covenant of Good Faith and Fair Dealing**

Because Plaintiff has established the existence of a contract, whether it be implied or express, the covenant of good faith and fair dealing claim is clearly not a stand-alone claim in Plaintiff's Complaint, as Belmont asserts in their Motion. Therefore, it is not necessary to further argue the existence of this claim. However, Belmont also contends that the allegations of Plaintiff's Complaint "belie its breach." Belmont goes on to state demonstrations of Belmont's "due process and fundamental fairness" to Plaintiff. Belmont takes the position that fair and just behavior in some actions excuses unfair and unjust behavior in other actions. Due process means *fair treatment in the judicial system.* (See www.law.cornell.edu/wex/due_process). If *every aspect* of a case is not fair, then there is no due process; none of it is fair. Universities cannot pick and choose in what areas they will treat students accused of misconduct fairly, they must treat them fairly in all areas.

Plaintiff mentions many violations of due process in his Complaint. These cannot be ignored just because Belmont claims to have been fair in some areas. A few of the due

8

process violations against Plaintiff include the following: Plaintiff was not provided with the detailed charges against him until after the investigation was finalized (Doc. 1 ¶ 33), Plaintiff was not allowed to appear before the honor council for the cheating accusation (Doc. 1 ¶ 44), Plaintiff was given much stricter punishment for dorm violations than others similarly situated (Doc. 1 ¶ 45), multiple different charges were intermingled with the Title IX charge (Doc. 1 ¶ 47), Plaintiff was harshly disciplined for *allegedly* lying with no evidence to support the charge (Doc. 1 ¶ 59). The due process violations are numerous and substantial and listed throughout Plaintiff's Complaint.

Plaintiff was suspended for one year with the requirement that he re-enroll after the suspension ended, he was placed on institutional probation for the remainder of his career at Belmont (if he was re-admitted after he re-enrolled), he was banned from holding any leadership positions in any Belmont organization and a permanent no-contact order was put in place against the woman, the woman he was found NOT to have assaulted. Plaintiff's should have been given notice and a hearing for the charges of lying during the investigation. The fact is, Plaintiff did not lie. The first Plaintiff knew of the allegation of lying was when he received his notice for discipline. Plaintiff agrees that lying during an investigation should not be tolerated, but Plaintiff did not lie and was never afforded an opportunity to defend himself against this charge. If a student is accused of cheating, lying, or any of the other actions listed by Belmont, they are entitled to due process; why was Plaintiff denied due process. Plaintiff still does not know what he could possibly have lied about. He did not lie about the evidence presented in the investigation or his relationship with the Complainant. He was found not responsible, if he lied, it would seem that Belmont would have found him responsible for the charges he faced. Belmont's actions make no sense.

9

No proof of lying exists against Plaintiff. However, there is ample proof that Student S lied. S claimed to have had sexual intercourse with Plaintiff. Plaintiff steadfastly denies this and was deemed credible by Belmont. At first glance it is exceedingly mystifying why Belmont did not discipline S for lying. The answer to this puzzle lies in the Title IX Coordinator's personal belief system. Zlock is known to be active in the women's movement and in women's issues. S is a woman and as a woman was treated more favorable than Plaintiff. Zlock clearly favored S from the outset.

For Belmont to claim Plaintiff suffered no damages is outrageous. Plaintiff was expelled from the university for something he did not do. Plaintiff cannot gain entrance into another university because his record notes discipline under Title IX, even though the actual discipline was for being untruthful- not for sexual assault. Plaintiff suffered monetary and emotional damages that are precise. Plaintiff spent money towards a degree he cannot attain because of the lack of due process and breach of contract Belmont enacted. Plaintiff's entire plan for his life was derailed and there is no facility to get it back on track. A complaint should survive a motion to dismiss if it contains "Sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625 (6th Cir. 2009). Plaintiff does not have to prove his case at this juncture, he must merely prove that if his claims are true as stated, they represent a claim; they do. This case falls into the rare contractual cases where emotional damages are warranted. See *Saari v. Jongordon Corp.,* 7 Cal.Rptr.2d 82, 88.

