UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:17-cv-01245 |
| | ) | CHIEF JUDGE CRENSHAW |
| BELMONT UNIVERSITY, | ) | |
| | ) | |
|     Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

John Doe ("Doe"), a former Belmont University ("Belmont") student, brings this action arising out of Belmont's investigation of accusations of sexual misconduct made against him by a female student ("Student S.").[1] After an investigation, Belmont concluded that Doe was not responsible for sexual misconduct, but Doe was punished for not being truthful during the investigation and for violating Belmont's residential visitation policy. Doe brings suit under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681 <u>et seq</u>. ("Title IX"), as well as Tennessee contract and tort law. Before the Court is Belmont's partial Motion for Judgment on the Pleadings. (Doc. No. 22.) Doe has responded in opposition (Doc. No. 26) and Belmont has replied (Doc. No. 28). For the following reasons, the motion will be granted in part and denied in part.

I.   <u>Legal Standard</u>

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for evaluating a motion for judgment on the pleadings is the same as that applicable to a motion to dismiss under Rule 12(b)(6)

---

[1] Pseudonyms are utilized for John Doe and Student S. to protect anonymity.

for failure to state a claim. Hayward v. Cleveland Clinic Found., 759 F.3d 601, 608 (6th Cir. 2014). "In reviewing a motion for judgment on the pleadings, [the Court will] construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle [him to] relief." Id. (internal quotation marks and citations omitted). However, a legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009)).

In ruling on a motion under Rule 12(c), the court may look only at the "pleadings." The term "pleadings" includes both the complaint and the answer, Fed. R. Civ. P. 7(a), and "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). It therefore follows that an attachment to an answer that is a "written instrument" is part of the pleadings and can be considered on a Rule 12(c) motion for judgment on the pleadings without the motion being converted to one for summary judgment. Beasley v. Wells Fargo Bank, N.A., Case No. 3:17-cv-00726, 2017 WL 3387046, at *3 (M.D. Tenn. Aug. 7, 2017); Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002). Thus, a court deciding a Rule 12(c) motion may consider documents attached to the answer, as long as they are central to the plaintiff's claim and of undisputed authenticity. Beasley, 2017 WL 3387046, at *3 (citing Horsley, 304 F.3d at 1135 (holding that "the Rule 12(b)(6) incorporation by reference doctrine should apply in Rule 12(c) cases as well")); accord Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335

(6th Cir. 2007) (court may consider documents referenced in the pleadings that are "integral to the claims" in deciding motion to dismiss).

## II.    Factual Allegations[2]

Belmont is a private university located in Nashville, Tennessee, that accepts federal funding. (Doc. No. 1 at ¶¶ 5, 12.) Doe, a resident of Tennessee, matriculated at Belmont and intended to graduate. (Id. at ¶ 11.) Upon enrolling at Belmont, Doe – like every other student – pledged to "exemplify behavior which is consistent with the University's Code of Conduct." (Doc. Nos. 21-2 at 9.) Belmont's Student Handbook, the Bruin Guide, sets forth certain policies and processes under Belmont's Code of Conduct. At the outset of the Bruin Guide, Belmont specifies that "[o]ccasionally, policies will change during the academic year." (Id. at 4.) The Bruin Guide specifies that students "voluntarily enter into membership in the University community" and, in doing so, assume certain obligations of performance and behavior. (Id. at 7.) However, students are cautioned that the Bruin Guide "is not intended to create nor is it to be construed to constitute a contract between Belmont University and any one or all of its students." (Id.)

### A.    Belmont's Relevant Student Conduct Policies

At Belmont, students "have a right to be free from sexual misconduct." (Id. at 12.) The Bruin Guide sets forth a Sexual Misconduct Policy, including definitions of consent, coercion, non-consensual sexual contact, and non-consensual sexual intercourse. (Id. at 12-13.) The Bruin

---

[2] The Court recites only those allegations necessary for the resolution of the motion. Belmont attached two documents to its Amended Answer: (1) Doe's initial Title IX Determination Letter dated December 13, 2016 (Doc. No. 21-1), and (2) the Belmont student handbook ("Bruin Guide") (Doc. No. 21-2). Doe does not contest the authenticity of these documents, and they have been expressly referenced in the Complaint and Answer. (See, e.g., Doc. Nos. 1 at ¶¶ 39-40, 66, 78, 80, 87, 97, 102, 107, 118, 121; 20 at ¶¶ 39, 43, 77, 78, 82, 111.) Under the relevant legal standards, the Court will consider these documents in ruling on the instant motion and discuss their contents herein.

Guide sets forth two "accountability processes." One of these is for alleged violations of Belmont's Sexual Misconduct Policy. (Id. at 12-18.) The other is a general accountability process for other violations of Belmont's Code of Conduct. (Id. at 44-49.)

The Sexual Misconduct Accountability Process begins with initial review of a complaint and any appropriate interim measures (e.g., a temporary no-contact order). (Id. at 15.) It then moves to a formal investigatory process by notification to the respondent of the accusation of sexual misconduct and provision of a copy of the complainant's written statement. (Id. at 16.) Belmont's Title IX investigators, at least one of whom should be "neutral," then interview the complainant and respondent, who may present evidence and suggest witnesses. (Id.) Prior to completing an investigation, the investigators are required to email final party and witness statements and evidence to the complainant and respondent for their review; the parties may comment within two days. (Id. at 17.) The Title IX Coordinator then reviews the complete investigatory file and makes a determination of responsibility based upon a preponderance of the evidence standard; there is no opportunity for a "hearing." (Id.)

In consultation with other campus leaders, the Title IX Coordinator may also impose sanctions. (Id.) Sanctions may include, alone or in some combination, a verbal reprimand, a "reflection essay," a fine, a permanent no-contact order, suspension, or expulsion. (Id.) Either party may appeal based on an asserted procedural error, new information, or a claim that no reasonable person could have arrived at a similar conclusion. (Id. at 18.) An appeal is promptly decided by an assigned "appellate officer," but the Dean of Students reserves the right to determine the final outcome. (Id.)

4

B.     The Complaint Against Doe by Student S.

Doe and Student S. met in May 2016. (Doc. No. 1 at ¶ 12.)  They were both on summer staff for Belmont and lived in the same dorm over the 2016 summer. (Id. at ¶ 13.) Doe and Student S. became close friends and went on outings with Doe's roommates or other mutual friends. (Id. at ¶ 16.) During that summer, Student S. was a bartender at a Nashville restaurant. (Id. at ¶ 18.) Student S. did not have a car and Doe, at Student S.'s request, gave her a ride home from work on a number of occasions. (Id. at ¶¶ 19-20.) As the summer progressed, Doe and Student S.'s relationship became closer; often Student S. would remain in Doe's room late into the night. (Id. at ¶ 21.) Sometimes, they kissed. (Id. at ¶ 22.) But Doe allegedly declined to have a more sexual relationship based on his "moral and Christian beliefs." (Id. at ¶ 23.) In June 2016, Doe stopped spending time with Student S. "because he believed they were incompatible spiritually." (Id. at ¶ 24.)

In October 2016, Student S. complained to Belmont about Doe's alleged sexual misconduct. (Id. at ¶ 25.) Student S. alleged that: (1) on an unspecified date, Doe kissed her and attempted to take her shorts off; (2) on June 3, 2016, Doe asked her to take her shorts off, which she did, and then attempted to have sexual intercourse with Student S.; and (3) on June 8, 2016, while Doe and Student S. were at Percy Warner Park in a hammock together kissing, Doe attempted to undress Student S. and she stopped him. (Id. at ¶ 34.) Doe alleged that, after these incidents, Student S. (1) spent time with him and (2) publicly commended him for "upstanding character." (Id. at ¶¶ 35-36.) Regardless, on October 6, 2016, Belmont's Deputy Title IX Coordinator found "reasonable cause to exist" and recommended the matter proceed under Belmont's formal Sexual Misconduct Accountability Process. (Id. at ¶ 27.)

