UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-01245** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **BELMONT UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

John Doe ("Doe"), a former Belmont University ("Belmont") student, brings this action arising out of Belmont's investigation of accusations of sexual misconduct made against him by a female student ("Student S.").[1] Doe brought suit under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), as well as Tennessee state law. On September 27, 2018, the Court dismissed all of Counts I, IV, IX, X, and most of Count II of the Complaint. (Doc. Nos. 40, 41.) Now before the Court is Belmont's Motion for Summary Judgment on all remaining allegations of the Complaint. (Doc. No. 44.) Doe has responded in opposition (Doc. No. 50) and Belmont has replied (Doc. No. 58). The parties have filed statements of facts and responses thereto (Doc. Nos. 51, 59) and numerous exhibits (Doc. Nos. 47-1 to 47-12, 48-1 to 48-9, 51-1 to 51-13, 63-1 to 63-12, 66-1 to 66-4.) In addition, Belmont has filed a Motion to Strike Exhibit A to Doe's Response (Doc. No. 60) that is opposed by Doe (Doc. No. 66). For the following reasons, Belmont's motions will be granted.

---

[1] Due to confidentiality concerns and the sensitive issues involved in this case, pseudonyms are utilized to protect anonymity.

I.      Belmont's Motion to Strike

The Court must first resolve Belmont's Motion to Strike because it will determine, in part, the evidence before the Court for purposes of summary judgment. Belmont moves to strike Exhibit A to Doe's response to the motion for summary judgment because (1) Doe did not timely identify that document without substantial justification and (2) his failure to do so resulted in harm when Doe relied upon that document to oppose Belmont's dispositive motion. Doe calls the motion "strange." It is not.

As discussed at length in the Court's Memorandum Opinion on Belmont's motion for judgment on the pleadings (Doc. No. 40), this case involves Belmont's Sexual Misconduct Policy, the relevant version of which was contained in the 2016-2017 Belmont Student Handbook ("Bruin Guide"). Page 21 of the Bruin Guide contains specific language that is relevant to the disposition of certain claims in this case. The Complaint, filed in 2017, did not attach the Bruin Guide, but Belmont attached it in PDF version to its Amended Answer prior to filing the motion for judgment on the pleadings. (Doc. No. 21-2.) Exhibit A to Doe's summary judgment response is page 21 of the Bruin Guide that is slightly *different* than the PDF version produced by Belmont so long ago. Doe contends that this is the online version (i.e., "magazine version") of the Bruin Guide that he and his counsel have relied on *since 2016.* But Exhibit A is a *December 8, 2018 screenshot* of the online version of the Bruin Guide. (See Doc. No. 63-1.) Doe has never before disclosed the purported existence of any alternate version of Page 21 or any theory of liability relying on it. Doe argues that, because Belmont should be familiar with its own materials, Doe cannot be at fault for not disclosing his purported reliance on an alternate version of the Bruin Guide prior to his response to the motion for summary judgment. As discussed below, the Court finds very significant problems with Doe's position.

2

Even if Doe had put Belmont on notice that he generally intended to rely on the Sexual Misconduct Policy, at no point prior to the response to the motion for summary judgment did Doe or his counsel disclose or describe the purported alternate page 21 (i.e., Exhibit A) or discuss any legal theories based upon purported differences between versions of the Bruin Guide in existence in 2016-2017. Doe did not identify the purported alternate page 21 in his initial disclosures or in response to interrogatories concerning bases for liability. (Doc. No. 61.) Moreover, in the briefing on the motion for judgment on the pleadings, Doe made no mention of any purported reliance on a purported alternate version of the 2016 Bruin Guide even though the text of the Sexual Misconduct Policy was at issue. (Doc. No. 26.)

These failures to disclose in discovery and motion practice were compounded when Doe was deposed. Counsel for Belmont asked Doe numerous questions regarding Belmont's handling of his investigation. (Doc. Nos. 61, 71.) At no point did Doe refer to the purported alternate Exhibit A specifically (or even the "magazine version" of the Bruin Guide generally), nor did Doe espouse a theory of liability based upon either. (Id.) This was particularly evident regarding Doe's negligence claims, where Exhibit A has the most potential impact. At his deposition, Doe responded that, aside from the sanction he received, he could not think of any other asserted breach of care. (Doc. No. 71.) In the response to the motion for summary judgment, citing Exhibit A for the first time, Doe now argues a breach of care related to purportedly different versions of page 21 of the Bruin Guide. (See Doc. No. 50 at 18-20.)

Equally compelling is that Belmont has – to put it mildly – substantially undermined Doe's claim that Exhibit A (i.e., the screenshot of page 21 of the Bruin Guide taken in December 2018) was in existence in 2016. Counsel for Doe submitted a Declaration asserting, without any corroboration, that Exhibit A is "consistent in all ways" with the Bruin Guide in use in 2016-2017.

3

(Doc. No. 50-2.) Belmont, however, has offered the sworn Declaration of Lori Chadoin, the current Director of Title IX Compliance and Prevention Programs, stating that Exhibit A *contains revised language that was authored in August of 2018 and published online in October of 2018 and thus could not have appeared before then for reliance by Doe or his counsel in 2016-2017.* (Doc. No. 62-2.) Ms. Chadoin, who supports her declaration with email correspondence and explanatory references to specific provisions, therefore states her view that the Declaration of Doe's counsel that Exhibit A is "consistent in all ways" with the 2016-17 version is necessarily "false." (Id. at 2.) Specifically, Ms. Chadoin explains that (1) she authored the relevant changes to the Sexual Misconduct Policy in August of 2018, (2) the changes were implemented "on or about October 1, 2018," and (3) after conducting a search, "there is no record of any [relevant] change . . . prior to my change in August of 2018."[2] (Id. at 3-4.) The Declaration concludes that "[i]t is *not possible* that plaintiff or his counsel relied upon the current version . . . of Belmont's Sexual Misconduct Policy [i.e., Exhibit A] in this case because the language in question *did not exist* in the 2016-2017 timeframe."[3] (Id. at 4 (emphasis added).)

---

[2] Counsel for Belmont declares that he presented this information to Doe's counsel; stated that, "[a]ccordingly, the current 2018 version [i.e., Exhibit A] could not have been something you or your client relied on in 2016"; and requested that counsel withdraw her Declaration and Exhibit A in lieu of the filing of a motion to strike. (Doc. Nos. 61, 61-6.) This request was refused. (Doc. No. 61-6.)

[3] Counsel for Doe also suggests that Exhibit A must have existed in 2016-2017 because a different page of the 2018 "magazine version" still referenced Molly Zlock, the former Title IX Coordinator. Ms. Chadoin also explained in her Declaration that this reference to Ms. Zlock was in the Anti-Discrimination Policy, not the Sexual Misconduct Policy, and is irrelevant to this case. (Doc. No. 62 at 4.) Ms. Chadoin further explained that the Ani-Discrimination Policy was still being revised in late 2018, but that her name has clearly replaced that of Ms. Zlock under the Sexual Misconduct Policy. (Id.) It was therefore Ms. Chadoin who was responsible for revising the relevant policy as discussed above. (Id.)

Federal Rule of Civil Procedure 26(a)(1)(A)(ii) requires a party to timely disclose "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." The Federal Rules also require that a party who has made a disclosure under Rule 26(a), or who has responded to an interrogatory, request for production, or request for admission, must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it "mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." Roberts ex rel. Johnson v. Galen of Va., Inc., 325 F.3d 776, 782 (6th Cir. 2003) (citing Vance v. United States, No. 98-5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)); see also, e.g., Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998) (noting that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless"). In order to assess whether a party's omitted or late disclosure is "substantially justified" or "harmless," the Court of Appeals for the Sixth Circuit considers five factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the

importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.[4] Howe v. City of Akron, 891 F.3d 718, 748 (6th Cir. 2015) (citing Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 396-97 (4th Cir. 2014)).

The Court takes these factors in order, beginning with the surprise to Belmont. Belmont essentially maintains that Doe's reliance on Exhibit A in the response to the motion for summary judgment is a complete and unfair surprise because (1) during initial disclosures or discovery, Doe never produced a copy of page 21 from a 2016-2017 magazine version of the Bruin Guide with purportedly different language than the PDF version of the Bruin Guide produced by Belmont early in the case; (2) prior to the summary judgment response, neither Doe nor his counsel have ever articulated an argument or theory of liability based upon the existence of purportedly different language on page 21 of the "magazine version" of the 2016-2017 Bruin Guide; and (3) during his deposition, Doe never referred to differences between versions of the Bruin Guide or complained of Belmont's conduct in connection therewith. As discussed, Belmont supports its contention of unfair surprise with evidence that Exhibit A did not even exist during the period in which Doe asserts that he relied upon it, to which Doe has offered basically nothing in response aside from personal assurances to the contrary. Because Belmont contends that Exhibit A did not exist in 2016, Doe's contention that its existence should not come as a surprise to Belmont completely misses the mark.

Second, it would be very difficult for Belmont to cure the surprise. Having no notice of the purportedly competing version of the page of 2016-2017 Bruin Guide in Exhibit A for the entire

_____

[4] Doe does not address this legal standard in response to the Motion to Strike, nor does he cite any Federal Rules or caselaw. Doe instead spills much rhetorical ink painting Belmont as an untruthful aggressor and himself as a victim of an unjust process. (See Doc. No. 66.) This has been of limited assistance in conducting this analysis.

6

discovery period (and believing no changes were made to the policy until the fall of 2018), Belmont did not pursue any discovery concerning the "magazine version" of Exhibit A or question Doe during his deposition about his alleged reliance upon it. Discovery has closed, the dispositive motion deadline has passed, and the trial date is only weeks away. Only after Belmont filed its motion for summary judgment did Doe respond with reliance on Exhibit A, leaving Belmont able to respond only by means of a short reply brief. Curing the surprise would involve, at a minimum, reopening discovery (including re-deposing Doe) and re-briefing summary judgment.[5] This would be costly and harmful to Belmont, particularly because Doe has gotten a free preview of Belmont's best summary judgment arguments. Notably, the Court of Appeals "put[s] the burden on the potentially sanctioned party to prove harmlessness." Roberts, 325 F.3d at 782. Here, Doe has made little, if any, attempt to do so. Furthermore, a showing of harmlessness requires "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." Sommer v. Davis, 317 F.3d 686, 692 (6th Cir. 2003). In this face of the Ms. Chadoin's Declaration, Doe simply does not meet this standard. Given that Ms. Chadoin has declared that Exhibit A did not come into existence until late 2018, Doe fails to establish that Belmont had "sufficient knowledge" of Exhibit A's existence between the fall of 2016 and that time.

Third, if the evidence were allowed, it would be disruptive to any trial. Allowing the time necessary for additional discovery and re-briefing of summary judgment would require postponing the rapidly approaching pre-trial conference and trial date to a significantly later date in this

---

[5] The Chadoin Declaration, while highly persuasive for purposes of this motion to strike, does not alone "cure" the problem created by Exhibit A for purposes of the motion for summary judgment. Rather, there would be a dispute of fact as to the progeny of Exhibit A. Only if Doe had timely identified his reliance on Exhibit A, or even alluded to a theory of recovery based upon differing versions of the Bruin Guide, could Belmont have conducted discovery and assembled a summary judgment record sufficient to "conclusively debunk [Doe's] theory that two versions of the [Bruin] Guide existed in 2016." (Doc. No. 67.) Belmont was not given that opportunity.

7

already-aging case. This is simply not fair. Belmont may already be involved in trial preparations concerning certain theories of the case that would need to be substantially modified. These late-in-the-game changes are what Rules 26 and 37 are designed to prevent.

Fourth, the evidence is important. It is relevant to multiple claims. In particular, Doe has used it to articulate a theory of negligence. In addition to bearing on substantive claims, it is also relevant to how a jury might view Belmont's credibility regarding implementation of the Sexual Misconduct Policy.