### D.     Promissory Estoppel

Belmont argues that Plaintiff's claim for Promissory Estoppel must fail because he did not specify the particular promises on which he relied. Plaintiff clearly states that his reliance throughout the disciplinary process was on Belmont's policies and procedures for

10

handling Title IX charges and complaints. Further, Plaintiff lists in paragraphs 128-137 of is Complaint (Doc. 1) the specific promises on which he relied. Basically, Plaintiff believed Belmont's promise that it would follow its policies regarding due process including, the opportunity for separate hearings and investigations into each different accusations against him, the promise that there would be an investigation into each matter against him and that if he was found not guilty of a Title IX violation he would not be punished for a Title IX violation. Contrary to Belmont's assertion that Plaintiff did not articulate or specify ***any*** particular promises on which he detrimentally relied, Plaintiff specified a *great number of promises* upon which he relied. (see Doc. 1 ¶¶ 64-137). Belmont attempts to assert that their policies are not promises at all, but something to which they have the choice of whether to follow. Because this is Belmont's stance, Plaintiff's due process claim under Title IX gains more strength. Belmont's argument is an admission that due process is not routinely afforded to Belmont students faced with Title IX charges. In fact, it appears Belmont does not intend to follow *any* of its polices and apparently they mean absolutely nothing. This may be Belmont's stance, but those promises were presented to Plaintiff, and all other Belmont students, in a manner that encouraged their reliance on those policies. Plaintiff's reliance was reasonable, he was encouraged to rely on them and that reliance was to his detriment when the policies were not followed.

In Tennessee the limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonable in justifiable reliance on the promise as made. *Calabro v. Calabro,* 15 S.W.3d 873, 879 (Tenn.Ct.App.,1999). Plaintiff relied on Belmont to follow the policies that afford him various due process protections in the event he is accused of a conduct or

11

sexual violation. Plaintiff cooperated with the investigation in reliance on Belmont's promises of due process. When Belmont did not follow their policies, and withheld due process, it was too late for Plaintiff to avoid attendance at Belmont, he was already there with tuition paid. Plaintiff has suffered substantial monetary damages because is unable to continue with his education as a direct and proximate result of Belmont's actions. The money Plaintiff paid to Belmont is completely lost. Plaintiff cannot gain entrance into another school to continue and complete his education, thus earning the degree he was seeking. The entire amount of tuition spent for Plaintiff's first year of education is valueless and had Plaintiff known from the outset that Belmont would not keep the promises they made in their Bruin Guide, he would not have attend the school. Belmont was well aware that once there was discipline implicating Title IX on Plaintiff's record he would be unable to gain acceptance into another school. Plaintiff's damages were foreseeable to Belmont.

### E. Intentional Infliction of Emotional Distress

An intentional infliction of emotional distress ("IIED") claim requires: 1) the defendant either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) the defendant's actions were the proximate cause of plaintiff's psychic injury; and 4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *Pyle v. Pyle*, 11 Ohio App.3d 31, 34. Plaintiff alleges Belmont University engaged in shocking, outrageous, and extreme conduct (Doc. 1, ¶¶ 40-55;58-69; 144-147), which demonstrated the intent to cause, or disregarded a substantial probability

12

of causing, Plaintiff severe emotional distress. (Compl. at ¶¶ 145-147). (Compl. at ¶¶ 126, 134.)

First, Belmont found Plaintiff *not responsible* for non-consensual sexual intercourse and non-consensual sexual contact, yet, found him accountable and punished him for *being purposefully untruthful in this investigation* when this was never even a charge against him. As well as finding that he repeatedly violated the university's visitation policy (a matter that should not have been intertwined with the Title IX charge). Plaintiff had only two days to appeal a determination for which there was never an investigation. During the same timeframe Plaintiff was suddenly accused of cheating from a year earlier with no opportunity to appear before the Honor Council. **Then** Plaintiff was accused of violating dorm visitation policies along with other students, however Plaintiff was given a much stricter discipline than the other students he was with- one of whom was the Title IX Complainant who received NO discipline. (Doc. 1, ¶¶ 40-48).