5

On October 11, 2016, Molly Zlock, J.D., Belmont's Assistant Dean of Students and Title IX Coordinator, issued a temporary no-contact order to Doe regarding Student S. (Id. at ¶ 28.) Belmont's Title IX Department then investigated Student S.'s complaint between October 11, 2016 and October 28, 2016. (Id. at ¶¶ 29-30.) On October 28, 2016, Belmont gave Doe and Student S. investigatory results, which included Student S.'s formal written statement, and instructed them to comment within a two to three day time period. (Id. at ¶¶ 31-32.) Doe noticed that one of his suggested witnesses, Student T., had not been interviewed and, through counsel, brought this to the attention of Zlock. (Id. at ¶ 37.) On November 3, 2016, Belmont interviewed Student T. and information pertaining to his statement was added to the investigation file and provided to the parties.[3] (Id. at ¶ 38.)

On December 13, 2016, Doe received the initial Title IX Determination Letter ("Determination Letter") from Belmont, signed by Zlock. (Id. at ¶ 39.) In the Determination Letter, Belmont concluded that Doe was "not responsible for non-consensual sexual intercourse and non-consensual sexual contact." (Id. at ¶ 40.) However, Belmont found Doe had been "purposefully untruthful in th[e] investigation," and had "repeatedly violated the university's visitation policy" based on evidence gathered in the investigation. (Id. at 13; Doc. No. 1 at ¶ 40.) The Determination Letter set forth the following punishment: (a) suspension for the spring 2017 semester (eligible to return summer 2017); (b) institutional "probation" continuing upon return to school; (c) loss of privilege to hold leadership positions in co-curricular activity; and (d) a permanent no-contact

---

[3] The Complaint alleges, without further detail, that the interview of Student T. was not conducted in a "meaningful manner." (Doc. No. 1 at ¶¶ 69, 107-109.) When presented with Student T.'s witness statement, however, Doe did not file a response. (Doc. No. 21-1.)

order barring Doe from having any interaction with Student S., at risk of further punishment. (Doc. No. 21-1 at 13-15.)

As was his right, Doe appealed. (Doc. No. 1 at ¶ 41.) On December 28, 2016, Doe received a final determination letter stating that no errors had been found and the outcome would stand. (Id. at ¶ 42.) After denial of his appeal, Doe withdrew from Belmont and did not return from his suspension for the summer 2017 semester.[4] (Id. at ¶ 71.) Belmont therefore terminated Doe from his student employment. (Id. at ¶ 171.)

III.  Discussion

Belmont has moved to dismiss only state law Counts I, II, IV, IX, and X. The Court will address each Count in turn.

A.  Count I - Breach of Contract

Doe alleges that a contractual relationship existed between Belmont and himself by virtue of his paying tuition. Doe claims that the relevant terms of the parties' contract are set forth in the Bruin Guide, and that Belmont breached these terms when it failed to provide Doe with a fair adjudicatory process in a number of ways. Belmont argues that it did not have a contractual relationship with Doe and, even if it did, Doe has not sufficiently alleged breach of that contract.

In Tennessee, to allege a breach of contract a plaintiff must plead (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach. Thomas v. Meharry Med. Coll., 1 F. Supp. 3d 816, 828 (M.D. Tenn. 2014). The Tennessee Supreme Court "has not . . . enunciated the standard which should be applied in a dispute arising out of the university-student relationship." Doherty v. S. Coll. of Optometry, 862

_____

[4] According to the Complaint, despite having been found "not responsible" for sexual misconduct, Doe has not been able to gain acceptance to another school. (Doc. No. 1 at ¶ 72-73.)

7

F.2d 570, 577 (6th Cir. 1988). However, the U.S. Court of Appeals for the Sixth Circuit, applying Tennessee law, has stated that "the student-university relationship is contractual in nature," although courts "have rejected a rigid application of contract law in this area." Sifuna v. S. Coll. of Tenn., Inc., No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018); Atria v. Vanderbilt Univ., 142 F. App'x 246, 255 (6th Cir. 2005). Generally speaking, this relationship is implied as opposed to express. Anderson v. Vanderbilt Univ., 450 F. App'x 500, 502 (6th Cir. 2011); see also Atria, 142 F. App'x at 255 (holding that, even though Vanderbilt's Student Handbook, including policies that were "not intended to be all-inclusive and do not constitute a contract," was not an express written contract, its provisions may be enforced in Tennessee as an implied contract); Doe v. Univ. of South, No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011) (holding same as to university's sexual assault policies and procedures); accord Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011) (under parallel contract law, finding implied contract exists between student and university).

Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship. Atria, 142 F. App'x at 255. Because the Bruin Guide attempts to disclaim its entire contractual force, the Court will not consider the disclaimer, and utilizes the Bruin Guide as defining the terms of the implied contractual relationship between Doe and Belmont. Id.; Doe v. Colgate Univ., No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *19 (N.D.N.Y. Oct. 31, 2017) (same). However, the Court looks only to specific provisions of the Sexual Misconduct Accountability Process. Absent actual alleged violations, the Court does not look to ascribe responsibility for failing to live up to general "aspirational statements" in the Bruin Guide (such as broad promises to nurture the campus environment). See Rolph v. Hobart and William Smith Colls., 271 F. Supp. 3d 386, 407 (W.D.N.Y. 2017).

A disciplinary action by a university is the appropriate subject matter of a breach of contract action. Id. However, "[c]ontracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities." Valente v. Univ. of Dayton, 438 F. App'x 381, 384 (6th Cir. 2011). It is not the role of the Court to "advocate for best practices." Yu v. Vassar Coll., 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). Doe alleges several types of breach of his contractual relationship with Belmont arising from the university's disciplinary action against him.

         1.      <u>Timely Notice</u>

Doe alleges that he was not timely notified of the "detailed charges against him." (Doc. No. 26 at 9.) This allegation refers to three types of charges.

        (a)      <u>Notice Regarding Sexual Misconduct Charges and Provision of Student S.'s Formal Statement</u>

First, Doe avers that he was neither properly notified of the commencement of the formal Sexual Misconduct Accountability Process nor timely provided with a written copy of Student S.'s formal statement. (Doc. No. 1 at ¶¶ 33, 80-81, 102.) Specifically, Doe alleges that, on October 11, 2016, Zlock notified Doe of the issuance of a temporary no-contact order concerning Student S., but gave "no specific information regarding the reason for the order." (Id. at ¶ 28.) Doe further alleges that Belmont did not provide Doe with Student S.'s "formal" statement at the outset of the investigation (Id. at ¶ 31), but only did so on October 28, 2016 – after Doe participated in interviews, suggested witnesses, etc. – when Doe was provided with the full investigatory file "after the investigation was finalized." (Id. at ¶ 33.) Doe claims that this was when he "first received information regarding the substance of the accusation." (Id.) Essentially, Doe alleges that Belmont provided him with Student S.'s formal statement at the end of the Process rather than the beginning, contravening the process and compromising his ability to prepare an effective defense.

9

The Sexual Misconduct Accountability Process in the Bruin Guide clearly sets forth that, at the beginning of an investigation, "[t]he Title IX Coordinator will put all parties on notice of the commencement of a Formal Sexual Misconduct Accountability Process by email notification. In addition, the Respondent will be provided a copy of the written statement submitted by the Complainant." (Doc. No. 21-2 at 16.) It further provides that, as part of the investigation, the investigators "should interview the parties regarding the Complainant's written statement." (Id.)

"The proper focus in analyzing whether a private university provided fundamental fairness is whether the University adhered to its misconduct procedure." Pierre v. Univ. of Dayton, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) (citation omitted). Here, Doe has stated a colorable claim that Belmont breached its contractual relationship with him by not satisfying its relevant rules concerning notice of the alleged sexual misconduct violations and provision of the Complainant's formal statement, as set forth in the Sexual Misconduct Accountability Process. Furthermore, by allegedly not providing Student S.'s statement to Doe until the final investigation results, Belmont also failed to put Doe in a position where he could intelligently discuss that statement when interviewed. Compare with, e.g., Doe v. Coll. of Wooster, 243 F. Supp. 3d 875, 891 (N.D. Oh. 2017) (reaching opposite conclusion where the student handbook did "*not* require that the written charges against the accused be provided within any specific time period or contain any specific information); Doe v. The Tr. of the Univ. of Pa., 270 F. Supp. 3d. 799, 816 (E.D. Pa. 2017) (reaching same conclusion where disciplinary procedures did *not* require university to provide a copy of Complainant's written statement to respondent). Stated differently, Doe has a viable claim that Belmont's actions did not fall within the objective "range of reasonable expectations" of the relevant rules set forth in the Bruin Guide. Pierre, 143 F. Supp. 3d at 713 (citing Walker v. President & Fellows of Harvard Coll., 82 F. Supp. 3d 524, 530 (D. Mass. 2014)).