Finally, the Court considers Doe's explanations for the late disclosure/production of Exhibit A. The Court will not make judgments about a party's underlying motivations. However, the Court does find Doe's explanation and the disclosure and use of Exhibit A to be highly curious, particularly in the face of Ms. Chadoin's Declaration. Ms. Chadoin has stated under oath that there was no relevant difference between page 21 of the PDF and "magazine version" of the Bruin Guide prior to 2018. In the Court's view, Doe has provided no logical justification for not producing an alternative version of Exhibit A if it existed prior to 2018 (or even discussing theories of liability based thereupon).[6] Put simply, if Doe sought to proceed in this litigation under theories of liability based on a different version of the Bruin Guide purportedly available to him in 2016-2017, it was Doe's responsibility to disclose the differing document and reveal his reliance thereupon in the same manner required in any litigation based on any other key document. See, e.g., State Auto.

---

[6] Doe's argument that he did not realize there was a difference between the two versions until briefing the summary judgment motion is wholly unpersuasive for two reasons. First, the argument is essentially a red herring because Doe never produced *any* version of page 21 in his initial disclosures or in response to interrogatories about his theories of liability such that he could later be entitled to complain about confusion. Second, even if the PDF version produced by Belmont early in this litigation was actually different from the version actually relied on by Doe and his counsel (which is not supported by the record), that Doe and his counsel claim to have not noticed this fact until briefing the summary judgment motion must inure to their own detriment, not to Belmont's.

Prop. & Cas. Co. v. There is Hope Cmty. Church ex rel Blacklock, Civil Action No. 4:11-cv-149-JHM, 2014 WL 2003302, at *5 (W.D. Ky. May 15, 2014) ("Defendant has the obligation to disclose under Rule 26(a) without Plaintiff even having to request the information. Because discovery is closed and a summary judgment motion has been filed, the time for disclosure has long since passed."); Kull v. Village of Yorkville, Ohio, Civil Action No. 2:07-CV-686, 2008 WL 5188167, at *3 (S.D. Ohio Dec. 10, 2008) (explaining that because one party may know discoverable information does not relieve the other party of its obligation to include that information in its Rule 26 disclosures); Johnson v. United Parcel Serv., 236 F.R.D. 376, 378 (E.D. Tenn. 2006) (granting motion to exclude evidence under Rules 37 and 26 and explaining that "[t]he fact Defendant might have been on notice since the grievances were filed with it does not excuse Plaintiff's failure to disclose; Defendant is correct in its argument it is not required to sift through every document in its possession that might possibly be relevant to Plaintiffs' claims and assume they all will be presented at trial. Rule 26 puts the burden on the party intending to present a document to notify the other party of its intent to do so").

The balance of these factors weighs in favor of a finding that Doe's disclosure and discussion of Exhibit A for the first time in opposition to the motion to summary judgment in December 2018, where Doe and his counsel claim that it has existed and they have relied upon it since 2016, is not substantially justified or harmless. Under Federal Rule of Civil Procedure 37, exclusion of Exhibit A for purposes of the pending summary judgment motion is appropriate. See, e.g., Baker v. Shelby Cty. Gov't, No. 05-2798-B/P, 2008 WL 245862, at *3 (W.D. Tenn. 2008) (granting motion to strike after concluding that violation of Rule 26 was not harmless where defendant received information after discovery deadline, after filing their summary judgment motion, and shortly before trial, and was therefore prohibited from conducting depositions and

challenging the evidence, and the explanation provided by plaintiffs was insufficient). Belmont's

Motion to Strike will therefore be granted. The Court will not consider Exhibit A, or arguments

based thereupon, when resolving Belmont's Motion for Summary Judgment.

II.      Belmont's Motion for Summary Judgment

         A.      Facts[7]

Belmont is a private university located in Nashville, Tennessee, that accepts federal

funding. (Doc. No. 51 at ¶ 1.) Doe, a resident of Tennessee, matriculated at Belmont in 2015 and

intended to graduate. (Id. at ¶ 2.) Doe – like every other student – was bound by a pledge to at all

times "exemplify behavior which is consistent with the University's Code of Conduct." (Doc. No.

51 at ¶ 2.)

                 1.      Belmont's Relevant Policies

Belmont's Student Handbook – the Bruin Guide – sets forth certain relevant policies under

the overarching Code of Conduct. (Id. at ¶ 3.) Most importantly, at Belmont, students "have a right

to be free from sexual misconduct." (Id. at ¶ 5.) The Bruin Guide sets forth a Sexual Misconduct

Policy, including definitions of consent, coercion, non-consensual sexual contact, and non-

consensual sexual intercourse. (Id.) Belmont believes that "[d]ata suggests false reporting is

uncommon in incidents of sexual violence and harassment," but, "[nevertheless], false reports do

occur"; Belmont "examine[s] those on a case-by-case basis." (Doc. No. 63-12.)

---

[7] The parties have put forth over 35 pages of facts and responses. These include some facts that
are either immaterial or not properly supported by citations as required under the Federal or Local
Rules. Belmont moves the Court to go line by line and strike factual references and argument not
supported by the record. (See Doc. No. 59.) The motion is **DENIED AS MOOT**. The Court has
reviewed the factual submissions and the record and relies only upon facts that are material and
properly supported by the record.

Belmont also has a Deceptive Behavior Policy, which prohibits a student from providing false or misleading information to a university official regardless of whether the recipient is deceived. (Doc. Nos. 51 at ¶ 42; 48; 21-2 at 26.) In other words, Belmont students are charged with the responsibility of being honest to university officials at all times. When a student is being investigated for another alleged violation, a determination can be made regarding a violation of the Deceptive Behavior Policy based upon a preponderance of the evidence at any time; there does not need to be a separate investigation. (Doc. Nos. 63-3 at 3; 59 at ¶ 4.) Belmont also has residence hall visitation policies that prohibit overnight guests of the opposite sex in residence hall rooms and prohibit opposite sex guest visitation except during approved visitation hours. (Doc. No. 51 at ¶ 46.) Under these policies, it is primarily a host's responsibility to make sure that visitors are checked in and follow visitation hours; however, all Belmont students are required to follow the rules at all times, whether they live on campus or not. (Doc. No. 59 at ¶ 7.) Finally, Belmont has an Honor Pledge concerning academic matters that, among other things, delineates "unauthorized collaboration on an academic assignment" as "Obtaining Unfair Advantage." (Doc. Nos. 51 at ¶ 87; 47-10.) Likewise, "providing material, information or other assistance" that violates the expectations of the Honor Pledge is considered "Aiding and Abetting" a violation. (Doc. Nos. 51 at ¶ 87; 47-10.)

### 2.    The Sexual Misconduct Policy Accountability Process

Broadly speaking, the Bruin Guide sets forth two "accountability processes." (Doc. No. 51 at ¶ 6.) Belmont has a general accountability process for alleged violations of its Code of Conduct, and a specific accountability process for alleged violations of Belmont's Sexual Misconduct

11

Policy.[8] (Id. at ¶¶ 6-7; Doc. No. 21-2.) Belmont's Sexual Misconduct Policy accountability process pre-empts the general accountability process. (Doc. No. 21-2 at 12.) Specifically, the Bruin Guide provides that, "[w]hen an incident involves multiple alleged violations, one of which is an alleged violation of the Sexual Misconduct Policy, [the Sexual Misconduct Policy accountability process] will control for all violations."[9] (Id.; Doc. Nos. 51 at ¶ 48; 48.) To avoid any disincentive for students to make a complaint of sexual misconduct or participate as a witness in such an investigation, Belmont's Sexual Misconduct Policy provides that the university will not pursue violations of other policies by a complainant or witness discovered during a sexual misconduct investigation. (Doc. Nos. 51 at ¶ 49; 21-2 at 12.) There is no such exception for a respondent. (Doc. No. 21-2 at 12.) This special consideration does not excuse any complainant or witness found to have themselves violated the Sexual Misconduct Policy. (Id.)

---

[8] The Sexual Misconduct Accountability Process begins with initial review of a complaint and any appropriate interim measures (e.g., a temporary no-contact order). (Doc. No. 21-2 at 15.) It then moves to a formal investigatory process by notification to the respondent of the accusation of sexual misconduct and provision of a copy of the complainant's written statement. (Id. at 16.) Belmont's Title IX investigators, at least one of whom should be "neutral," then interview the complainant and respondent, who may present evidence and suggest witnesses. (Id.) Prior to completing an investigation, the investigators are required to email final party and witness statements and evidence to the complainant and respondent for their review; the parties may comment within two days. (Id. at 17.) The Title IX Coordinator then reviews the complete investigatory file and determines responsibility based upon a preponderance of the evidence standard; there is no opportunity for a "hearing." (Id.) In consultation with other campus leaders, the Title IX Coordinator may also impose sanctions. (Id.) Sanctions may include, alone or in some combination, a verbal reprimand, a "reflection essay," a fine, a permanent no-contact order, suspension, or expulsion. (Id.) Either party may appeal based on an asserted procedural error, new information, or a claim that no reasonable person could have arrived at a similar conclusion. (Id. at 18.) An appeal is promptly decided by an assigned "appellate officer," but the Dean of Students reserves the right to determine the final outcome. (Id.)

[9] Doe offers the "disputed" fact that such ancillary discipline may only be issued in conjunction with a *guilty* finding under Title IX. (Doc. No. 59 at ¶ 3.) However, Doe cites no authority for this proposition and it is contradicted by the plain language of the Sexual Misconduct Policy.

12

3. <u>The Complaint Against Doe by Student S.</u>

Doe and Student S. met in May 2016. (Doc. No. 51 at ¶ 8.) They were both on summer staff for Belmont and lived in the same dorm over the 2016 summer.[10] (<u>Id</u>.) Doe and Student S. became close friends and went on outings with Doe's roommates or other mutual friends. (<u>Id</u>. at ¶ 9.) As the summer progressed, Doe and Student S.'s relationship became closer; often Student S. would remain in Doe's room late into the night. (<u>Id</u>. at ¶ 10.) Sometimes, they kissed. (<u>Id</u>. at ¶ 11.) In October 2016, however, Student S. complained to Belmont about Doe's alleged sexual misconduct. (<u>Id</u>. at ¶ 12.) Student S. alleged that: (1) on an unspecified date, Doe kissed her and attempted to take her shorts off; (2) on June 3, 2016, Doe asked her to take her shorts off, which she did, and then attempted to have sexual intercourse with Student S.;[11] and (3) on June 8, 2016, while Doe and Student S. were at Percy Warner Park in a hammock together kissing, Doe attempted to undress Student S. and she stopped him. (<u>Id</u>. at ¶ 13.)

4. <u>Belmont's Title IX Department Begins the Investigation of Student. S.'s Complaint</u>

Molly Zlock ("Zlock") was Belmont's Assistant Dean of Students and Title IX Coordinator. (<u>Id</u>. at ¶ 15.) In 2007, Zlock received a law degree from Seton Hall University School of Law. (<u>Id</u>. at ¶ 16.) She has been in good standing with the New Jersey Board of Bar Examiners since 2007, and she remains licensed to practice in that state. (<u>Id</u>.) Zlock has practiced law in both the public and private sector, including a judicial clerkship. (<u>Id</u>.) Immediately prior to joining the staff at Belmont, Zlock was the Director of Students at Seton Hall University School of Law. She

---

[10] Doe later became a commuter student during the Fall 2016 semester. (Doc. No. 47 at 3.)

[11] Doe disputes this fact because it does not include the sexual position that was allegedly attempted. (<u>See</u> Doc. No. 51 at ¶ 13.) That detail is clearly both unnecessary and immaterial.