As a result of these events, Plaintiff's psychological and emotional health have been greatly compromised by the entire ordeal. (Compl. at ¶ 147). Student S's actions as well as Zlock's actions are nothing short of harassment. Plaintiff suffered severe emotional distress when the one person at Belmont who was supposed to support a fair investigation for both parties (S and Plaintiff) was entirely biased against Plaintiff from the very beginning of their encounters. Plaintiff had no one to turn to and no one who believed he was telling the truth. Even when the evidence overwhelming showed Plaintiff not guilty of sexual misconduct, Zlock still punished and harassed Plaintiff. This railroading of Plaintiff by Zlock caused him to suffer suicidal ideations and become completely despondent. Zlock created a situation in which Plaintiff is completely UNABLE to attend college, all with a

13

not guilty verdict for the incident she was to investigate. This is inexcusable. This is intentional infliction of emotional distress.

Comparable conduct has qualified as outrageous and extreme. For example, in *Peterson v. Northeastern Local School District,* 2015 WL 5013360, at *4 (S.D.Ohio, 2015) high school students were victim to racial- and gender-based harassment, and school officials failed to prevent, stop, or correct the harassment. Instead they expelled the student victims in violation of their due process rights. This is identical to Plaintiff's situation. Similarly, Plaintiff has plead plausible claims of outrageous and extreme conduct. He has also established the other prongs under IIED, and Defendants' Motion should be denied on this count.

F. **Intentional interference with a business relationship**

Plaintiff was employed by the student work program and received federal grant money for his work. Therefore, since Belmont itself did not pay the stipend or money to Plaintiff, but it was paid by the Federal Government, the third party aspect of this claim does exist. Belmont was not a party to the contract, the Federal Government was the party to the business contract and therefore Belmont's argument fails as a factual matter.

E. **Unjust Enrichment**

Belmont does not argue that it is not using Plaintiff photos for advertising purposes, but merely argues they have the right to do so because the Bruin Guide authorizes such use of pictures. However, based on Belmont's own argument that the notices in the Bruin Guide are not promises and are subject to change and cannot be relied upon, they cannot now argue that those same promises provide them an unfettered right to use the photograph of students whom they have expelled and suspended from campus. Belmont is speaking out of both sides of their mouth on this issue. The very fact that Plaintiff is not permitted on

14

Case 3:17-cv-01245   Document 26   Filed 01/26/18   Page 14 of 15 PageID #: 266

campus and was not a student at Belmont at the time the photographs were in use makes any wording authorizing such use within the Bruin Guide inapplicable to Plaintiff. Plaintiff was not a student at the time of use and therefore the Bruin Guide in no way applies to him. Therefore, no permission was given for the use of his likeness for promotional purposes. This claim should stand.

## CONCLUSION

For all of the foregoing reasons, none of Plaintiff's claims should be dismissed because there exists no failure to state a claim upon which relief can be granted by the Court.

Dated January 26, 2018.

Respectfully Submitted,

*s/Michelle Owens*
Michelle Owens TBR No. 26512
Agee Owens, LLC
2911 Elm Hill Pike, Suite 2
Nashville, TN 37214
(615) 300-8546
mowens@ageeowenslaw.com

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was served via the Court's ECF filing system on the following:

Timothy A. Palmer
Casey McCuskey
Parker Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
SunTrust Plaza 401 Commerce Street, Suite 1200
Nashville, TN 37219
Timothy.Palmer@ogletree.com
casey.parker@ogletreedeakins.com

on January 26, 2018.

*s/Michelle Owens*
Michelle Owens

15