(b.)    Notice Regarding Collateral Visitation Violations

Second, Doe avers that he received no notice that he was being investigated for violations of Belmont's residential visitation policy (also called Community Commitment), a situation made particularly problematic because Belmont's punishment of Doe was, in the end, actually based in part on violations of that policy. (Doc. No. 1 at ¶¶ 45-49, 58.) The Bruin Guide states only that *complainants* in sexual misconduct investigations will not be held responsible for collateral violations arising from investigations (out of concern that doing otherwise would discourage reporting).[5] This clearly implies that findings of such violations by respondents might arise and be punished. (See Doc. No. 21-2 at 12 ("[T]his special consideration will not excuse any violations by someone alleged to have violated the Sexual Misconduct Policy.").) There is a preemption clause in the Bruin Guide's Sexual Misconduct Policy: "The [Sexual Misconduct Accountability Process] alters the general accountability process found in the Bruin Guide. . . . When an incident involves multiple alleged violations, one of which is an alleged violation of the Sexual Misconduct Policy, this process will control for all violations." (Doc. No. 21-1 at 12.) Accordingly, when a student is investigated under Belmont's Sexual Misconduct Accountability Process and any collateral violations are raised, the investigation may encompass all violations but the student is entitled to the same process and promises set forth in the Sexual Misconduct Accountability Process.

Here, Doe alleges that he was assured by Zlock that any visitation violations would not be considered during the investigation (Doc. No. 1 at ¶ 47), but the Determination Letter reflects Zlock's conclusion that Doe "repeatedly violated the university's visitation policy." (Doc. No. 21-

---

[5] For this reason, Doe's claim to unequal treatment because Student S. was not punished for the same visitation violations (See, e.g., Doc. No. 1 at ¶ 61) is expressly contradicted by the language of the Bruin Guide.

1 at 13.) Once again, "[t]he proper focus is . . . [on] whether [Belmont] adhered to its misconduct procedure." <u>Pierre</u>, 143 F. Supp. 3d at 713. As above, Doe has stated a colorable claim that Belmont acted unreasonably under the Sexual Misconduct Accountability Process and breached its notice obligations to Doe concerning these alleged violations.

        (c)    <u>Notice Concerning Truthfulness Violations</u>

Finally, Doe claims that he received no advance notice regarding charges of untruthfulness or warning that Belmont was considering punishing him for untruthfulness. (Doc. No. 1 at ¶¶ 58-59, 102-106.) Once again, the Sexual Misconduct Accountability Process governs under the Bruin Guide's preemption clause. The Court thus looks again to the procedure that Belmont followed.

Initially, it is clear from the Determination Letter that the questions as to Doe's untruthfulness arose during and *throughout* the investigation, not *before*. Thus, at the outset of the investigation there was simply no notice of alleged untruthfulness to provide to Doe. Second, the pleadings before the Court show that, when questions about Doe's truthfulness did arise, Doe *was* made aware. Specifically, Doe had alleged that Student S. tampered with cell phone evidence that was illustrative of the physical nature of their relationship and contradictory of Doe's statements. (Doc. No. 21-1 at 11.) Belmont engaged in an expert analysis, and the parties submitted their cell phones and records from cell phone companies. (<u>Id</u>.) Doe has no plausible claim that he was unaware of the substance of the untruthfulness charges arising from the investigation by which he put his own truthfulness center stage. Nor has Doe explained how more timely knowledge of the adverse evidence could have aided in defense of the untruthfulness finding. To the contrary, it seems that Doe was intent on disputing the text messages no matter what, leading to the *inevitable* consultation of the electronics experts and eventual conclusion that Doe had been deceptive. Based on the results of the expert investigation, Belmont concluded that Doe had made false statements

12

that Student S.'s electronic messages were "clearly doctored," contained "glaring forgery," and were "total lies." (Id. at 13.) Belmont concluded that Doe's statements had no reasonable basis, that Doe had been given the opportunity to be truthful, but that Doe had instead chosen to complicate the investigation. (Id.) It was on these grounds that Belmont concluded that Doe had been "purposely untruthful." (Id.)

Last, there is an inherent expectation of cooperation and truthfulness in the Sexual Misconduct Accountability Process. (See Doc. No. 21-1 at 17 ("Witnesses are expected to cooperate with all university investigations.").) It cannot have come as a "surprise" to Doe that he could be punished for being untruthful or deliberately complicating the investigation. Such an eventuality is neither fundamentally unfair nor outside of the objectively reasonable "range of expectations" of the Sexual Misconduct Accountability Process. The Court concludes that Doe has not stated a colorable claim for breach of the Sexual Misconduct Accountability Process concerning the "untruthfulness" for which he was punished.

2.     Right to Counsel

Doe alleges that Belmont denied him a "meaningful right to counsel." (Doc. No. 1 at ¶¶ 97-101.) The Complaint states that "[t]he notion of a student being able to defend himself competently in the immensely emotional situation Doe found himself is absurd. Doe was intimidated, as any innocent student accused of sexual assault would have been, and could not have been expected to prepare and deliver his version of the facts in a coherent and logical manner. Doe should not have been forced to go through the investigation process without counsel." (Id. at ¶ 100.)

Under the Sexual Misconduct Accountability Process, the complainant and respondent are entitled to a "support advisor" of their choosing, who may be an attorney, and that person may

13

attend meetings "for support" but may not speak or otherwise directly influence the proceedings. (Doc. No. 21-2 at 15.) However, there are no restrictions placed on the extent to which the support advisor may provide assistance outside the context of formal interviews (e.g., assisting Doe in preparing for an interview). (Id.) So Doe was indeed able to have counsel present and to consult with counsel outside of the formal investigative setting. This is more counsel than even necessary, because "it is well established that colleges and universities need not allow active representation [of students in disciplinary proceedings] by legal counsel . . . in order to comply with notions of fairness." Coll. of Wooster, 243 F. Supp. 3d at 894 (emphasis added) (dismissing breach of contract claim, where complaint alleged that "[t]he notion of a young man being able to defend himself competently in this intensely emotional situation is absurd," because student handbook limited participation of counsel); see also Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 636 (6th Cir. 2005) ("Ordinarily, colleges and universities need not allow active representation by legal counsel or some other sort of campus advocate."); Jaksa v. Regents of Univ. Of Mich., 597 F. Supp. 1245, 1251-52 (E.D. Mich. 1984), aff'd 787 F.2d 590 (6th Cir. 1986) (same). This is not, therefore, a plausible basis for a breach of contract claim.

### 3. Cross-Examination

Doe alleges that he was prevented from cross-examining Student S. and other witnesses. (Doc. No. 1 at ¶¶ 114-117.) However, the Complaint acknowledges that the Sexual Misconduct Accountability Process does *not* provide for a hearing (id. at ¶ 114) in any circumstance, and thus the implied *contractual* relationship between Doe and Belmont does not provide for the opportunity for confrontation that Doe alleges he was denied. The Court recognizes that, in the context of a procedural due process claim against a public university, a different result would likely arise under recent precedent. See Doe v. Baum, --- F.3d ---, No. 17-2213, 2018 WL 4265634, at

14

*1-6 (6th Cir. Sept. 7, 2018) (holding that, if a public university has to choose between competing narratives to resolve a sexual misconduct case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder); Doe v. Univ. of Cincinnati, 872 F.3d 393, 400-404 (6th Cir. 2017) (holding that a student facing suspension in a sexual assault investigation is entitled to a hearing and the respondent is entitled to cross-examination where the university was deciding between competing narratives and making a judgment as to the credibility of the accuser). However, that is not the case here. Belmont is a private university and the Bruin Guide expressly states that, "[a]s a private institution . . . [it] does not adhere to the standards of Constitutional Due Process." (Doc. No. 21-2 at 45.) This Court will not read Baum and Univ. of Cincinnati more broadly than the Court of Appeals has written them.[6] This is not grounds for Doe's breach of contract claim.