13

assumed her role at Belmont in 2015.[12] (Id.) Zlock has been a member of the Association of Title

IX Administrators ("ATIXA") since 2015, and she attended the annual ATIXA conference in 2015

and 2016. (Id.) She is a level four certified Title IX Coordinator through ATIXA. (Id.) She has

regularly attended training seminars and participated in webinars related to Title IX and is trained

in the administration and oversight of Title IX investigations.[13] (Id.)

In her role as Title IX Coordinator at Belmont, Zlock, along with others, administered and

supervised Belmont's Title IX compliance program and Sexual Misconduct Policy. (Id. at ¶ 17.)

After the intake of Student S.'s complaint, on October 7, 2016, Zlock advised Student S. of the

finding of reasonable cause to proceed with the Doe investigation and assigned two Resident

Directors, Bryan Miller and Hillary Bruner, to serve as neutral investigators of Student S.'s

complaint. (Id. at ¶ 18.) Miller and Bruner had fully participated in an investigator training Zlock

conducted in the summer of 2016. (Id.)

On October 11, Zlock emailed Doe to advise him that a complaint of sexual misconduct

had been made against him. (Id. at ¶ 19.) This email attached a Sexual Misconduct Accountability

Form advising Doe of the identity of the complainant, the date of the incident, the reported location

of the incident, and that the alleged violations were (1) non-consensual sexual contact and (2) non-

consensual sexual intercourse. (Id.) Zlock's email and the accountability form provided Doe with

---

[12] In 2017, Zlock's title became Director of Title IX and Prevention Programming. (Doc. No. 51 at ¶ 16.

[13] Doe claims that he lacks sufficient information to assess the truth of these facts, which are derived from Zlock's Declaration. However, these facts are objectively verifiable, and Doe made no attempt to offer evidence to the contrary. Furthermore, Zlock, as an attorney, is charged with a duty of candor to the Court regarding her professional credentials. Accordingly, the Court accepts these facts as undisputed for purposes of summary judgment. Zlock left Belmont in late 2017 and is now Director of Title IX and Title IX Coordinator at Vanderbilt University.

a description of the investigatory process as well as a statement of his rights and responsibilities in the investigation. (Id. at ¶ 20.) Pursuant to Belmont's standard practice in this context, Zlock also issued a no-contact order prohibiting Doe and Student S. from contacting each other either directly or through third parties. (Id. at ¶ 21.) Zlock encouraged Doe to review the Sexual Misconduct Policy in Belmont's Bruin Guide, and Doe read the Policy multiple times over the next few days. (Id. at ¶ 22.) Zlock also offered to meet with Doe to discuss the investigatory procedures and answer any questions. (Id.) At this time, Zlock was unaware that Doe was also under investigation by the Director of Student Accountability for multiple dorm visitation violations.[14] (Id. at ¶ 24.)

On October 12, Doe and his father met with Zlock to discuss the investigation process. (Doc. No. 71-1 at 40-42.) Doe testified that the process that Zlock explained would be followed during the investigation was consistent with what he had read in the Sexual Misconduct Policy. (Id. at 43.) Doe also testified that Zlock assured him that "it would be a fair and impartial investigation." (Id. at 41.) Later that day, Doe emailed Zlock and stated that he felt that he should take a leave from his position on Belmont's student Accountability Council pending resolution of the sexual misconduct investigation.[15] (Doc. Nos. 51 at ¶ 25; 48-3.) Zlock forwarded this email to

---

[14] Doe disputes this fact by citing to his own Declaration. (Doc. No. 51 at ¶ 24.) But in his Declaration, Doe only states that he informed Zlock that he was being investigated for dorm violations "during the investigation." This does not create a dispute of fact that, at the time that Zlock sent Doe her October 11 email initiating the sexual misconduct investigation, Zlock was unaware of those parallel alleged dorm visitation violations.

[15] The Honor Council/Accountability Council is one of three ways Code of Conduct violations can be adjudicated at Belmont as part of the general accountability process (the other two ways being adjudication by a professor or administrative adjudication). (Doc. No. 47 at 2.) Doe had applied and been selected to join the Council at the start of the semester and had not yet participated in any hearings. (Id.; Doc. No. 71-1 at 39.) Each member of the Council must execute a commitment form that stresses his or her personal obligation to abide by Belmont's Code of Conduct. (Doc. Nos. 47; 47-1.)

15

Belmont's Director of Community Accountability Janelle Briscoe ("Briscoe").[16] (Doc. Nos. 51 at ¶ 25; 48-3.) In Briscoe's role as Director of Community Accountability, she, along with others, administer and oversee Belmont's behavioral and academic policies (i.e., general accountability processes), not including administration or oversight of Belmont's Title IX policies and procedures or Sexual Misconduct Policy. (Doc. No. 51 at ¶ 63.) Briscoe advised Zlock that she would contact Doe regarding the Accountability Council membership issue. (Id. at ¶ 25; Doc. No. 48-3.) Briscoe therefore became aware of the existence of the Title IX investigation. (Doc. No. 59 at ¶ 12.) However, other than discussing this recusal subject, there is no record evidence that Zlock had any further communications with Briscoe regarding Doe's Title IX investigation, the specifics of Student S's complaint, or Doe's response to the complaint. (Doc. No. 51 at ¶ 26.) Briscoe was not involved in Zlock's Title IX investigation.[17] (Id. at ¶ 96.)

---

[16] Doe disputes this fact by citing to a portion of Briscoe's deposition testimony in which she vaguely references the email from Zlock but does not remember the e-mail's exact context. (Doc. No. 51-6.) However, from the language and context it is evident that Briscoe was discussing the email from Doe to Zlock that Zlock forwarded to Briscoe with an introductory message, which is cited by Belmont. (See Doc. No. 48-3.)

[17] Doe disputes this fact by asserting that "[he] and his family had conversations with Briscoe regarding the Title IX proceedings and Briscoe addressed the Title IX proceedings with Doe and his father." (Doc. No. 51 at ¶ 96.) However, in support of this assertion, Doe cites only to "Exhibit I" to Document Number 51, which is a three-page excerpt of the deposition of Doe's father that is irrelevant to this issue. Obviously, this is insufficient. Briscoe's sworn Declaration establishes that she was not involved in Zlock's Title IX investigatory process. (Doc. No. 47 at ¶ 21.) Furthermore, Briscoe discusses at multiple points in her deposition that she was "unaware" of the discipline Doe received for the violations considered by Zlock. (See Doc. No. 69-1 at 90-100.) Indeed, Briscoe could not recall receiving any communication from Zlock or anyone else concerning those violations or related punishment aside from the one instance – instigated by Doe – regarding Doe's withdrawal from membership on the Accountability Council. (Id. at 97.)

16

5.    The Investigation

The investigation of Student S's complaint lasted from approximately October 11 to December 1, 2016. (Id. at ¶ 27.) Doe was represented by counsel, a common practice in Title IX investigations.[18] (Id. at ¶ 60.) As part of the investigation, Doe and Student S. each identified relevant witnesses and provided the investigators with any documentation they considered important to the issue. (Id.) With the exception of Student T., witnesses with relevant knowledge of the complaint and a limited number of character witnesses were interviewed. (Id.) Doe was aware of Belmont's Deceptive Behavior Policy and acknowledges that he had an obligation to be truthful to university officials during the investigation. (Id. at ¶ 43; Doc. No. 71 at 38-39.)

Doe and Student S. were interviewed during the investigation. (Doc. No. 51 at ¶ 27.) In Doe's initial interview with the Belmont investigators, he described his encounters with Student S, in part, as follows: "We then kissed for several minutes with our bodies in contact with one another, though no attempt by either of us was made to grab, caress, or otherwise intentionally touch the other in a sexual way. . . . The full extent of this encounter was kissing while standing up in my room. . . . My hands were behind her back as were hers behind my back. . . . [T]here were about five other times, basically the exact same." (Id. at ¶ 37; Doc. Nos. 48; 48-4.) At his deposition, however, Doe "[did] not deny" that there were times Student S. spent the night in his room in his bed and that Doe and Student S. physically touched each other. (Doc. No. 63-5 at 6.) Doe conceded that this "wasn't a point of emphasis" when he gave his statement to the Belmont's sexual misconduct investigators. (Id.) Rather, during his interview, Doe "pretty much just described to them . . . kind of our relationship in the context of work – and how we met through

_____

[18] Prior to this investigation, Zlock had worked with counsel in other Title IX investigations without incident and without assessing sanctions against the party so represented. (Doc. No. 48.)

17

that and became friends during that time frame."[19] (Id. at 7.) Doe discussed that Student S. came over to his apartment, but, in his words, just because they happened to be "living in the same building at the time and whatnot." (Id.) At his deposition, Doe conceded that he did not "ever" recall having that conversation with investigators in which he revealed that "[Student S.] had slept in the bed with [him] enough that [he was] used to falling asleep with her, and [that] there were times [he] texted her and wanted her to come spend the night with [him]." (Doc. No. 71-1 at 24.) In her interview with investigators, however, Student S. alleged a more intimate physical relationship – that she and Doe had spent the night together multiple times – and she submitted numerous text messages regarding their relationship as evidence, including one in which Doe stated "I am kinda used to falling asleep with you beside me now and so I really want you here tonight if you would like. I gotta be up early ish and I'm super sleepy but I just kinda want to snuggle." (Doc. Nos. 51 at ¶ 38; 48; 48-5.)

The parties were given the complete investigatory file on October 28, 2016 and were instructed to submit their final statements on the matter. (Doc. No. 51 at ¶ 28.) On November 2, 2016, Doe's father sent an e-mail complaining that "[they] were told that Belmont would contact his professors to get him some additional consideration during this time," but that Doe "hasn't seen any evidence that exceptions are being made and he has had to miss several classes and exams as a result." (Doc. No. 63-10.) Doe's father asked what could be done to take advantage of accommodations. (Id.) Record evidence reflects that two weeks earlier Zlock had emailed at least one of Doe's professors requesting leniency and understanding for absences and any need to reschedule exams due to involvement in a confidential traumatic event. (Doc. Nos. 48; 48-2.) In

---

[19] The "work" referred to by Doe was the Towering Traditions summer program at Belmont. (Doc. No. 59 at ¶ 17.)

18

addition, after this time, at Zlock's instruction, an additional witness proposed by Doe (Student T.) was interviewed by investigators, and on November 4, his statement was submitted to both parties for further comment.[20] (Doc. No. 51 at ¶ 29.)

A response was then submitted on Doe's behalf that sharply attacked the authenticity of the text messages submitted by Student S. and claimed, among other things, that they "appear[ed] to have been edited," "[we]re clearly doctored," were "glaring forger[ies]," or were "suspect at least, total lies at most."[21] (Id. at ¶ 39; Doc. Nos. 51-9; 51-10.) On November 15, 2016, Zlock requested an inspection of the parties' cell phones. (Doc. No. 51 at ¶ 30.) Zlock referred the question of the authenticity of the text messages for investigation to Mr. William Ingram, Belmont's Chief Information Officer, and Mr. Randall Reynolds, Belmont's Director of Information Security. (Id. at ¶ 40.) After conducting an analysis, Mr. Ingram and Mr. Reynolds reported that the messages submitted by Student S. were most likely authentic and had not been modified. (Id.) On November 28, Zlock asked the investigators to submit a clarifying question to

---

[20] There is a dispute of fact regarding when Doe submitted Student T.'s name as a witness. Doe claims it was during the investigation along with other witnesses, while Zlock states that it was after Doe received the investigatory file on October 28, 2016. (See Doc. Nos. 48; 51 at ¶¶ 27, 29; 51-8, 51-9.) The Court finds that this dispute is not material. The parties do *not* dispute that Student T. was interviewed as part of the investigation and that his statement was provided to them for review. Doe simply disagrees with the weight and credibility that Belmont assigned to Student T.'s evidence, neither of which are material here. (See Doc. No. 21-1.)