4.  Appropriateness of Investigation

The Complaint alleges that Belmont failed to conduct an appropriate investigation (Doc. No. 1 at ¶¶ 87-90). However, the Sexual Misconduct Accountability Process contains no requirements on what means an investigator must utilize to conduct any interviews or evaluate evidence; instead it only requires that an investigation be conducted. (See Doc. No. 21-2 at 16 (noting that investigators may meet with individuals as reasonably necessary to collect information and will determine whether collected information is relevant).) Here, Doe clearly alleges that

---

[6] The Court notes that Belmont *did* interview Doe and Student S. with some degree of formality, and made a written account of those interviews and of its contacts with all of the other witnesses. Doe was allowed to present additional information and was provided a copy of the investigative file and the Determination Letter, and he was allowed to submit comment – including comment or criticism of other witnesses' statements and evidence (and, indeed, Belmont pursued further investigation of the veracity of Student S.' text message evidence based on Doe's feedback). In this manner, although there was no hearing, Doe was not prevented from challenging Student S. (and he did). Doe has not pleaded any facts that establish that the procedure employed by Belmont led to an erroneous result.

15

Belmont conducted an investigation. (Doc. No. 1 at ¶ 30.) Belmont interviewed a number of witnesses, including Doe and Student S., during the over-two-week investigation.[7] (Doc. No. 21-1 at 2-11.) Doe is just dissatisfied with the *result* of the investigation. This is an insufficient basis for Doe's breach of contract claim. Coll. of Wooster, 243 F. Supp. 3d at 891-92; see also Powell v. St. Joseph's Univ., Civil Action No. 17-4438, 2018 WL 994478, at *5 (E.D. Pa. Feb. 20, 2018) (holding students are only entitled to those safeguards that a school specifically provides in its procedures); Doe v. Columbia Coll. Chicago, Case No. 17-CV-00748, 2018 WL 497284, at *7 (N.D. Ill. Jan. 22, 2018) (breach of contract claim failed where school met with and communicated with both complainant and respondent throughout the investigation, gathered facts and witnesses, considered the evidence provided and the credibility of the parties, and created an investigation report); Tr. of Univ. of Pa., 270 F. Supp. 3d. at 813 (concluding that the promise of a "thorough and fair investigation" did not impose any addition requirements other than those specifically set forth in the student disciplinary procedures); Doe v. Brown Univ., 210 F. Supp. 3d 310, 340 n.17 (D.R.I. 2016) (observing that "an investigator must retain the discretion to make judgment calls about relevance"); Tsuruta v. Augustana Univ., No. 4:15-CV-04150-KES, 2015 WL 5838602, at *7 (D.S.D. Oct. 7, 2015) (noting that the decision of a school to exercise discretion afforded by policy in student handbook was not a violation of that policy); Dempsey v. Bucknell Univ., Civil Action No. 4:11-CV-1679, 2012 WL 1569826, at *18 (M.D. Pa. May 3, 2012) (holding that student's breach of contract claim failed where complaint allegations demonstrated that an

---

[7] Doe complains that Belmont initially overlooked one of his witnesses, Witness T. (Doc. No. 1 at ¶ 108.) However, when this was brought to Belmont's attention, it interviewed Witness T. (Id. at ¶ 109.) Doe alleges that Belmont "failed to do so in a meaningful manner" (id.), but, again, the Sexual Misconduct Accountability Process does not contain criteria to define "meaningful" interviews. Rather, Belmont officials may meet with witnesses as reasonably necessary in their sole judgment. (Doc. No. 21-2 at 16.) The record before the Court reflects that Belmont did so.

investigation into the assault complaint was conducted); Flaim, 418 F.3d at 635 (holding that school disciplinary boards are not bound by formal rules of evidence or rules of criminal procedure) (citations omitted); Jaksa, 597 F. Supp. at 1250 ("While a university cannot ignore its duty to treat its students fairly, neither is it required to transform its classrooms into courtrooms."); Doe v. Tr. of Boston Coll., 892 F.3d 67, 82 (1st Cir. 2018) (where student guide contained no such requirement, as long as university properly commenced investigation it was not even necessary to wait for all evidence to become available before considering case and rendering decision).

5.    Credibility Determinations

The Complaint also alleges that Belmont improperly found certain witnesses, including Witness T., not credible. (See, e.g., Doc. No. 1 at ¶¶69-70, 107-09.) But, again, the Sexual Misconduct Accountability Process does not set forth any procedure for making credibility determinations, nor a requirement that Belmont explain those decisions to a party's satisfaction. Indeed, in every investigation it is necessary to make credibility determinations, and there frequently will be a party displeased by one or more of those decisions. In the absence of specific provisions in the Bruin Guide, especially in a situation where Belmont conducted an investigation and interviewed numerous witnesses, Belmont's discretionary decisions as to the relative merit and credibility of those witnesses cannot, absent something more, equate to a breach of contract. See, e.g., Doe v. Univ. of Dayton, Case No. 3:17-cv-134, 2018 WL 1393894, at *7 (S.D. Oh. Mar. 20, 2018) ("As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess."); Coll. of Wooster, 243 F. Supp. 3d at 894 (same); Walker, 82 F. Supp. 3d at 531-32 ("It is not the business of . . . judges to tell universities what statements they may consider and what statements they must reject."); Pierre, 143 F. Supp. 3d at 713 (noting that "the issue before this Court is not whether the

17

[university] should have believed a certain party's version of events") Doe v. Univ. of South, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) (observing that, in considering a school's disciplinary outcomes, it is not for the courts to review who is credible).

### 6. Competency and Bias of Investigators and Appeals Officer

Doe also alleges that Zlock, the Belmont investigators, and the Assistant Dean appeals officer were incompetent and biased. (Id. at ¶¶ 110-113.) This is based on Doe's wholly speculative and conclusory "belief" that those individuals (a) did not have "any training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting" and (b) were determined to punish him. (Id.) Regarding the Assistant Dean appeals officer in particular, Doe avers that "[d]espite the absence of any relevant training, Mr. Donovan was somehow able to conclude that no procedural errors, evidence of bias, or relevant new information had impacted or would impact the ultimate outcome and sanctions in Doe's case." (Id. at ¶ 124.)

As to competency, the Sexual Misconduct Accountability Policy does not dictate any credentials the investigator, the Title IX Coordinator, or the Assistant Dean appeals officer must possess aside from receiving some training in these type of investigations "on a yearly basis."[8] (Doc. No. 21-2 at 16.) The Complaint is insufficient because it does not make any specific allegations about the backgrounds or lack of training of any of the Belmont investigators. See Powell, 2018 WL 994478, at *5 (where policy only required professionally trained investigators, dismissing breach of contract claim because complaint alleged nothing about backgrounds of investigators). Doe cannot bring suit under a unilaterally-imposed higher bar than the Bruin Guide.

---

[8] The Court also notes that Doe's allegation that Zlock, an attorney, has "no training in law" is fanciful. (See Doc. No. 21-1 at 14 (Determination Letter signed by "Molly S. Zlock, J.D.").)

18

See Colgate Univ., 2017 WL 4990629, at *19 (finding breach of contract argument failed where student handbook required nothing more than "annual training").