[21] Doe disputes this fact by arguing that the "analysis" of Student S.'s text messages was conducted by his father, who works in the information technology field. (Doc. Nos. 51-9; 59 at ¶¶ 15, 16.) However, in his deposition, Doe could not remember whether it was done by him or his father and, during extensive questioning, he had little memory of the entire episode of challenging Student S.'s text messages, could not recall who challenged them, or even if it was done on his behalf. (Doc. No. 71-1 at 72-76.) Doe concluded the questioning by simply stating, "I cannot confirm or deny." (Id. at 76.) Beyond this, in Doe opposition brief, counsel for Doe does not appear to seriously dispute that the attack on Student S.'s text messages was submitted on Doe's behalf during the investigation, nor is it contended that the representations in question were made without Doe or his counsel's knowledge or approval. (See Doc. Nos. 51; 59.) Likewise, there is no serious contention that the Deceptive Behavior Policy does not extend to all materials submitted as part of a respondent's defense in an investigation. (Id.)

19

Student S. (Id. at ¶ 30.) On November 30, both parties were given the findings from the cell phone inspection and Student S.'s answer to the clarifying question and afforded an opportunity to submit a limited response. (Id.) Given the forensic report and the totality of the responses from each party, Zlock concluded that it was not reasonable to believe that Doe simply forgot about the text messages or the true nature of his relationship with Student S. (Id. at ¶ 41.; Doc. Nos. 48; 21-1 at 12-13.)

### 6.    The Determination Letter, Sanctions, and Appeals

On December 13, 2016, Zlock provided a written outcome letter ("Determination Letter"), signed by her, to both Student S. and Doe. (Doc. Nos. 51 at ¶ 31; 21-1.) In the Determination Letter, Zlock found that the investigation did not establish by a preponderance of the evidence that Student S. had suffered non-consensual sexual contact or non-consensual sexual intercourse. (Doc. Nos. 21-1 at 13; 48.) Accordingly, Doe was found not responsible for these alleged violations, and was exonerated under Title IX for any alleged violation of Belmont's sexual misconduct policy. (Doc. No. 21-1 at 13.) Zlock did, however, find Student S.'s statement of the physical relationship between the parties to be both credible and largely corroborated by the text messages and other documentation. (Doc. Nos. 51 at ¶ 33; 21-1 at 13.) Zlock found Doe had the opportunity to be truthful in both his initial statement to the investigators and his final statement after having reviewed Student S.'s text messages and instead chose to "purposefully complicate the investigation" through the submission of false or misleading information. (Doc. No. 51 at ¶ 41; 21-1 at 13.) Furthermore, Zlock found that Doe had been "purposefully untruthful." (Doc. Nos. 51 at ¶ 34; No. 21-1 at 13.) Zlock also found that "the evidence establish[ed] that [Doe] repeatedly

violated [Belmont's residence hall] visitation policy."[22] (Doc. Nos. 51 at ¶ 35; 21-1 at 13.) Zlock did not issue any finding against Student S. or any witnesses involved in the investigation for any policy violations. (Doc. No. 51 at ¶ 50.) Zlock testified in her deposition that the visitation violations addressed in the Determination Letter were those "related to the sexual misconduct investigation" and "found through the course of the sexual misconduct investigation process" (such as, for example, Doe and Student S. "visiting after hours"), and were unrelated to Doe's alleged visitation violations that were under parallel investigation by Briscoe in "a completely different process." (Id. at ¶ 36; Doc. Nos. 48; 70 at 126-129.)

As a sanction for the violations of the Deceptive Behavior Policy and visitation policies, Zlock suspended Doe for the Spring 2017 semester. (Doc. No. 21-1 at 13-14.) Belmont defines suspension as separation from the university for a specific period with eligibility to reapply to return for the following semester. (Id.) Doe completed his exams and received credit for all coursework performed in 2016. (Doc. No. 51 at ¶ 53.) Accordingly, Doe was eligible to reapply to return to Belmont for the summer of 2017. (Doc. Nos. 21-1 at 13-14; 48.) Upon returning, Doe was to be placed on institutional probation for the remainder of his time at Belmont, precluded from holding a leadership position in any co-curricular organization for the remainder of his time at Belmont, and prevented from having any contact with Student S.[23] (Doc. No. 21-1 at 13-14.)

---

[22] In her Declaration, Zlock states that the visitation violations were "not a major factor" in the assessment of the sanctions. However, as Doe correctly indicates, the Determination Letter does not distinguish the weight accorded to the findings regarding untruthfulness and visitation. (Doc. No. 51 at ¶ 47; 21-2 at 13.)

[23] This was the only time Zlock issued sanctions for violation of Belmont's Deceptive Behavior Policy and visitation policies. Zlock stated that she only found such sanctions necessary under the "unique facts and circumstances" of this case when "Doe's statements departed from a good faith defense and became false and misleading information designed to needlessly complicate the investigation." (Doc. No. 48 at 10.)

Doe appealed the sanctions he received based upon his Deceptive Behavior Policy and visitation policies violations. (Doc. No. 51 at ¶ 54.) Doe stated that he was "not appealing the decision of Ms. Zlock," but only the sanctions. (Id.) On December 28, 2016, the Assistant Dean of Students for Residence Life, Anthony Donovan, upheld the Determination Letter and sanctions. (Id. at ¶ 55; Doc. No. 48-7.) Among other things, Donovan concluded that "[t]he preemption clause (outlined in the Bruin Guide, page 20) empowers the Title IX process to subsume all other alleged violations and provides control over all violations including but not limited to those that might be committed in the investigation process." (Doc. No. 48-7 at 1.) Donovan further found that Zlock "exercised great care in separating her finding of [Doe's] impediment of the investigation of lack of truthfulness from unduly influencing her decision in finding [Doe] not in violation of the Sexual Misconduct Policy." (Id. at 1-2.) Donovan found the sanction for untruthfulness severe but allowable and justified, particularly given the cumulative visitation violations. (Id. at 2.)

On January 5, 2017, Associate Provost and Dean of Students Jeffery Burgin issued a final outcome letter upholding Donovan's appellate determination. (Doc. Nos. 51 at ¶ 56; 48-8.) Burgin concluded that the sanctions were appropriate for someone held responsible for "mislead[ing] the investigators by questioning the authenticity of text messages, misrepresenting the nature of the physical relationship, and falsely stating when the 'nonprofessional' nature of the[ ] relationship ended." (Doc. No. 48-8 at 1.) Burgin also mentioned Doe's visitation violations and reminded Doe that Belmont's response to such breaches of the Code of Conduct "is assertive."[24] (Id.)

---

[24] Student S. also appealed the determination that Doe was not responsible for non-consensual sexual misconduct. As part of her appeal, Student S submitted new information alleging that Doe had violated the no-contact order between the parties by directing a family member of his to contact a co-worker of hers. (Doc. No. 51 at ¶ 57.) Donovan ordered that a separate investigation be conducted of this alleged violation. (Doc. No. 48-7 at 2-3.) On January 6, Zlock advised Doe of this alleged violation by email, provided him the details of the investigation that would be conducted by Deputy Title IX Coordinator Dr. Donna Gwaltney, and explicitly informed Doe that

7.    Code of Conduct Violations Handled by Briscoe

Although there are several ways that violations of the Code of Conduct can be handled under the general accountability process, Briscoe routinely handled disciplinary matters administratively for commuter students such as Doe. (Doc. No. 51 at ¶ 69.) While the sexual misconduct investigation was underway, Briscoe dealt with several alleged Code of Conduct violations by Doe. Although Zlock was aware that Briscoe had charged Doe with these violations, there is no record evidence that she had any involvement with or input into the discipline that Briscoe issued for them.[25] (See Doc. Nos. 51 at ¶ 97; 47 at ¶ 21; 59 at ¶ 23; 63-4.)

The first of these incidents occurred around 3:00 a.m. on October 1, 2016, when Doe was involved in a dormitory visitation violation in which he, another male student, and two female students were visiting after hours in a male student's dormitory room. (Doc. No. 51 at ¶ 65.) The Resident Advisors on duty reported the incident and issued a Notice of Community Responsibility to Doe and the other students involved. (Id. at ¶¶ 66-67; Doc. No. 47-3.) Doe admitted the violation and checked the box on the Notice for "I accept responsibility." (Doc. Nos. 51 at ¶ 68; 47-3.) On October 19, Briscoe held an administrative inquiry on the appropriate sanction for this violation.

---

she was recusing herself from the matter. (Doc. Nos. 51 at ¶ 58; 48-9.) Zlock did not participate in the investigation of the alleged no contact order violation and was not involved in the determination of responsibility or any sanctions issued. (Doc. Nos. 51 at ¶ 58; 48.) Doe has curiously filed a Declaration stating that Zlock never informed him of her recusal. He has not, however, denied receiving the January 6 email in which Zlock stated exactly that. Regardless, because this issue was raised by Student S. after Zlock's Determination Letter of December 13, it could not have played a role in her assessment of sanctions against Doe. (Doc. No. 51 at ¶ 59.)

[25] Doe disputes this fact with no support. He only cites the Determination Letter, in which Doe is found not responsible for violations of the Sexual Misconduct Policy and responsible for collateral violations different than those considered by Briscoe. (Doc. No. 51 at ¶ 97.) Briscoe and Zlock's Declarations and deposition testimony establish that, in their discrete roles, they were considering different alleged violations in "completely separate process[es]." (Doc. Nos. 46-3; 47; 48; 69; 70.)

23

(Doc. No. 51 at ¶ 69.) Briscoe reviewed Doe's disciplinary file and learned that Doe had accepted responsibility for an earlier visitation violation on June 5 while living on campus as a residential student for Belmont's orientation program.[26] (Id. at ¶ 70.) Because the October 1 violation was Doe's second visitation violation in the span of four months, Briscoe assigned a "loss of privilege" as the appropriate sanction. (Id. at ¶ 72.) Doe was prohibited from visiting in the residence halls for the remainder of the fall 2016 Semester (i.e., approximately two months). (Id. at ¶ 73.) Briscoe routinely assigned this level of punishment for second visitation violations that occurred less than a year after the first. (Id. at ¶ 74.)

One week later, on October 26, 2016, Doe was again reported by Resident Advisors for a visitation violation. (Id. at ¶ 76.) A Notice of Community Responsibility was again issued; it explained that, after spending an hour together in the dorm, Doe and the female resident he was with saw the Resident Assistants for the dormitory, turned around, and went out the back door. (Id.; Doc. No. 47-7.) This time, Doe checked the box for "I deny responsibility." (Doc. No. 47-7.) Briscoe emailed Doe on November 1, 2016, to advise him of the reported violation and offer to meet to discuss the disciplinary process. (Doc. No. 51 at ¶ 77.) Doe eventually agreed to meet for an administrative inquiry adjudicating the alleged violation on November 7, 2016, during which he again denied responsibility.[27] (Id. at ¶ 78.) Briscoe reminded Doe that the previously-imposed sanction for the Oct 1 violation had prohibited Doe from visiting in the residence halls for the remainder of the semester under any circumstance. (Id. at ¶ 80.) On November 9, 2016, Briscoe

---

[26] Doe had previously accepted responsibility for that violation and had been disciplined by the Resident Director for the dormitory, Ben Wood. (Doc. No. 51 at ¶ 71.)

[27] Doe testified at his deposition that he does not recall the events around the October 26th violation, does not recall whether he was visiting a student in the dorm in question that night, does not recall the specifics of that night, and thus cannot state why he denied responsibility for the incident. (Doc. No. 51 at ¶ 79.)