As to bias, Doe acknowledges the "lack of any language regarding impartiality" in the Sexual Misconduct Accountability Policy. (Doc. No. 1 at ¶ 88.) This alone might be fatal because, while there is a procedural due process guarantee to impartial decision-makers, Doe v. Miami Univ., 882 F.3d 579, 601 (6th Cir. 2018), Doe has only brought a breach of contract claim. Even if the Court were to presume that Doe was entitled to impartiality as a result of an implied duty of good faith and fair dealing, Belmont obviously extended a significant degree of fairness to Doe in the investigation, because it concluded that Doe was "*not responsible*" for the sexual misconduct charges. "In the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias." Atria, 142 F. App'x at 256; McMillan v. Hunt, No. 91-3843, 968 F.2d 1215 (table), 1992 WL 168827, at *2 (6th Cir. Jul. 21, 1992) (per curiam) (citing Ikpeazu v. Univ. of Neb., 775 F.2d 250, 254 (8th Cir. 1985)). To overcome that presumption, Doe must plausibly allege "personal animosity, illegal prejudice, or a personal or financial stake in the outcome" on the part of Belmont officials. Ikpeazu, 775 F.2d at 254; accord Doe v. Cummins, 662 F. App'x 437, 450 (6th Cir. 2016) (quoting Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir. 1987)) (stating that, to survive a motion to dismiss, allegations of bias must be "evident from the record and cannot be based on speculation or inference"); Doe v. Ohio State Univ., 219 F. Supp. 3d 645, 658 (S.D. Oh. 2016) ("To survive a motion to dismiss, [the plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias.") Stated differently, a "mere belief that [school officials] acted with . . . ulterior motives" during the course of the investigation "is insufficient to state a claim for relief." Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 602 (S.D. Oh. 2016); see also Center for Bio–Ethical Reform, Inc. v. Napolitano,

19

648 F.3d 365, 377 (6th Cir. 2011) (holding "vague and conclusory allegations of nefarious intent and motivation . . . are not well-pleaded, and are therefore insufficient to plausibly suggest an entitlement to relief"); <u>Gorman v. Univ. of Rhode Island</u>, 837 F.2d 7, 15 (1st Cir. 1988) ("Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."). The Court will not "indulge in unreasonable inferences." <u>Cummins</u>, 662 F. App'x at 454. Doe has not alleged any facts to support "actual bias," and the speculative allegations of prejudgment and purported bias, without factual support, fail to meet the required hurdle to sustain a breach of contract claim.[9] <u>Coll. of Wooster</u>, 243 F. Supp. 3d at 892.

### 7. Failure to Punish Student S.

Doe alleges that the investigation was substantively flawed because it did not result in the punishment of *the Complainant, Student S.* (<u>See, e.g.</u>, Doc. No. 1 at ¶¶ 91-92.) Indeed, the Complaint frequently opines that because Doe was found "not responsible," Student S. should have been disciplined for being "untruthful" and making "false accusations." (<u>See, e.g.</u>, <u>id</u>. at ¶¶ 60-61, 135.) However, the issue of whether Student S. engaged in any misconduct is immaterial to whether Doe engaged in misconduct. <u>Doe v. Wright St. Univ.</u>, Case No. 3:16-cv-469, 2017 WL 3671240, at *8 (S.D. Oh. Aug. 24, 2017). Furthermore, the Sexual Misconduct Accountability Process clearly does not provide for a right to punishment of a student's accuser upon a "not responsible" finding. (Doc. No. 21-2.) Indeed, it specifies the *opposite*: "If a person reports a

---

[9] Doe argues that Zlock was biased in favor of Student S. for reasons related to gender. (Doc. No. 26 at 10.) To be clear, the Complaint does not set forth gender bias as a factual basis for Doe's breach of contract claim (<u>see</u> Doc. No. 1 at ¶ 87-92), and the contract claim therefore may not advance on such an unsupported basis. Beyond this, the Court simply notes that "experience working with survivors of domestic violence does not establish that [an investigator] harbors pro-female biases." <u>Doe v. Univ. of Denver</u>, Civil Action No. 16-cv-00152-PAB-KMT, 2018 WL 1304530, at *11 (D. Colo. Mar. 13, 2018). Indeed, not even "being a feminist . . . support[s] a reasonable inference that a person is biased." <u>Miami Univ.</u>, 882 F.3d at 602.

20

violation of the Sexual Misconduct Policy, the University will not pursue any other violations it learns of related to the incident. These violations may include, but are not limited to, violations of the . . . Visitation Policy . . . etc. This applies to the person making the report. . . ." (Id. at 12.) Accordingly, it would have been a *breach* of the terms of the process for Belmont to have punished Student S. for visitation violations or, arguably, for "untruthfulness."

Regardless, this allegation suffers from a fatally faulty premise because Belmont's investigation did *not* conclude that Student S. – a party who made quite detailed allegations, had spontaneously "broken down" in a Title IX informational presentation on campus, had sought counseling, and had met with Belmont's Victim's Advocate – had made "false" accusations. The investigation merely examined, under the preponderance of the evidence standard,[10] whether it was not "more likely than not" that Doe "intentionally touched or had sexual intercourse with Student S. absent consent on multiple occasions," and concluded only that Doe was "not responsible" for such conduct under Belmont's Sexual Misconduct Policy. (Doc. No. 21-1 at 13; see also Doc. No. 21-2 at 13 (Bruin Guide explaining that a complaint may not be proved even where the evidence is equally balanced).) Indeed, according to the Determination Letter, despite the outcome, Belmont found Student S. to have been "credible," and concluded that she "confide[d] in [ ] witnesses what she perceived occurred between the parties." (Doc. No. 21-1 at 12.) As stated in the Determination Letter, the evidence simply "[fell] short." (Id. at 13.)

Accordingly, this is not a plausible basis for Doe's breach of contract claim.

---

[10] The Court of Appeals for the Sixth Circuit has noted with approval the use of this standard in university sexual assault disciplinary proceedings. See Doe v. Univ. of Ky., 860 F.3d 365, 368 n.2 (6th Cir. 2017).

8.        Failure to Refrain from Proceeding

The Complaint alleges that Belmont breached an obligation to "refrain from proceeding if the charges lacked sufficient evidence." (Doc. No. 1 at ¶¶ 93-96.) Doe's sole basis for this allegation is that Belmont should not have investigated him upon becoming aware that Student S. had made a positive social media post about Doe on June 23, 2016. (Id.) However, the Sexual Misconduct Accountability Process does not require any particular type of threshold evaluation. Specifically, a Belmont official need only determine if a student's complaint of sexual misconduct "falls under the purview of the Sexual Misconduct Policy" to recommend a formal investigation. (Doc. No. 21-1 at 15.) There is no requirement of a threshold factual evaluation of substantive evidence that will later be considered as part of the formal investigatory process (such as a potentially-contradictory social media post). Nonetheless, the Complaint appears to concede that Belmont performed at least some degree of threshold analysis when it issued the temporary no-contact order and found "reasonable cause" to proceed with a formal investigation. (Doc. No. 1 at ¶ 27.) And even if a greater threshold inquiry were required, simply because Doe identified a piece of evidence (i.e., the social media post) that arguably conflicted with other evidence advanced by Student S. at the outset does not mean Belmont's decision to proceed was incorrect. See, e.g., Doe v. Tr. of Boston Coll., Civil Action No. 15-cv-10790, 2016 WL 5799297, at *18 (D. Mass. Oct. 4, 2016) (noting the simple existence of conflicting evidence does not defeat a student's complaint), affirmed in part and reversed in part on other grounds, Tr. of Boston Coll, 892 F.3d at 67; Univ. of Denver, 2018 WL 1304530, at *11 (stating that the presence of conflicting evidence in the record does not mean that university failed to consider that evidence). While Doe clearly disagrees with Belmont's decision to proceed with Student S.'s complaint, he has failed to allege facts that

support a claim that Belmont breached the Sexual Misconduct Accountability Process in the initiation of its investigation.

### 9. Sufficiency of Evidence

Doe alleges that Belmont "put forward no evidence" to support the collateral untruthfulness violation and concludes that "there is no evidence of such untruthfulness from Doe in the record." (Id. at ¶¶ 118-120.) This is echoed at other points in the Complaint, where it is variously alleged that "Belmont did not conduct any investigation into the allegations for which Doe was disciplined," (Doc. No. 1 at ¶ 85), "no specific details were given in regard to what Zlock believed Doe was untruthful about," (id. at ¶ 55), and that Zlock "gave no evidence to support her finding that Doe was untruthful." (Id. at ¶ 59.)