24

issued a decision finding Doe responsible for his third visitation violation in five months. (Id. at ¶ 81.) As a sanction, she extended Doe's loss of privilege of residence hall visitation through the end of spring semester 2017 (i.e., one additional semester). (Id. at ¶ 82.) Briscoe has stated that this punishment was more lenient than sanctions Briscoe has commonly assigned to other students with three violations in the same short timeframe. (Id. at ¶ 83.)

Finally, Briscoe also disciplined Doe for an Honor Code violation in this timeframe. In November of 2016, Belmont required students to take and successfully pass an online computer proficiency test on Microsoft Word, Excel, and PowerPoint. (Id. at ¶ 85.) On November 29, 2016, Briscoe received an e-mail from a Belmont employee Facebook monitor, attaching a posting made by Doe on Belmont's Class of 2019 Facebook Page. (Id. at ¶ 84.) In response to another student's post asking, "does anyone know how to do computer proficiency," Doe posted, "I did a few for a small fee last year for some folks. Would be interested in discussing something similar this time around if anyone would like." (Id. at ¶ 86.) On December 1, 2016, an Honor Pledge Form was issued to Doe accusing him of "Obtaining Unfair Advantage" and "Aiding and Abetting" a violation of Belmont's Honor Pledge based on that Facebook posting. (Id. at ¶ 88.)

On December 15, 2016, Briscoe conducted an administrative adjudication, rather than an Honor Council, because students were preparing for and taking exams.[28] (Id. at ¶ 89.) During the adjudication, Doe argued that the Honor Pledge violation was based upon a misinterpretation of his words, which he admitted were not the wisest. (Id. at ¶ 90.) Doe contended that he was simply

---

[28] In her deposition, Briscoe explained that she "usually cut off [Council hearings] right past Thanksgiving-ish so people can just start to focus on wrapping up the conclusion of their academic year." (Doc. No. 69-1 at 23.) Briscoe further testified that she discussed with Doe whether he preferred that Briscoe conduct an immediate administrative inquiry or wait for an Honor Council during the next semester, and that Doe had responded that he "wanted [her] to do it so he could get it out of the way." (Id. at 27.)

offering to tutor his classmates on the mechanics of the proficiency test (e.g., logging in and out).[29]

(Id.) On December 16, 2016, Briscoe issued a finding holding Doe responsible for violating

Belmont's Honor Pledge on both grounds. (Id. at ¶ 92.) Academic probation is given to all students

who are found responsible for an Honor Code violation at Belmont, regardless of whether the

matter is adjudicated by Briscoe, the Honor Council, or a faculty member. (Doc. No. 69-1 at 24.)

Briscoe placed Doe on academic probation and instructed him to write a responsive essay. (Doc.

No. 51 at ¶ 93.) This was consistent with punishment Briscoe had imposed on other students in

similar circumstances. (Id. at ¶ 94.) Doe appealed Briscoe's determination regarding the Honor

Code violations, but the findings and sanctions were upheld after an independent review. (Id. at ¶

95.)

### 8. After Doe's One-Semester Suspension

Doe received full credit for the Fall 2016 semester at Belmont. (Doc. No. 71-1 at 61.)

However, Doe did not apply to return to Belmont after his one-semester suspension. (Id. at 62.)

As a result, his transcript was marked as "administratively withdrawn." (Id. at 63.) Doe and his

father understood that his transcript did not reflect that he had been disciplined for a Title IX

infraction. (Id. at 63-64. Doe applied for and was accepted to the University of Tennessee at

Chattanooga subject to probation.[30] (Doc. No. 51 at ¶ 98.) Doe's family did not inquire as to

whether there was any opportunity to take steps to be relieved of probation after he was enrolled.

(Doc. No. 63-8 at 4.) Doe testified that he could have "continued [his] education there, obtained a

---

[29] Discovery in this case has shown that in the previous year (2015), on two different occasions, Doe had similar Facebook exchanges with students regarding assisting students in some capacity for a fee. (Doc. Nos. 51 at ¶ 91; 71-15; 71-16 at 2.) Doe also maintains that those incidents were misunderstood. (Doc. No. 71-1.)

[30] Doe had investigated other schools, but he did not follow through with the applications. (Doc. No. 71-1 at 62-63.)

degree in whatever subject matter [he] chose to study, and graduated and gone on about [his] career." (Doc. Nos. 51 at ¶ 98; 71-1 at 64.) In April of 2017, however, Doe decided to instead accept full-time employment with Dell Computers, which he obtained "pretty quickly." (Doc. Nos. 51 at ¶ 99; 71-1 at 64.) He became an account manager and overperformed on commissions during the first year. (Doc. No. 71-1 at 65.) In May 2018, Doe moved to AbTech Technologies, a Dell re-seller, at a higher base salary and continued commission structure. (Id. at 65.) While Doe is still upset about how Belmont handled his case and that he did not graduate from that university on schedule with his friends, he testified that he makes enough money to provide for his needs; he has friends with whom he goes out and has a good time; and he enjoys life activities such as flying, kayaking, and photography. (Id. at 65-68.)

    B.    Legal Standard

    In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely

colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-252 (1986). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." <u>Hill v. White</u>, 190 F.3d 427, 430 (6th Cir. 1999) (citing <u>Anderson</u>, 477 U.S. at 247-49).

        C.     <u>Discussion</u>

Belmont moves for judgment as a matter of law on all remaining claims. Doe resists the motion. As this Court has explained before, the law does not allow the Court here to retry the university's disciplinary proceedings. It is not the role of the federal courts to set aside decisions of school administrators just because the court might view them "as lacking in wisdom or compassion." <u>Plummer v. Univ. of Houston</u>, 860 F.3d 767, 772 (5th Cir. 2017). It is not even a court's role to "advocate for best practices" in university discipline. <u>Yu v. Vassar College</u>, 97 F.Supp.3d 448, 461 (S.D.N.Y. 2015). Furthermore, this is not a lawsuit between Doe and Student S. Accordingly, the Court is not asked to make an independent determination about what happened between them. <u>See</u> <u>Pierre v. Univ. of Dayton</u>, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) (noting that "the issue before this Court is not whether the [university] should have believed a certain party's version of events"). Bearing this in mind, the Court addresses Doe's remaining claims in turn.

        1.     <u>Count III – Title IX Retaliation</u>

Title IX was enacted to supplement the ban on discrimination in the Civil Rights Act of 1964, and it is designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. <u>Bonnell v. Lorenzo</u>, 241 F.3d 800, 810 n.6 (6th Cir. 2001); <u>Schaumleffel v. Muskingum Univ.</u>, Case No. 2:17-cv-463, 2018 WL 1173043, at *12 (S.D. Ohio Mar. 6, 2018).

It states that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance. . . . " 20 U.S.C. § 1681(a). Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available. Klemencic v. Ohio St. Univ., 263 F.3d 504, 510 (6th Cir. 2001). In Jackson v. Birmingham Board of Education, the Supreme Court held that "[r]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" 544 U.S. 167, 193 (2005) (quoting Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 642 (1999)).

Title IX retaliation claims are generally analyzed using the same standards as Title VII retaliation claims. Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 673 (6th Cir. 2013), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013); see also Nelson v. Christian Bros. Univ., 226 F. App'x 448, 454 (6th Cir. 2008) ("Generally, the courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims.") A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. Spengler v. Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010). Where a plaintiff relies on indirect (i.e., circumstantial) evidence, the familiar McDonnell Douglas burden-shifting framework applies. Fuhr, 710 F.3d at 673; Fuller v. Mich. Dep't of Transp., 580 F. App'x 416, 423 (6th Cir. 2014). To establish a prima facie case of Title IX retaliation, a plaintiff must show that 1) [he] engaged in a protected activity under Title IX; 2) this activity was known to the defendant; 3) the defendant, thereafter, took an adverse school-related action against [him]; and 4) a causal connection exists between the protected activity and the adverse school-related action. Fuhr, 710 F.3d at 674; Gordon

29

v. Traverse City Area Pub. Schs., 686 F. App'x 315, 320 (6th Cir. 2017); Univ. of Tenn., 186 F.

Supp. 3d at 809 (citing Varlesi v. Wayne State Univ., No. 14-1862, 643 F. App'x 507, 2016 WL

860326 (6th Cir. March 7, 2016)); Doe v. Rutherford Cty., Tenn. Bd. of Educ., No. 3:13-00328,

2014 WL 4080163 (M.D. Tenn. Aug. 18, 2014). If a plaintiff succeeds, the defendant may rebut

that presumption by "articulating some legitimate, nondiscriminatory reason for its action." Fuhr,

710 F.3d at 674 (quoting Spengler, 615 F.3d at 492). Should the defendant do so, the burden shifts

back to the plaintiff to undermine the defendant's proffered reason as pretextual. Id.

      Belmont contends that it is entitled to summary judgment because Doe has not established

any of the elements of a *prima facie* case of Title IX retaliation. Doe responds that he has "easily"

met the requirements.[31] The Court begins with the first element of the *prima facie* case – engaging

in a protected activity. Doe's retaliation claim is *solely* premised upon the theory that he was

punished, by means of collateral violations, for "defending himself" against Student S.'s sexual

misconduct charges during Belmont's Title IX investigation. (See Doc. No. 1 at ¶¶ 138-143.)

However, in stark contrast to merely defending oneself against charges as a participant in a sexual

---

[31] Belmont contends that the conclusion Doe requests the factfinder draw from his evidence – i.e., moving from a generalized assertion of punishment for defending himself to a specific demonstration of a retaliatory motive under Title IX – requires making inferences. (See Doc. No. 45 at 8-9.) Direct evidence of retaliation does not require a factfinder to draw any inferences to conclude that unlawful retaliation was a motivating factor in an adverse action. Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 544 (6th Cir. 2008); DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal quotations omitted). Thus, to be considered direct, Doe's evidence must establish not only that Belmont had a predisposition to retaliate, but also that it acted on that predisposition. DiCarlo, 358 F.3d at 415. For example, a school administrator's express statement of a desire to retaliate against students due to their complaints of unequal treatment on the basis of sex could be direct evidence of retaliatory intent. Doe's evidence, however, clearly requires drawing inferences. It would require the jury to infer that Belmont intended to retaliate against him because he was a male who defended himself in a sexual misconduct investigation and that it acted upon that alleged intent by punishing Doe simply because he did so. This is particularly so where Belmont has offered multiple non-discriminatory reasons for its actions. The Court therefore proceeds under the Mc-Donnell Douglas framework governing indirect evidence.

misconduct investigation, the "protected activity" that forms the basis of a Title IX retaliation claim is actively complaining of or opposing alleged discrimination on the basis of sex under Title IX. See Jackson, 544 U.S. at 183 (explaining that claims under Title IX are appropriately brought by individuals who have been retaliated against "because they complain of sex discrimination"); Doe v. Univ. of Tenn., 186 F. Supp. 3d 788, 809 (M.D. Tenn. 2016) ("The Supreme Court has recognized a retaliation claim under Title IX for individuals who are retaliated against by Title IX funding recipients for complaining of Title IX violations.") (citing Jackson); Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist., 727 F. Supp. 2d 657, 666-67 (S.D. Ohio 2010) ("Title IX prohibits retaliation against persons who complain of sex discrimination."). Doe has offered no authority for the novel proposition that defending himself against allegations of sexual misconduct, in and of itself, is the legal equivalent of opposing or complaining of unlawful practices under Title IX. If this were the law, every respondent in a Title IX investigation would have a baked-in retaliation claim simply because they resisted an allegation of sexual misconduct. Indeed, merely defending an allegation of misconduct is as different from actively opposing or complaining of unlawful discrimination as day is to night; the former involves affirming that one has not committed wrongdoing, while the latter rests on the notion, real or perceived, that one has been on the receiving end of or has opposed wrongdoing in the form of illegal discrimination.