"The law does not allow this Court to retry [Belmont's] disciplinary proceeding," Univ. of South, 687 F. Supp. 2d at 755, and it is not for the Court to construe the Sexual Misconduct Accountability Process as "requiring a particular outcome." Anderson, 450 F. App'x at 502. That being said, it is clear *from face of the Complaint and the Determination Letter* that Belmont *did* conduct an investigation into the untruthfulness violation, *did* give specific details as to the subject of the untruthfulness, and *did* give specific evidence to support Belmont's conclusion as to untruthfulness. The Determination Letter *explicitly states* that the conclusion regarding Doe's lack of truthfulness concerned Doe's representations about the limited extent of his physical relationship with Student S. and his allegation that Student S. had doctored and forged text messages. The Determination Letter explains that Belmont sought and relied upon two technical experts in the investigation of the latter issue. (Doc. No. 21-1 at 12.) Specifically, the Determination Letter states:

It is clear from the evidence that was submitted, especially from the text messages, that the parties had a more physical relationship than [Doe] acknowledged. Upon discovery of [Student S.]'s evidence, [Doe] attempted to question the text messages' authenticity and argued that their fabrication created suspicion as to [Student S.]'s credibility. In fact, [Doe] argued that the messages were "clearly doctored," contained "glaring forgery," and were "total lies." In his response to [the experts'] statement that found the text messages to be accurate, [Doe] attempted to downplay their significance as "minimal consequence." It is unreasonable to believe that [Doe] had simply forgotten about the text message history he shared with [Student S.]. [Doe] had the opportunity to be truthful regarding his relationship with [Student S.] throughout this process, in both his initial statement and his final statement to the investigators. Instead, he chose to try to purposefully complicate this investigation.

(Id. at 12-13.) Given the extensive discussion in the Determination Letter, Doe's remarkable statement in his brief that he "still does not know what he could possibly have lied about" (Doc. No. 26 at 9) does not render insufficient the evidence developed during the investigation. For purposes of evaluating Doe's claim, Belmont's explanation is sufficient on its face. See Hall v. Med. Coll. of Ohio, 742 F.2d 299, 310 (6th Cir. 1984) (stating that "[a]n accused individual is generally not entitled to a statement of reasons for a decision against them, at least where the reasons for the decision are obvious"). This is not a sufficient basis for Doe's breach of contract claim.[11]

---

[11] The Complaint raises several other allegations that appear to form at least part of the basis for Doe's Title IX retaliation claim (Count III), which is not the subject of the instant motion. The Court merely mentions these allegations here to confirm that they cannot serve a ground for Doe's breach of contract claim. First, the Complaint states that an allegation of cheating was raised against Doe "during the time frame of the Title IX investigation," the allegation was improperly not referred to an Honor Council, and Doe was subsequently forced to undergo an investigation into that alleged violation. (Doc. No. 1 at ¶¶ 43-44, 140.) Under the Bruin Guide's Personal Integrity Policy, a student is not promised an Honor Council determination, and that is only one potential means for investigating and resolving an allegation of academic dishonesty. (Doc. No. 21-2 at 21.) Second, Doe refers, without specific detail, to being more strictly punished than other students who "were also present during housing violations." (Doc. No. 1 at ¶ 142.) As discussed above, collateral violations were appropriately considered as part of Doe's investigation under the Sexual Misconduct Accountability Process. Also as mentioned above, the punishments of *others*

10.    Damages

Based on the foregoing, Doe has adequately pleaded breach of his contractual relationship with Belmont, as reflected by the Sexual Misconduct Accountability Process, based only on (1) notice regarding sexual misconduct allegations and provision of Student S.' formal statement and (2) notice regarding alleged visitation violations. No other basis advanced by Doe is sufficient. Doe was found "not responsible" for the sexual misconduct allegations, and so logically he was not "damaged" by the alleged notice violations concerning the sexual misconduct charges. But, assuming, *arguendo*, that Doe believes he was damaged by both of the alleged breaches, the Court considers the legal test for whether Doe has a claim for "damages caused by the breach." Thomas, 1 F. Supp. 3d at 828.

"Damages in breach of contract cases are nothing more than payment in money for actual losses caused by the breach of contract." Custom Built Homes v. G.S. Hinsen Co., No. 01A01–9511–CV–00513, 1998 WL 960287, at *4 (Tenn. Ct. App. Feb. 6, 1998). Accordingly, "[a]n injured party is only entitled to be put *in the same position* he would have been in had the contract been performed, and he should not profit by the defendant's breach." Hennessee v. Wood Grp. Enterprises, Inc., 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991) (citations omitted) (emphasis in original). In Tennessee, parties are not entitled to recover uncertain, contingent, or speculative damages. Kindred v. Nat'l Coll. of Bus. And Tech., Inc., 2015 WL 1296076, at *6 (Tenn. Ct. App. Mar. 19, 2015); Moore Constr. Co. v. Clarksville Dep't of Elec., 707 S.W.2d 1, 15 (Tenn. Ct. App.

_____

are immaterial to the treatment of *Doe* under the Sexual Misconduct Accountability Process, which governed here under the Bruin Guide's preemption clause; the Process does not impose any guarantee of equitable treatment from student to student. Finally, in the Bruin Guide, Belmont expressly reserves the right to delay, deny, or revoke any student's graduation due to a violation of the Code of Conduct. (Doc. No. 21-2 at 40.) Neither of these allegations supplies a plausible basis for Doe's breach of contract claim.

25

1985). "Damages will be considered uncertain or speculative when their existence is uncertain, or when the proof is insufficient to enable a trier of fact to make a fair and reasonable assessment of damages." Custom Build Homes, 1998 WL 960287, at *4 (citing Wilson v. Farmers Chem. Ass'n, Inc., 444 S.W.2d 185, 189 (Tenn. 1969)).

Here, as a result of the investigation and conclusions, Belmont suspended Doe through the end of the spring 2017 semester with eligibility to return in the summer 2017 (i.e., a suspension of one semester). (Doc. No. 1 at ¶ 62; Doc. No. 21-1 at 13.) However, Doe chose to not return to Belmont. (See Doc. No. 1 at ¶ 71 (noting Doe "withdrew" from Belmont").) The Complaint does not allege that Doe lost any money or benefits for the fall 2017 semester, nor does it allege that Doe lost any money that he had pre-paid for the spring 2017 semester. (Doc. No. 1, passim.) Rather, in addition to boilerplate language, Doe has pleaded damages for "loss of educational opportunities," "past and future economic loss" and "loss of future career prospects." (Doc. No. 1 at ¶ 126; id. at 28 ¶ 6.) However, in cases involving higher education discipline, Tennessee courts have concluded that these types of breach of contract damages are impermissibly speculative. See Kindred, 2015 WL 1296076 at *7 (holding that future value of educational opportunity is impermissibly speculative form of damages and, in any event, that damages were inappropriate where plaintiff voluntarily withdrew from school after defendant's alleged breach); Canady v. Meharry Med. Coll., 811 S.W.2d 902 (Tenn. Ct. App. 1991) (where medical school breached contract with plaintiff by failing to properly conduct hearings regarding complaints as to plaintiff's performance, concluding "the only immediate loss sustained by plaintiff . . . was his emotional reaction from being disciplined" and that plaintiff could not claim speculative damages for "the inability to realize his [career and financial] hopes").

26

Doe's damage claims are likewise impermissibly speculative. Doe did not return to Belmont after his suspension and now seeks to hold Belmont liable for unknown damages related to his educational opportunities, career prospects, and future earning capacity. Tennessee breach of contract law exists to make Doe whole, not to provide him with an unquantifiable windfall for the future. Accordingly, Doe has not adequately pleaded damages for the several alleged breaches that survived the above analysis.

This being the case, Count I will be dismissed in its entirety.

B.      Count II - Promissory Estoppel

Doe also brings a claim for promissory estoppel. In the Complaint, Doe alleges that "the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of [ ] Doe. In reasonable reliance on these promises and representations, Doe accepted the University's offer of admission and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness. . . ." (Doc. No. 1 at ¶ 128.) The Complaint then repeats several of the alleged breach of contract violations, such as failure to conduct a proper investigation, failure to provide ample notice, biased investigators, and failure to sanction Student S. for being "inconsistent."[12] (Id. at ¶¶ 132-137.)

A claim for promissory estoppel in Tennessee, also known as "detrimental reliance," has three elements: "(1) a party made a promise which the promisor should reasonably have expected

_____

[12] Buried in this cause of action in the Complaint is an additional claim that Zlock refused Doe "assistance and accommodations" and "ignored" Doe and his parents. (Doc. No. 1 at ¶ 134.) So little detail is contained in this statement that it is difficult for the Court to even evaluate how this conduct might violate his implied contract with Belmont.