Here, Doe's retaliation claim does not allege that he complained to anyone about discrimination on the basis of sex prior to or during the sexual misconduct investigation, and the summary judgment record is devoid of evidence of this requisite protected activity. To the contrary, Doe was, broadly speaking, satisfied with the Title IX process followed by Belmont.

31

(Doc. No. 71-1 at 12.)[32] (Id.) Critically, Belmont exonerated Doe on the sexual misconduct charges. Doe testified during his deposition that this finding was not based on any faulty process or procedure, and that Belmont looked at all the evidence. (Id. at 18-19.) Doe was only punished by Zlock for Deceptive Behavior Policy and visitation policies violations that arose during the investigation. Regarding the Deceptive Behavior Policy violation, Doe testified at his deposition that he "d[id]n't dispute the process," only the substantive findings. (Id. at 59). In short, there is no evidence from which a jury could conclude that Doe was engaged in the protected activity of complaining about unlawful discrimination on the basis of sex under Title IX and was retaliated against as a result.[33] Furthermore, any general complaints Doe might have had about the handling of his investigation are not the equivalent of specific complaints about unlawful discrimination on the basis of sex under Title IX. See Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989) (opposition in the form of a mere "vague charge of discrimination" is insufficient); Braun v. Ultimate Jetcharters, LLC, 828 F.3d 501, 511 (6th Cir. 2016) (observing that general "complaints to management" do not constitute protected activity when the plaintiff

---

[32] When asked at his deposition if Zlock described the "process that would be followed during the course of th[e] investigation," Doe responded, "Yes." (Doc. No. 71-1 at 12.) When asked if that process was "consistent with what [he] had read in the [S]exual [M]isconduct [P]olicy," Doe responded, "Yes." (Id.) And when asked if that was, "in fact, the process that was followed to the best of your recollection," Doe responded, "the general framework of the investigation was pretty much how I expected it." (Id.) Doe further testified that, other than in one instance when he did not receive an extension of time to take an accounting test and another instance when the interview of Student T. was delayed but ultimately conducted and included as part of the investigation, there was no other process or procedure that he requested in the course of the investigation that he did not receive. (Doc. No. 71-1 at 14.)

[33] This conclusion does not differ even if the assertion is that *Briscoe* retaliated against Doe. First, there is no record evidence that Briscoe was involved in the Title IX investigation. Second, there is no record evidence that Zlock influenced Briscoe's separate disciplinary processes. Finally, and most importantly, there is no record evidence that Doe complained of discrimination of the basis of sex to Briscoe or in connection with Briscoe.

does not "object[] to discriminatory conduct" under relevant laws); Pastura v. CVS Caremark, No. 1:11-cv-400, 2012 WL 6738660, *10 (S.D. Ohio Dec. 31, 2012) (holding that an employee's verbal complaints that he suffered "discriminatory" discipline and that he felt "harassed" and "treated differently" were merely "vague protests").

Doe unsuccessfully attempts to rely on the "zone of interest theory" espoused in Ollier v. Sweetwater Union High School District, 768 F.3d 843, 866 (9th Cir. 2014), which in turn cites to Thompson v. North American Stainless, LP, 562 U.S. 170, 131 (2011). Invoking this authority, Doe argues that a retaliation claim may be viable when there is a nexus between a student and the university such that the student lies within the "zone of interest." These cases, however, are not applicable here. Sweetwater and Thompson only permit zone-of-interest recovery for plaintiffs who are so closely associated with the person who in fact engaged in the protected activity such that the court could find that the protected activity was the plaintiff's own or that the retaliation against the plaintiff was intended to actually harm that person. Univ. of Tenn., 186 F. Supp. 3d at 809 n. 16. In Sweetwater, for example, female athletes alleged unequal treatment and the defendant retaliated by firing their coach, who had advocated on the students' behalf. See Sweetwater, 768 F.3d at 866-67 (finding that members of a women's high school softball team suffered judicially cognizable injuries flowing from the school's retaliatory responses to Title IX complaints made by the coach on the students' behalf); see also Thompson, 562 U.S. at 867-69 (allowing a retaliation claim by a plaintiff who was fired because his fiancée, who was also his coworker, engaged in protected activity and firing him was intended to harm her). Doe cannot seriously contend to have been in analogous circumstances because he did not make any underlying Title IX complaints (such as students arguing disparate treatment) and he did not raise complaints on

33

behalf of others with whom he had a close relationship. The zone-of-interest theory would therefore not apply to save Doe's retaliation claim.

The Court's inquiry ends there. But the Court notes that, even if it were to assume, *arguendo*, that Doe engaged in a protected activity, the retaliation claim would also fail because Doe cannot satisfy the fourth element of the *prima facie* case – establishing the requisite causal connection between his protected activity and the adverse action. Prior to 2013, it was clearly the law in this Circuit that a causal connection could be established when a plaintiff proffers "evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." Fuhr, 710 F.3d at 675 (quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009)). In 2013, the Supreme Court decided Nassar and enunciated the now-familiar "but-for" causation requirement for Title VII retaliation claims. The Supreme Court justified its decision in part by explaining that "*[u]nlike Title IX*, § 1981, § 1982, and the federal-sector provisions of the ADEA, Title VII is a detailed statutory scheme . . . [that] enumerates specific unlawful employment practices." Nassar, 570 U.S. at 356 (emphasis added). It further distinguished Title IX's "broadly written general prohibition on discrimination" from Title VII's "greater detail [with respect to] the conduct that constitutes discrimination." Id. at 357 (citing Jackson, 544 U.S. at 175). Because of the specificity of Title VII, the Court concluded that it could not draw inferences to allow anything short of a "but-for" causation standard for retaliation claims brought thereunder. Id. at 356-362. However, the Supreme Court has not resolved the question of precisely how Nassar applies to a Title IX retaliation claim. See Feminist Majority Found. v. Hurley, 911 F.3d 674, 695 n.10 (4th Cir. 2018). Nor have the Courts of Appeals conclusively resolved this issue. See, e.g., Varlesi, 643 F. App'x at 518 (Sixth Circuit observing that "Nassar, a Title VII case, went to some lengths to differentiate Title VII from Title IX," and assuming without deciding that Nassar applies

to Title IX retaliation claims because the jury instruction at issue was sufficient under Nassar); Burton v. Bd. of Regents of Univ. of Wis. Sys., 851 F.3d 690, 695 (7th Cir. 2017) (asserting, without discussion or explanation, that Nassar applies to Title IX retaliation claim); Gordon, 686 F. App'x at 320 (Sixth Circuit, after Nassar, applying pre-Nassar explanation of causation from Fuhr to Title IX retaliation claim); Lininger v. St. Marys City Sch. Dist. Bd. of Educ., Case No. 3:16-cv-2853, 2019 WL 188050, at * 7-8 (N.D. Ohio Jan. 14, 2019) (after Nassar, applying pre-Nassar explanation of causation from Fuhr to Title IX retaliation claim).

Assuming without deciding that Nassar's but-for standard applies, there is simply no evidence to support the conclusion that Belmont punished Doe "because" he defended himself as a respondent in a sexual misconduct inquiry. Indeed, this theory of causation defies logic. Four things are clear from the record: (1) Belmont cleared Doe in the Title IX investigation; (2) Doe was generally satisfied with the investigatory process employed by Belmont; (3) Belmont was within its authority, per the Bruin Guide's pre-emption clause, to sanction Doe for collateral violations regardless of the outcome of the Title IX charges; and (4) the investigation provided sufficient evidence from which Belmont could conclude, by a preponderance standard, that (a) Doe and Student S. engaged in multiple visitation violations and (b) Doe was deliberately deceptive during the investigation. Zlock clearly delineated the collateral violations in the well-supported Determination Letter. Doe simply has not put forth evidence that Zlock sought to punish him for *anything* other than the cited violations, let alone "because of" Doe's Title IX defense.[34] Notably, this same fundamental flaw would doom Doe's case for causation even if the Court applied only the more forgiving "substantial factor" test; for the same reasons, there is no evidence

---

[34] This is even more clearly the case for the far more attenuated discipline Doe received from Briscoe for parallel Code of Conduct violations, because Briscoe was not even involved in the Title IX investigation.

35

from which a reasonable jury could conclude that Doe's decision to defend himself against sexual misconduct charges was even the "likely" cause of the collateral violation discipline.

It is not clear exactly what Doe argues to try to establish causation under any legal test.[35] Indeed, at his deposition Doe, despite the fourteen-page Determination Letter, testified that he had "no idea" why Belmont disciplined him. (Doc. No. 71-1 at 59.) But, as Belmont indicates, it appears that Doe may implicitly contend that the temporal proximity of the Title IX investigation and his punishment for the collateral violations is satisfactory. It is true that, in certain circumstances, temporal proximity between events can be close enough in time to constitute sufficient evidence of a causal connection for the purposes of the *prima facie* retaliation case. See Montell v. Diversified Clinical Servs., 757 F.3d 497, 505-06 (6th Cir. 2014) (citing Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)). However, the timeline of events can also extinguish any inference based on temporal proximity. Wasek v. Arrow Energy Servs., 682 F.3d 463, 472 (6th Cir. 2012). Here, the Deceptive Behavior Policy and visitation policy violations were obvious "intervening legitimate reasons" for Belmont to discipline Doe that "dispel[led] an inference of retaliation based on temporal proximity." Id.; see also Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010) (holding that an intervening "obviously nonretaliatory basis" for the adverse action is evidence negating temporal proximity). Accordingly, Doe cannot rely solely on temporal proximity. Setting that aside, he has put forth no other evidence to support the inference that the discipline issued to him for violating the Deceptive Behavior Policy and

---

[35] In this section of his opposition brief, Doe discusses the "damage" the he has encountered as a "direct and proximate cause" of Belmont's retaliation. (See Doc. No. 50 at 15.) This is not the relevant legal analysis.

visitation policies was punishment for defending against sexual misconduct claims as opposed to being untruthful or breaking dorm visitation rules.[36]

For all these reasons, Belmont is entitled to summary judgment on Doe's Title IX retaliation claim.

### 2.   Count II - Promissory Estoppel

The Court previously dismissed all of Count II except for a claim based Paragraphs 47 and 131 of the Complaint. That part of the Complaint contains an allegation that "Doe was assured the visitation violation would not be considered or intermingled with the [sexual misconduct] charge by Zlock and yet Zlock specifically mentions visitation violations in her [D]etermination [L]etter and bases her discipline on alleged visitation infractions[,]" and that, as a result, Zlock improperly sanctioned Doe for alleged actions he was not charged with.[37] (Doc. No. 1 at ¶¶ 47, 131.) The Court held that discovery was appropriate concerning whether the promise occurred, and, if so, whether it verged on "actual fraud"; whether Belmont obtained an unconscionable advantage in the investigation by its actions, and whether Doe relied on the promise to his detriment. (Doc. No. 40 at 29.) Belmont now contends that discovery has failed to identify any evidence to create a dispute of fact regarding these issues.

A claim for promissory estoppel in Tennessee, also known as "detrimental reliance," has three elements: "(1) a party made a promise which the promisor should reasonably have expected

---

[36] Again, even if the claim were that *Briscoe* retaliated against Doe, it would likewise fail on causation grounds as well, because each of the three Code of Conduct violations for which Briscoe disciplined Doe was independently reported to her by university employees. These intervening reports dispel reliance on the temporal proximity of Briscoe's actions to the Title IX investigation.

[37] Paragraph 47 specifically refers to the visitation violation that arose during the sexual misconduct investigation. (Doc. No. 1 at ¶¶ 45-46.) Paragraph 131 refers to all of the violations for which Doe was sanctioned by Zlock (id. at ¶ 131), which include both the Deceptive Behavior Policy and the visitation policies violations punished in the Determination Letter.