27

to induce the action or forbearance of the promisee; (2) the promise does induce that action or forbearance; and (3) injustice can be avoided only by enforcing the promise." Sifuna, 2018 WL 3005814, at *2 (citing Atria, 142 F. App'x at 256); Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citation omitted). The key element is, of course, the promise. Chavez v. Broadway Elec. Serv. Corp., 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). Tennessee does not liberally apply the doctrine of promissory estoppel and limits its application to exceptional cases "verging on actual fraud." Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003); Baliles v. Cities Serv., 578 S.W.2d 621 (Tenn. 1979). A claim of promissory estoppel is not dependent upon the existence of an express contract between the parties. Calabro v. Calabro, 15 S.W.3d 873, 879 (Tenn. Ct. App. 1999) (citing Engenius Entm't, Inc. v. Herenton, 971 S.W.2d 12, 19-20 (Tenn. App. 1997)). In fact, as a general matter, the theory of recovery is not viable when a valid contract exists. Jones v. BAC Home Loans Servicing, LP, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at *9 (Tenn. Ct. App. July 12, 2017). However, Tennessee courts have upheld a claim for promissory estoppel despite the existence of a valid contract in limited cases where an alleged promise was made at the time of contracting and operated to expand, not to add to or vary the terms of a contract. Thomas Energy Corp. v. Caterpillar Fin. Servs. Corp., No. E2014-00226-COA-R3-CV, 2014 WL 7366676, at *7 (Tenn. Ct. App. Dec. 26, 2014) (citing Bill Brown Const. Co. v. Glen Falls Co., 818 S.W.2d 1, 11-12 (Tenn. 1991) (upholding a claim for promissory estoppel when the insurer's agent's representations expanded the terms of an insurance contract)).

Doe's wide-ranging promissory estoppel claim fails because, as discussed above, there is an implied contract between Doe and Belmont that is reflected in the terms of the Bruin Guide, and the promissory estoppel claim is premised on essentially the same allegations that support

28

Doe's breach of contract claim. <u>College of Wooster</u>, 243 F. Supp. 3d at 895 (reaching same conclusion under comparable Ohio law). That Doe has failed, in many instances, to sufficiently allege breaches of certain contractual provisions does not give rise to a promissory estoppel claim as an automatic result. Furthermore, to the extent that Doe seeks another bite at the apple regarding imposing substantive and procedural requirements that are simply not present in the Sexual Assault Misconduct Policy, a promissory estoppel claim is "not available" for the purpose of seeking "to change the terms of existing, valid contract." <u>Jones</u>, 2017 WL 2972218, at *10.

However, there is one instance in which Doe has alleged that Belmont made a specific promise to him that changed the terms of the Sexual Misconduct Accountability Process. As discussed above, the Process specifies that the investigation may include collateral violations (subject to the same procedural terms set forth therein). The Complaint alleges that "Doe was assured the visitation violation would not be considered or intermingled with the [sexual misconduct] charge by Zlock and yet Zlock specifically mentions visitation violations in her determination letter and bases her discipline on alleged visitation infractions." (Doc. No. 1 at ¶ 47.) (<u>See also id</u>. at ¶ 131 ("Zlock sanctioned John Doe for alleged actions he was not charged with.").) While arguments may eventually be made regarding whether this alleged promise "added to" or "varied" versus "expanded" the terms of the implied contractual relationship between Doe and Belmont, the Court is satisfied that, at least for now, a promissory estoppel claim based on this factual predicate should not be dismissed. Discovery is appropriate concerning whether (a) the promise actually occurred, (b) the promise verged on "actual fraud," (c) Belmont obtained an unconscionable advantage in the investigation by its actions, or (d) Doe actually relied on this promise to his detriment.[13] <u>Shedd</u>, 118 S.W.3d at 700; <u>EnGenius Entm't</u>, 971 S.W.2d at 20.

---

[13] If appropriate, these issues can be revisited in subsequent dispositive motion practice.

In sum, the Court will dismiss Count II except for a promissory estoppel claim based on the allegations in Paragraphs 47 and 131 of the Complaint to proceed.

    C.    <u>Count IV – Intentional Infliction of Emotional Distress</u>

In Tennessee, the tort of intentional infliction of emotional distress ("IIED") is synonymous with the tort of outrageous conduct. <u>Lyons v. Farmers Ins. Exch.</u>, 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000). Under Tennessee law, a plaintiff must establish the following elements to support a claim for IIED: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." <u>Bain v. Wells</u>, 936 S.W.2d 618, 622 (Tenn. 1997). To say that Tennessee courts narrowly define "outrageous conduct" would be something of an understatement. The conduct must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." <u>Goldfarb v. Baker</u>, 547 S.W.2d 568, 569 (Tenn. 1977). As the Tennessee courts have explained:

> In describing these elements, we have emphasized that *it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress.* A plaintiff must in addition show that the defendant's conduct was so outrageous *in character*, and so extreme in degree, as to go beyond *all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.*

<u>Lourcey v. Estate of Scarlett</u>, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted) (emphasis added); <u>see also</u> Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); <u>Godfredson v. Hess & Clark, Inc.</u>, 173 F.3d 365, 376 (6th Cir. 1999) (discussing standard under identical Ohio law). It is clear from this explanation that (a) the standard is not whether *an aggrieved person* (such as Doe) considers a party's actions to have been so outrageous, but whether *a civilized society* would so find, and (b) a plaintiff must prove that the conduct is outrageous in

30

*character*, and not just in *motive*. A plaintiff seeking damages for IIED must meet an "exacting standard." Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999). "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). "[T]he trial court may reasonably dismiss this legal theory as a matter of law." Lane v. Becker, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

Doe alleges, without more, that Belmont's actions "were done intentionally or recklessly"; "are so outrageous that they are not tolerated in a civilized society;" and "resulted in serious mental injury." (Doc. No. 1 at ¶¶ 145-147.) However, the Tennessee courts have consistently held that removal from academic programs and frustration of earning academic degrees, even if humiliating, depressing, or distressful, are not sufficiently egregious to support a claim of IIED. See, e.g., Kindred, 2015 WL 1296076, at *9-10 (dismissing IIED claim where plaintiff's enrollment was cancelled by school and plaintiff alleged the actions of administrator caused her "continuing great emotional pain and mental distress," and that she "felt that she could no longer pursue her educational goals because she could not continue at National College and she could not start all over somewhere else," because reasonable minds could not find that school's conduct was "utterly intolerable" or "beyond all bounds of decency"); Runions v. Tenn. St. Univ., No. M2008-01574-COA-R3-CV, 2009 WL 1939816, at *6 (Tenn. Ct. App. July 6, 2009) (holding that a student's physical removal from classroom and expulsion from nursing program, despite prior promises of fair treatment and reinstatement from provost, did not meet exacting standard for recovery on claim of IIED); Goldfarb, 547 S.W.2d at 568 (finding fact that student was publicly accused of assault

and blackmail by teacher and removed from class, although a "misfortune," was not sufficient to establish IIED claim).[14]

Here, it is undisputed that Belmont investigated Doe in response to a claim of sexual misconduct lodged by another student. Belmont conducted an investigation that included interviewing Doe and his witnesses. Belmont afforded Doe enough process to conclude that he was *not responsible* for sexual misconduct. Belmont's findings as to collateral violations were explained in the Determination Letter and supported by the contributions of two experts. Doe was allowed to give a final statement, comment on the investigative file, and appeal the Determination Letter. Even if Belmont's investigation was imperfect or unfair, the alleged conduct is not so atrocious, so beyond the bounds of decency, so utterly intolerable to society such that it meets the demanding Tennessee standard for an IIED claim. Put simply, Doe has not alleged discomfort that a student in a modern university sexual misconduct investigation cannot be expected by society to face. Accordingly, the Court will dismiss Count IV.