37

to induce the action or forbearance of the promisee; (2) the promise does induce that action or forbearance; and (3) injustice can be avoided only by enforcing the promise." Sifuna v. S. Coll. of Tenn., No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018) (citing Atria v. Vanderbilt Univ., 142 F. App'x 246, 256 (6th Cir. 2005); Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citation omitted)). Tennessee does not liberally apply the doctrine of promissory estoppel and limits its application to exceptional cases "verging on actual fraud." Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003). The key element, of course, is the promise. Chavez v. Broadway Elec. Serv. Corp., 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007); Amacher v. Brown-Forman Corp., 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991). "It is the key because the court must know what induced the plaintiff's action or forbearance[.]" Amacher, 826 S.W.2d at 482. Doe must at least raise a dispute of fact over whether a promise was made, and the promise must be "unambiguous." Jackson v. CitiMortgage, Inc., No. W2016-00701-COA-R3-CV, 2017 WL 2365007, at *8 (Tenn. Ct. App. May 31, 2017) (internal citations omitted).

As discussed above, Doe testified that, at the outset of the investigation, Zlock encouraged him to read the provisions of the Sexual Misconduct Policy and explained that the process that would be followed during the investigation would be consistent with it. Specifically, the Sexual Misconduct Policy pre-empts the general accountability process such that it allows for punishment of collateral violations that arise during the investigation. (Doc. No. 21-2 at 12.) Doe testified during his deposition that he found the process that Belmont used to be consistent with the Sexual Misconduct Policy. At no time during his deposition did Doe mention any promise by Zlock or another Belmont official that the pre-emption clause would not apply in Doe's case and that he would be exempted from consideration of collateral violations that arose during the investigation

38

of sexual misconduct charges. In short, Doe has put forth no evidence that Zlock (or anyone else at Belmont) made an unambiguous, explicit promise that Deceptive Behavior Policy or visitation policy violations that came to light during the sexual misconduct investigation would not be considered for punishment.[38] Because the record is devoid of evidence that the alleged unambiguous, enforceable promise was made to Doe, his own admissions are sufficient for the Court to conclude that no reasonable inference based on the evidence would lead a rational trier of fact to infer the promises asserted by Doe. See Jackson, 2017 WL 2365007, at *9 (granting summary judgment where plaintiff's admissions established that no explicit promise was made).

The Court need go no further, but it notes that Doe's promissory estoppel claim would fail for other reasons as well. Because Doe acknowledged that (1) he was informed about the Sexual Misconduct Policy and encouraged to read it, and (2) Belmont followed that policy during its investigation, Doe cannot establish a question of fact regarding whether he relied on any promise to his detriment. Also regarding detrimental reliance, Doe was expected to participate in the sexual misconduct investigation and be truthful regardless of whether collateral violations might become a concern. In other words, Doe has not articulated any purported "reliance" on Zlock's alleged promise other than the participation and truthfulness in the investigation that was otherwise required.

In addition, Doe has not established a question of fact regarding the detriment he allegedly suffered, which must have been a substantial economic harm. Atria, 142 F. App'x at 256-57. As discussed in the Court's prior Memorandum Opinion, Doe claims impermissibly speculative damages related to educational opportunities, career prospects, and future earnings. (Doc. No. 40

---

[38] Nor is there record evidence of any kind that any promise was made to Doe that Briscoe would not consider other, unrelated Code of Conduct violations during the same time frame that the Title IX investigation was ongoing.

39

at 26.) The summary judgment record is of no help to Doe on this point. Belmont suspended Doe for one semester with the ability to re-enroll; assigned institutional probation and loss of co-curricular organization leadership positions; and issued a permanent no-contact order. It was Doe's decision to not return to Belmont. Doe was admitted to the University of Tennessee at Chattanooga, but he chose not to enroll there. According to Doe, he then had little difficulty securing two different positions in the information technology field. On this record, no reasonable jury could conclude that Doe has suffered substantial economic harm as a result of Belmont's alleged (but unproven) promise.

Doe's opposition focuses at length on the alleged interplay between visitation violations addressed by Briscoe and visitation violations addressed by Zlock in the Determination Letter. Doe argues that it was only in Zlock's deposition, for the first time, that she asserted that the visitation violations for which she punished Doe in the Determination Letter were different from those considered by Briscoe. (See Doc. No. 50.) This is unpersuasive for two reasons. First, Doe appears to offer this argument based on the revised position that Belmont's explicit promise was only "to be fair" in the investigation. (Id. at 16.) But where, as here embodied in the Bruin Guide, there is a valid contractual relationship, Tennessee courts only recognize a claim for promissory estoppel in limited cases where the alleged promise operates to expand the terms of a contract. Thomas Energy Corp. v. Caterpillar Fin. Servs. Corp., No. E2014-00226-COA-R3-CV, 2014 WL 7366676, at *7 (Tenn. Ct. App. Dec. 26, 2014) (citing Bill Brown Const. Co. v. Glen Falls Co., 818 S.W.2d 1, 11-12 (Tenn. 1991)). Because the Bruin Guide promises a fair investigation, Zlock's promise to be fair did not "expand" the term of the relationship between Doe and Belmont such that it may form the basis of Doe's promissory estoppel claim. Second, this argument is simply not supported by the record. As discussed above, Belmont has established that: (1) Briscoe and

40

Zlock considered different visitation violations and were not involved in the substantive determinations of each other; (2) Zlock's Determination Letter references visitation violations that arose during the sexual misconduct investigation (based on the parties' statements and e-mails) and are different than those considered by Briscoe; (3) Zlock testified that the visitation violations she addressed in the Determination Letter were the ones she found through the course of the sexual misconduct investigation; and (4) Briscoe testified that the visitation violations she addressed were not part of the sexual misconduct investigation. Doe has not raised any serious challenge to these facts. Moreover, the primary collateral violation for which Doe was punished in the Determination Letter was his violation of the Deceptive Behavior Policy – something Doe does not even suggest that Briscoe was involved with at all.

Accordingly, Belmont is entitled to summary judgment on Doe's remaining promissory estoppel claim.

3. Counts V and VII – Negligence and Gross Negligence

Under Tennessee law, a *prima facie* case for negligence includes the following five elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. Merhson v. HPT TA Props. Tr., No. M2018-00315-COA-R3-CV, 2018 WL 5793564, at *2 (Tenn. Ct. App. Nov. 5, 2018) (quoting Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000)). For gross negligence, a plaintiff must establish the elements of negligence, plus the additional element that the act in question was "done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Thrasher v. Riverbend Stables, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *5 (Tenn. Ct. App.

41

May 21, 2008) (quoting <u>Ruff v. Memphis Light, Gas, and Water Div.</u>, 619 S.W.2d 526, 528 (Tenn. Ct. App. 1981)).

However, where the alleged "breach of duty" that a plaintiff alleges occurred is a breach of contractual obligations, regardless of whether the defendant was negligent in attempting performance, "the action remains in contract."[39] <u>Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n</u>, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (dismissing negligence claims because alleged damages arose from breach of contractual relationship and stating "the alleged claim for negligence sounds in contract, and dismissal was proper"); <u>see also</u> <u>Harvest Corp. v. Ernst & Whinney</u>, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980) ("[I]t matters not a whit whether the breach was an intentional one or an unintentional one caused by negligence in attempting to perform. The action still remains in contract."); <u>America's Collectibles Network, Inc. v. Sterling Commerce (America), Inc.</u>, Case No. 3:09-cv-143, 2016 WL 9132294, at *19 (E.D. Tenn. Sept. 7, 2016) ("Under Tennessee law . . . [w]here the only duty alleged arises from a contractual obligation, its breach cannot form the basis of a parallel negligence claim."); <u>Williams v. SunTrust Mort., Inc.</u>, No. 3:12-CV-477, 2013 WL 1209623, at *4 (E.D. Tenn. Mar. 25, 2013) ("[W]hen two parties enter into a contractual agreement, their obligations to each other arise out of the contract itself, so that a violation of the contractual duty supports an action in contract rather than in tort.") (citing <u>Permobil, Inc. v. Am. Express Travel Related Servs., Inc.</u>, 571 F. Supp. 2d 825, 842 (M.D. Tenn. 2008) ("[I]f the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence

---

[39] This limitation arises from the idea that, where two parties enter into a contractual arrangement, their obligations to each other generally arise only out of the contract itself. <u>Thomas & Assocs., Inc. v. Metro. Gov't of Nashville</u>, No. M2001-00757-COA-R3-CV, 2003 WL 21302974, at *6 (Tenn. Ct. App. June 6, 2003).

action.")) (other citations omitted). Thus, where a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, "the first element of the tort claim fails." Silvestro v. Bank of Am., N.A., No. 3-13-0066, 2013 WL 1149301, at *4 (M.D. Tenn. Mar. 19, 2013).

In the Complaint, Doe alleges that Belmont had a duty of care to conduct the Sexual Misconduct Policy accountability process "in a non-negligent way" and "failed to perform that duty." (Doc. No. 1 at ¶¶149-151; 159-161.) In his opposition brief, Doe reiterates this theory of liability and states that his negligence and gross negligence claims are based upon Belmont's duty to "uniformly enforce and apply its Sexual Misconduct Policy." (Doc. No. 50 at 18.) Doe has not identified through discovery any additional duty that Belmont allegedly owed him beyond the obligations set forth in the Bruin Guide and Sexual Misconduct Policy. As discussed in the Court's prior Memorandum Opinion, the Bruin Guide and Sexual Misconduct Policy reflect that they are the source of Belmont's contractual obligations to Doe relevant to this case. (See Doc. Nos. 40 at 7-9; 21-2.). Because Doe has not identified a source of duty outside the contractual relationship established by the Bruin Guide and Sexual Misconduct Policy, his negligence and gross negligence claims are an impermissible attempt to recast his (dismissed) contractual claims in the language of tort. See, e.g., Silvestro, 2013 WL 1149301, at *4 (dismissing negligence claims because plaintiff had not identified duty outside of contractual relationship); Valente v. Univ. of Dayton, 438 F. App'x 381, 387 (6th Cir. 2011) (under similar Ohio law, affirming dismissal of student's negligence claims because university's alleged duties arose from contractual obligations embodied in Honor Code and the tort claims mirrored the bases of student's breach of contract claim); Schaumleffel, 2018 WL 1173043, at *18 (under similar Ohio law, explaining that "Plaintiff's negligence claim based upon a duty arising from Muskingum's Policies is barred because the

43

alleged duties are contractual duties, not separate and independent duties created by common law that would exist even if no contract existed").

Even assuming, *arguendo*, that Doe could avoid that problem, he still cannot succeed in advancing this claim. Assuming a university owes every student a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm, Atria, 142 F. App'x at 251 (citing Burroughs v. Magee, 118 S.W.3d 323, 329 (Tenn. 2003)), the Court considers whether there is record evidence that Belmont acted in a manner that "pose[d] an unreasonable and foreseeable risk of harm" to Doe. Id. The risk is unreasonable "if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." Id. (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)); Doe v. Univ. of the South, No. 4:09-cv-62, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011).

Belmont contends that Doe has not raised a question of material fact regarding whether Belmont's conduct during the investigation posed an unreasonable risk of harm. Specifically, Belmont argues that the record reflects that the process it used to conduct the investigation was "thorough, transparent, and entirely consistent with the process set forth in the Bruin Guide." (Doc. No. 45 at 21.) As discussed herein, Doe testified during his deposition that the process that Zlock explained was consistent with the Sexual Misconduct Policy.[40] (Doc. No. 71-1 at 12.) Doe testified that the "general framework of the investigation was pretty much how [he] expected it." (Id.) Even

---

[40] The only actual problems with implementation of the accountability process that Doe could identify at his deposition were (1) a problem rescheduling an accounting test, which was both *de minimis* and not in Zlock's full control, and (2) a delay in interviewing Student T., which Belmont rectified. (Doc. No. 71-1 at 12-14.) Doe also testified that there may have been one or more occasions where he needed more time to respond during the investigation, but he could not recall ever not being given more time to respond. (Id.)