> D.      Count IX – Intentional Interference with Business Relations

Tennessee law recognizes the tort of intentional interference with business relations. To recover under such a theory, a plaintiff must demonstrate "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's

---

[14] In support of his IIED argument, Doe oddly cites to a 2015 report and recommendation in Peterson v. Ne. Local Sch. Dist., No. 3:13cv00187, 2015 WL 5013360, at *4 (S.D. Oh. 2015). This discovery ruling has nothing to do with an IIED claim. In Peterson, a year before the cited ruling, the district court *dismissed* the plaintiff's IIED claims in response to a motion to dismiss on the pleadings, but allowed the plaintiffs to file a second amended complaint. Peterson v. Ne. Local Sch. Dist., No. 3:13cv00187, 2014 WL 5013360, at *14-15 (S.D. Oh. May 20, 2014). Later, the court *granted* summary judgment to the defendants on the IIED claims, finding that the plaintiffs had designated "no evidence" to support a claim of emotional anguish. Peterson v. Ne. Local Sch. Dist., No. 3:13cv00187, 2016 WL 5013360, at *14-15 (S.D. Oh. Feb. 17, 2016).

business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." <u>Trau-Med of Am., Inc. v. Allstate Ins. Co.</u>, 71 S.W.3d 691, 701 (Tenn. 2002). Furthermore, under Tennessee law, a party to a contract cannot be liable for tortious interference with that contract. <u>Cambio Health Solutions, LLC v. Reardon</u>, 213 S.W.3d 785, 789 (Tenn. 2006) (citing <u>Ladd v. Roane Hosiery, Inc.</u>, 556 S.W.2d 758, 760 (Tenn. 1977)). "This principle correctly reflects the purpose of the tort of intentional interference, which is to deter *third* parties from interfering with the contractual relations of parties to a contract." <u>Cambio</u>, 213 S.W.3d at 789 (emphasis in original).

Doe alleges that he "was employed or received funds from . . . Belmont in return for specified work on campus" and that he "was terminated from his employment and lost his monetary compensation as a direct and proximate result of the unfair and illegal actions of Belmont when Belmont disciplined [him] . . ." (Doc. No. 1 at ¶¶ 170-171.) Doe's intentional interference with business relations claim is, therefore, self-defeating. Doe alleges nothing more than that he was employed by Belmont, the party with whom he had a contractual relationship, and that he lost that employment. Belmont cannot be liable for interference with its *own* business relationship with Doe. <u>Cambio</u>, 213 S.W.3d at 789. The Complaint identifies no business relationship with any third party of which Belmont was aware, or which Belmont allegedly intended to sabotage. Perhaps recognizing this fact, Doe suggests in passing in his brief that he was employed by the third party "the federal government" because Belmont's student work program received federal grant monies. (Doc. No. 26 at 14.) This allegation is totally absent from the Complaint. And Doe does not offer any details of what his contract with the federal government could have been. Regardless, even if such a theory were viable, Doe has not alleged that Belmont undertook its sexual misconduct

33

investigation with the intention of interfering with Doe's employment. Count IX will therefore be dismissed.

E.    Count X – Unjust Enrichment

Unjust enrichment is a quasi-contractual theory in which a court may impose a contractual obligation where one does not exist. Cole v. Caruso, No. W2017-00487-COA-R3-CV, 2018 WL 1391625, at *3 (Tenn. Ct. App. Mar. 20, 2018) (citing Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998)). The theory of unjust enrichment is based on the principle that "a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit." Id. (quoting Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005)). Accordingly, to establish an unjust enrichment claim, "one must prove: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Id. (quoting Freeman Indus., 172 S.W.3d at 525); see also Paschall's Inc. v. Dozier, 407 S.W.2d 150, 154-55 (Tenn. 1966) (same). "The Tennessee Supreme Court has noted that the most significant requirement in a claim for unjust enrichment is that the enrichment to the defendant be unjust." Cole, 2018 WL 1391625, at *3 (citing Freeman Indus., LLC, 172 S.W.3d at 525; Whitehaven Cmty. Baptist Church, 973 S.W.2d at 596).[15] Importantly, if a plaintiff enjoys privity of contract with a defendant, the plaintiff must

---

[15] The Tennessee Supreme Court has generally held that "[a]ctions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." Cole, 2018 WL 1391625, at *4 (citing Paschall's, Inc., 407 S.W.2d at 154). However, that court has outlined separate and distinct elements applicable to unjust enrichment and quantum meruit claims. Compare Castelli v. Lien, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995) (outlining the five elements needed to establish a quantum meruit claim), with Freeman Indus., LLC, 172 S.W.3d at 525 (outlining three elements needed to establish an unjust enrichment claim). Although there is

34

demonstrate that he or she has exhausted all remedies against the defendant. <u>Freeman Indus., LLC</u>, 172 S.W.3d at 525 (citing <u>Paschall's, Inc.</u>, 407 S.W.2d at 155; <u>Whitehaven Cmty. Baptist Church</u>, 973 S.W.2d at 596).

The Complaint alleges that Belmont received a benefit by using a photograph of Doe for advertising and promotional purposes without compensating him, including during the time that Doe was suspended. (Doc. No. 1 at ¶¶ 174-176.) Doe has failed to sufficiently allege an unjust enrichment claim for three reasons. First, the claim has essentially no factual predicate – the Complaint does not offer *any* detail about what photo was used, where it was used, when it was used, or how it was used. (<u>Id</u>.) This is the type of "unadorned, the-defendant-unlawfully-harmed-me accusation" rejected by the Supreme Court. <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555). Second, the Complaint does not sufficiently allege what, if any "benefit" actually inured to Belmont from the (unknown) use of Doe's picture.

Third, the Complaint does not allege that Doe, a party in privity with Belmont as discussed herein, exhausted any remedies against Belmont pertaining to the use of his picture. This is important because the Bruin Guide specifically provides that Belmont *may use* pictures of students: "From time to time, University personnel will photograph or videotape campus events for the instructional, documentary, promotional, public relations and/or advertising purposes of Belmont University. Belmont students included in such photographs or video agree that the photographs or

---

much "confusion between these two concepts [,]" a quantum meruit theory has not been put forth by Doe either in the Complaint or his brief. Instead, the Complaint explicitly alleged unjust enrichment and Doe did not argue in his brief that the proper claim in this case is for quantum meruit. Consequently, the Court considers only unjust enrichment. <u>See</u> <u>Cole</u>, 2018 WL 1391625, at *4 (proceeding similarly) (citing <u>Patterson v. Patterson</u>, No. M2016-00886-COA-R3-CV, 2017 WL 1433310, at *9 n.9 (Tenn. Ct. App. Apr. 20, 2017) (holding that where no party argued that the wrong claim was raised by the complaint, the court would not consider "whether the appropriate claim was brought in this case")).

video may be used for these purposes by Belmont University." (Doc. No. 21-2 at 42.) But the Bruin Guide further provides an opportunity for students to preclude the use of their photos: "If a student objects to this provision, he or she should provide written notice of this objection to the Office of Communications, which can be reached at communication@belmont.edu or at 615.460.6650." (Id.) The Complaint does not allege that Doe ever contacted the Office of Communications by either of these specified means, or asked Belmont in *any* other way to cease using his picture.[16]

For these reasons, Count X will be dismissed.

IV.   Conclusion

Belmont's Motion for Judgment on the Pleadings (Doc. No. 22) will be granted in part and denied in part. Counts I, IV, IX, and X will be dismissed in their entirety. Count II will be dismissed except for the promissory estoppel claim based upon the factual predicate set forth in Paragraphs 47 and 131 of the Complaint.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

_____

[16] Doe briefly argues that the authorization in the Bruin Guide is inapplicable to him because he was not a student on campus at the time of the use of his photograph. (Doc. No. 26 at 14-15.) Again, the Complaint contains no allegations as to how and when Doe's photograph was used. Because Doe has not alleged when his photo was allegedly used, it is impossible to know if it was before or after Doe withdrew from Belmont. Setting that aside, the permission granted by the Bruin Guide does not have any temporal or situational limitations. The photograph was necessarily *taken* when Doe was on campus. If Doe's suggested reading of the Bruin Guide were the case, Belmont could never use photographs of students once they left campus (e.g., graduated) – an unalleged and unsupported result not dictated by the plain language of the Bruin Guide.

36