44

when asked about the process that Zlock had used to find him responsible for the collateral Deceptive Behavior Policy violation, Doe responded, "*[h]onestly, I don't dispute the process*. I disagree with their *findings*." (Doc. No. 71-1 at 59 (emphasis added).) Belmont's Determination Letter, appeals determinations, declarations and deposition testimony all establish that the university followed the Sexual Misconduct Policy accountability process set forth in the Bruin Guide. Furthermore, Zlock's choice of sanctions was within a range of discretionary punishments allowed by the Sexual Misconduct Policy accountability process. As is particularly clear from Doe's deposition testimony, he merely believes that he did not *substantively merit* the sanctions for the collateral violations:

> Q.    And is there a specific area in which they did not exercise the care you feel like they should have that forms the basis for your claim?
> A.    Yes, sir, with the sanctions that they assigned me.
> Q.    You feel like those sanctions were not merited?
> A.    Correct.
> Q.    . . . Is there any other specific breach of care that you contend Belmont engaged in regarding your negligence claim?
> A.    No, sir, not that I can think of.

(Id. at 62.) Of course, showing mere disagreement with Belmont's preponderance-of-the-evidence substantive conclusions is a far cry from raising a question of material fact regarding whether Belmont was negligent in its duty of care to implement the Sexual Misconduct Policy accountability process in a non-negligent manner.

In sum, because they are wholly dependent upon the Bruin Guide, Doe's negligence and gross negligence claims are an impermissible second bite at the apple of contract claims dismissed from this action. Just as importantly, Doe has not raised a question of fact about whether Belmont breached its duty of care by applying the Sexual Misconduct Policy to him in a manner that posed

an unreasonable risk of harm.[41] Belmont is therefore entitled to summary judgment on these claims.

### 4.  Count VI – Negligent Infliction of Emotional Distress

The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, as well as the additional requirement that a plaintiff must prove that a defendant's conduct caused a serious or severe emotional injury. Rogers v. Louisville Land Co., 367 S.W.3d 196, 206 (Tenn. 2012) (citations omitted). A serious or severe injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Id. at 210. "[T]oo much trivial or modest emotional disturbance occurs in modern life for the law to attempt to provide universal peace of mind," and the severe mental injury component helps "to avoid the judicial system being flooded with potentially fraudulent, manufactured, or overstated claims arising from the transient and trivial emotional distress of daily life[.]" Foster v. Aramark, No. 3:13-516, 2014 WL 1961245, at *7 (M.D. Tenn. May 14, 2014) (internal quotation marks and citation omitted). As the Tennessee Court of Appeals pointed out in Brown v. Mapco Express, Inc., "in the elements that must be established for a claim of negligent infliction of emotional distress, the requirement that the stimulus conduct be extreme and outrageous is interwoven with the 'reasonable person' component of the element of serious or severe emotional injury." 393 S.W.3d 696, 706 (Tenn. Ct. App. 2012). "In effect, the plaintiff must prove that the conduct giving rise to his claim was so

---

[41] As discussed in the portion of this opinion dealing with the Motion to Strike, the Court is not considering Doe's late-raised theory regarding "alternate versions" of the Bruin Guide, which, in any event, would only be relevant if Doe could circumvent the limitation on recasting contract claims in tort.

46

extreme and outrageous that it would have caused a reasonable person to suffer serious or severe emotional injury." Id.

Belmont is entitled to summary judgment on this claim for the same reasons described above concerning Doe's failure to raise a question of material fact about Belmont's breach of any duty. In other words, because Doe has no viable negligence claim, he also has no viable negligent infliction of emotional distress claim. Doe's claim also fails as a matter of law because "the 'reasonable person' component of the emotional injury element of the tort has not been met." Id. at 706. Doe has not offered record evidence to establish a dispute of fact over whether the conduct of Zlock and other Belmont officials of which Doe complains rises to the level of "outrageous." Foster, 2014 WL 1961245, at *8. Belmont has, as discussed, established that Doe – although dissatisfied with the substantive outcome of the investigation regarding collateral violations – was generally satisfied with the investigative process used by Belmont and its consistency with the Bruin Guide.

Doe has also not introduced evidence of severe emotional injury resulting from the one-semester-suspension and related sanctions. Doe testified during his deposition that he has friends, has a social life, has hobbies, and is functioning well in the workplace. When asked to describe his emotional distress, Doe explained that it was distressful "[j]ust whenever I kind of sit down and think about where I could have been right now had all this not come up." (Doc. No. 71-1 at 70.) Doe stated further that it was "really hard" that he was "not going to be getting my degree in May like [his former classmates] will and getting to walk across the stage. Or even just like when they came back on campus and everybody was – last day of school, whatever, those types of things just

47

– each one of them is just a crushing blow to me."[42] (Id.) When asked if there was anything further, Doe responded that there was "nothing specific."[43] (Id.) The Court concludes that "a reasonable person, normally constituted, would be able to adequately cope with the mental stress" as described by Doe. Foster, 2014 WL 1961245, at *8. Accordingly, Doe has simply not "demonstrated severe mental injuries." Am. Nat. Prop. and Cas. Co. v. Stutte, No. 3:11-CV-219, 2015 WL 268994, at *9 (E.D. Tenn. Jan. 21, 2015); see also Rogers, 367 S.W.3d at 211 (finding no serious mental injury where plaintiff, who was mourning the loss of her son, reported being "very, very emotional, very tearful" but, among other things, the Court found she incurred no "significant impairment in her daily functioning"); Vanover v. White, No. 3:07-CV-15, 2008 WL 2713711, at *18 (E.D. Tenn. July 10, 2008) (serious mental injury is evinced by an inability to "cope" with the mental stress caused by the relevant events). As such, it is not necessary to consider whether the conduct alleged here "has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency." See Bryan v. Campbell, 720 S.W.2d 62, 64 (Tenn. Ct. App. 1986).

---

[42] Doe's inability to graduate, even if credited as having an impact upon him, is significantly the result of choices Doe made for himself. Doe was merely suspended from Belmont for one semester for collateral violations with certain limitations upon his return. But Doe's opposition brief paints a curiously different picture of the world than is reflected in his deposition testimony. (See Docs. No. 50 at 21; 71-1.) In it, Doe asserts that he "couldn't go to school, couldn't graduate, couldn't get into another school.…" (Doc. No. 51 at 21.) And yet Doe could have returned to Belmont after one semester. He could have matriculated at UT-Chattanooga after he was accepted. And, because he had approximately 60 credits, Doe could have graduated from either of those institutions before too long.

[43] Doe's opposition brief states that, once he was charged with sexual misconduct, he "saw a psychiatrist and took medication for the first time in his life." (Id.) This assertion has no citation, and it is absent from the parties' statements of facts. Furthermore, without revealing confidential information, this statement appears so at odds with Doe's deposition testimony that it is difficult for the Court to fathom how counsel included it in his brief without explanation. (See Doc. No. 71-1 at 67-70.) Regardless, if this is a belated attempt to establish a dispute of fact regarding Doe's mental state, Doe obviously has not sufficiently cited to the summary judgment record. See Fed. R. Civ. P. 56(c).

48

However, the Court has found nothing in the summary judgment record to suggest that a reasonable jury could find that Belmont's conduct was "extreme or outrageous [ ]or unacceptable in a civilized community." Stutte, 2015 WL 268994, at *9.

Belmont is therefore entitled to summary judgment on Doe's negligent infliction of emotional distress claim.

### 5. Count VIII – Negligent Training and Supervision

The last of Doe's theories is that Belmont injured him through negligent training or supervision of its employees. Under Tennessee law, a negligent training or supervision claim may be maintained by establishing the elements of a negligence claim, plus the additional element that the employer had knowledge of the employee's unfitness for the job. Thompson v. Bank of Am., N.A., 773 F.3d 741, 755 (6th Cir. 2014) (citing Doe v. Catholic Bishop for Diocese of Memphis, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)); Billiter v. SP Plus Corp., 329 F. Supp. 3d 459, 474 (M.D. Tenn. 2018). The Court of Appeals has explained that, "[c]learly, this requires the plaintiff to identify the employee and explain what the employee did that negligently injured the plaintiff." Thompson, 773 F.3d at 775.

This count of the Complaint focuses solely on Molly Zlock. Doe alleged that Zlock "lacked the proper training to carry out her responsibilities" under relevant federal and state law and Belmont University's sexual misconduct policy and "committed negligent, grossly negligent, and intentional tortious acts that caused injury to Plaintiff." (Doc. No. 1 at ¶¶ 164-165.) This claim fails for two main reasons. First, as discussed above, Doe has failed to establish the basic elements of a negligence claim. Even when he frames the purported breach in terms of Zlock specifically, rather than Belmont as an institution, Doe still has neither (1) identified a source of duty that Zlock owed to Doe outside the contractual relationship established by the Bruin Guide and Sexual

49

Misconduct Policy, nor (2) raised a question of fact about whether Zlock, acting on behalf of Belmont, breached a duty of care by applying the Sexual Misconduct Policy to him in a manner that posed an unreasonable risk of harm. Second, and equally important, Doe has not raised a question of material fact regarding the additional required element for this claim – that is, whether Belmont was aware that Zlock was unfit for her job. To the contrary, the record establishes that Zlock was an experienced, licensed attorney in good standing; a level four certified Title IX Coordinator, and an active member of the Association of Title IX Administrators. Doe has made no evidence-based challenge to Zlock's training in the administration and oversight of Title IX investigations. Setting insinuations about Zlock's motives aside, there is no record evidence that would allow a reasonable jury to conclude that Zlock was unqualified for her job or that Belmont had any knowledge of such unfitness before the Doe investigation.[44]

Accordingly, Belmont is entitled to summary judgment on this claim.

III.    Conclusion

The Court has recognized that sexual misconduct investigations on campus raise issues that are important to the community as well as very personal to those whose lives are touched. See Z.J. v. Vanderbilt Univ., No. 3:17-cv-00936, --- F. Supp. 3d ---, 2018 WL 6694866, at *39 (M.D. Tenn.

---

[44] In his opposition brief, Doe shifts gears from the Complaint and argues that it was Zlock's *investigators* who lacked training. (Doc. No. 50 at 21.) The Court will not entertain this new argument because Count VIII of the Complaint, which was very specific to Zlock, did not encompass the investigators and thus did not give Belmont notice to defend against such a claim. See, e.g., Desparois v. Perrysburg Exempted Village Sch. Dist., 455 F. App'x 659, 665-66 (6th Cir. 2012) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (defendant is entitled to be given "fair notice of what the . . . claim is and the grounds upon which it rests")). Regardless, there is no support for this assertion about Doe's investigators in the record, which establishes that Zlock trained and oversaw her personnel. The record further establishes that it was solely Zlock's responsibility to review the evidence. Zlock led and was actively involved in the investigation (e.g., by asking follow-up questions, ordering the text message analysis, etc.), and she alone reached the substantive decisions reflected in the Determination Letter, which were then upheld at two independent levels of appeal.

Dec. 19, 2018). This was a difficult case at the university level. Neither party was satisfied with the outcome. Also, a student was found not responsible for sexual misconduct but responsible for collateral violations of other university policies. However, the Court is not to assume the role of an investigator or to substitute its judgment for that of the academic institution. The Court is only to determine if any of Doe's legal claims should survive summary judgment and be tried to a jury. For the reasons discussed herein, on the record before the Court, the Court concludes that Belmont is entitled to judgment as a matter of law on all of Doe's remaining claims. Belmont's Motion to Strike and Motion for Summary Judgment (Doc. Nos. 44, 60) will be granted and this case will be dismissed.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE